UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEVE HOBART, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-cv-3332 |
| | § | |
| CITY OF STAFFORD, et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is the Motion for Summary Judgment (Doc. No. 32) filed by Defendants City of Stafford ("Stafford"), Jesus Estrada ("Officer Estrada"), and Bonny Krahn ("Chief Krahn") (collectively, "Defendants"); the Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. No. 61) filed by Defendants Stafford and Chief Krahn; and the Motions to Quash Deposition Notices and for Protection from Improper Discovery (Doc. Nos. 46-51, 53) filed by non-parties Stafford City Council (the "Council"), various city council members, and Stafford Mayor Leonard Scarcella (collectively, "Movants"). After considering the parties' arguments and the applicable law, the Court finds that the Motion for Summary Judgment should be granted in part and denied in part, that the Motion to Dismiss should be denied; and that the Motions to Quash Deposition Notices should be denied.[1]

## I.    FACTUAL BACKGROUND

This lawsuit arises from the death of Aaron Hobart ("Aaron"), son of Plaintiffs Steve and Pam Hobart (individually, "Mr. Hobart" and "Ms. Hobart"; collectively, "the

---

[1] The Court does not at this time rule on the Motion to Dismiss or Motion for Summary Judgment with regard to Chief Krahn.

Hobarts" or "Plaintiffs"). Aaron suffered from a schizoaffective disorder, which resulted

in delusions. (Pls.' Ex. 24, Moreland Decl.) Aaron's mental health was deteriorating in

the days, weeks, and months leading up to February 18, 2009. For example, on August

25, 2007, Aaron was arrested for reckless driving, and the arresting officer believed that

Aaron was "experiencing a mental health crisis." (Defs.' Ex. 6, Texas Department of

Public Safety Offense Report, at 1-2.) When the Hobarts went to visit Aaron in jail, he

spoke in an alternate voice—which Mr. Hobart described as "hoarse, whispered," and

"raspy"—and claimed that "he knew all the secrets of the universe," while other people

were "all just ignorant." (Defs.' Ex. 18, Pls.' Ex. 5, Steve Hobart Dep., May 20, 2010, at

24, 29-30, 35-36.)[2] After being transferred temporarily to a mental health facility, Aaron

was prescribed medication for his schizoaffective disorder and released on September 13,

2007. (*See* Defs.' Ex. 19, Pam Hobart Dep., March 23, 2010, at 235, 237.)

Aaron was examined by three doctors during 2008, including two visits with the

third, Dr. C. Scott Moreland, a psychiatrist. (Defs.' Ex. 9, 10, 11, Medical Records.)

Aaron did not visit Dr. Moreland after September 11, 2008, and Dr. Moreland's records

indicate that, contrary to Dr. Moreland's orders, Aaron had stopped taking his Abilify

medication in November 2008. (Defs.' Ex. 9, at 178-79.)[3] On February 16, 2009, Mrs.

Hobart called Dr. Moreland's office to request an immediate appointment, and they

scheduled an appointment for February 18, the next available slot. (*Id.*) Mrs. Hobart said

at that time that Aaron was not posing a danger to himself or to others. (*Id.*) Someone

---

[2] Defendants have provided deposition excerpts with not only irrelevant pages omitted, but indeed with some of the lines omitted on the pages that Defendants did choose to submit. The Court finds the selective provision of lines on a given page quite unhelpful, as it deprives the Court of any context besides that Defendants determine is favorable to their characterization of the facts. Accordingly, the Court hopes that in the future all parties will provide the full context of deposition excerpts, including, at a minimum, the entirety of any page they deem worthy of submission to the Court.

[3] Dr. Moreland's records also indicate that Mrs. Hobart told Dr. Moreland that Aaron had recently visited a psychologist and neurologist. (*Id.*)

from Dr. Moreland's office instructed Mrs. Hobart to call him if there was any change in Aaron's mental status for an earlier appointment, and that if Aaron became a danger to himself or others to call 911 or take him to the emergency room. (*Id.*)

**The Events at Issue**

On February 18, 2009, Aaron refused to leave his room to go to his doctor's appointment. Mr. Hobart came home from work and joined Aaron in Aaron's room, where he found Aaron speaking "belligerently and abusively" in the same raspy alternate voice. (Steve Hobart Dep., at 20-24.) Mrs. Hobart also called Dr. Moreland, who told her not to press Aaron to attend the appointment that day so that Aaron could calm down. (Defs.' Ex. 9, at 183.) Dr. Moreland also sent a follow-up email to Mrs. Hobart giving her instructions on how to administer Aaron's medication, and providing information from the Houston Crisis Intervention Team ("CIT") website regarding how to request emergency help. (*Id.* at 184-85.) The information stated that the CIT program "educates patrol officers about mental illness and tactics and techniques to help verbally de-escalate situations involving individuals in serious mental health crises," that one should call for a CIT officer "[w]hen the situation involves a person in a serious mental health crisis," and that, if the situation is an emergency, one should call 911 and request a CIT officer. (*Id.*) It also noted that "If the person is mentally ill and poses a substantial risk of imminent harm to self or others, Texas Peace officers have the authority to take the individual to a facility for an emergency mental health evaluation, even if the person is involuntary. The officer may use whatever force he needs to get the individual to the facility for evaluation." (*Id.*)

Based on the instructions in Dr. Moreland's email, Mrs. Hobart called 911 and requested a "CIT officer." (Pls.' Ex. 9, Dispatch Transcript, at 1.) She told the 911 operator, "I have a son that needs to be taken," that he was "becoming . . . very violent," and that he was "deteriorate" [sic] and "becoming delusional," but that "he's not hurting anyone," and "needs to be in a hospital" and "needs medication." (*Id.*) The operator informed her that an officer would come to the Hobarts' home. (*Id.*) A few minutes later, a man from the Stafford Police Department ("SPD") called Mrs. Hobart twice with some questions, and Mrs. Hobart informed him that Aaron was "becoming more and more belligerent" but that he did not have any weapons in his room and that he was not "under the influence." (*Id.* at 2-3.) Officers Garcia and Claunch from the SPD were the primary officers dispatched on the call, but Officer Estrada was the first to arrive at the Hobarts' home. (Pls.' Ex. 3, Jesus Estrada Dep, June 3, 2010, at 176-78.)

Officer Estrada testified that, prior to arriving at the home, he was aware that Aaron was hallucinating, but did not know if Aaron was mentally ill or was simply under the influence of drugs. (*Id.* at 138.) Officer Estrada also testified that he believed dispatch had informed him that Aaron did not have a weapon. (*Id.* at 179.) SPD Sergeant Dustin Claborn ("Sgt. Claborn") testified that Officer Estrada asked dispatch to ask Mrs. Hobart to step outside to talk to him when he arrived. (Pls.' Ex. 2, Dustin Claborn Dep., June 4, 2010, at 126.) However, it is undisputed that when Officer Estrada arrived, Mrs. Hobart let him into the house. (*See id.* at 128.) Sgt. Claborn also testified that Officer Estrada did not attempt to learn where Aaron was located or whether he was trying to hurt himself or others. (*Id.* at 127-30.)

The video camera in Officer Estrada's car was running during the events at issue in this case, and both sides have provided that footage as an exhibit. The video shows Officer Estrada enter the Hobarts' home by himself at approximately 15:07:59 on the video's clock. For a period of time only the front yard is visible, with audio from inside the home captured on Officer Estrada's microphone. Immediately after he enters the home, one can hear Officer Estrada conversing with Mrs. Hobart. At approximately 15:08:15, one can hear noises, and Officer Estrada shouts, "Stop!" and "Get back!" several times. At approximately 15:08:20, one can hear gunshots. Officer Estrada then begins shouting, "Goddamnit!" "Shots fired!" and "Oh my god!" and Mrs. Hobart begins screaming loudly. The video then shows two other SPD officers arriving in the house at approximately 15:08:43. They accompany Officer Estrada onto the lawn, where he kneels down with his head on the ground sobbing, and remains panicked during the next seven minutes of video and audio, repeatedly saying, "Oh my god," crying, and stating that he cannot catch his breath.[4]

According to Officer Estrada's testimony, the following occurred in the house: When he first entered, he thought that everything seemed quiet and normal, and "perceived . . . that either the disturbance was over or there was no disturbance." (Estrada Dep., at 208-11, 224-25.) Mrs. Hobart let him in, and the two spoke inside the house. (*Id.* at 209-10.) Officer Estrada then began walking down the hall, at which point Mrs. Hobart pointed town the hall, and Officer Estrada saw Aaron, approximately 30 feet away. (*Id.* at 224-30, 236.) Aaron was in a bedroom, and at first he was facing away from Officer Estrada, not yelling, screaming, or causing a disturbance. (*Id.* at 228.) Aaron then turned

---

[4] At that point, Officer Herman says, "Are you recording?" and it appears that the microphone is moved from Officer Estrada. The video continues to capture the Hobarts' front lawn in the aftermath of the shooting.

and saw Officer Estrada for the first time, at which point he loudly "roared," brought his arms up "from down low to—up to his waist," and began to charge at Officer Estrada. (*Id.* at 228-36.) At that point, Officer Estrada, who was approximately five feet away from the front door of the house, "took a step back trying to back away from him" because he believed Aaron was "going to come at" him. (*Id.* at 233-36.) However, Officer Estrada was unable to get out of Aaron's way or to back out of the house because Aaron traveled the entire length of the hallway and began "attacking" Officer Estrada. (*Id.*) Officer Estrada remembers in those moments "hearing and feeling [] thumps on [his] head" that he attributes to "being punched" on the left side of his face and head. (*Id.* at 252-60.)[5] Officer Estrada attempted to pull out his baton but was unable to because it got stuck in its holster, and was also unable to use his spray or to operate his police radio. (*Id.* at 237-41.) He testified that Aaron hit him to the point where Officer Estrada became "disoriented," began "seeing stars" and "darkness" coming into his vision, and thought he was "fixing to be knocked out." (*Id.* at 257-64.) He then heard the sound of gunshots, but did not know that he was the one doing the shooting, let alone who he was shooting at. (*Id.* at 262-63.) He does not know where Aaron was in relation to him when the shooting occurred, and is not sure where Mrs. Hobart was at the time (though he thinks she was to his left). (*Id.* at 265-68.) A few seconds later, Officer Estrada believed that Aaron was getting back up and felt someone—who he believed to be Aaron—grabbing his vest, so he attempted to shoot his gun again, but could not get his fingers to squeeze the trigger. (Estrada Dep. at 276-77; Pls.' Ex. 4, Statement of Jesus Estrada, at 76.) However, the

---

[5] He testified in his deposition that he was not sure whether he was hit in the face with fists or some type of weapon. (*Id.* at 292-95.)

person grabbing his vest turned out to be one of his fellow SPD officers, who had just entered the house. (Estrada Dep. at 277.)

According to Mrs. Hobart's testimony, the following occurred in the house: When Officer Estrada arrived she "was under the impression that . . . [she] was getting a CIT person that was going to explain that and was going to go through a certain procedure, so [she] was trusting that they knew what was going to happen next." (Defs.' Ex. 19, Pls.' Ex. 6, Pam Hobart Dep., March 23, 2010, at 168.) Aaron ran from out of his bedroom and toward Officer Estrada while "flailing with his arms." (*Id.* at 33-35.) When he reached Officer Estrada, "Officer Estrada had his arms up," and Aaron's arms hit Officer Estrada's arms. (*Id.* at 33-35.) She did not see Aaron's arms hit Officer Estrada's head. (*Id.* at 35.) Although Mrs. Hobart acknowledged that she did not "see every single strike that Aaron made on Officer Estrada, sufficient to tell us where each one landed," she "watched them the entire time," and only closed her eyes after Officer Estrada pulled gun from its holster but before he fired it. (*Id.* at 37-40.) The flailing stopped and "2 or 3 seconds passed" before Officer Estrada began shooting. (*Id.* at 40.) In the few seconds prior to the shooting there was "a separation of 2 or 3 feet" between Aaron and Officer Estrada, and that she had shifted her weight to go between the two, at which point Officer Estrada pulled out his gun. (*Id.*)

Officer Estrada fired six or seven bullets in the Hobarts' home, and four struck Aaron: one in the back of the right upper neck, one in the right lower back, one in the back of the right hip, and one in the right middle back. (Pls.' Ex. 22, Autopsy Report, at 4-6.) Officer Estrada did not have any bruises on his face from the incident, although he did have some redness on his face. (Estrada Dep., at 260; Pls.' Ex. 16-21, Photos of

Estrada's Injuries.) At the time of his death on February 18, 2009, Aaron was nineteen years old, stood five-foot-nine-inches tall, and weighed 166 pounds. (Pls.' Ex. 22, Autopsy Report, at 3.). He was barefoot and dressed in shorts and a t-shirt. (*Id.*) There is no suggestion that he had any type of weapon at that time. Officer Estrada stands six-foot-one-inch tall and weighs 190 pounds. (Estrada Dep., at 53-54.)

## II.    PROCEDURAL HISTORY

Defendants filed a Motion to Dismiss (Doc. No. 7) on November 4, 2009. They filed this Motion for Summary Judgment (Doc. No. 32) on August 9, 2010. Also on August 9, Plaintiffs filed a Motion to Compel Depositions of Members of the Stafford City Council (Doc. No. 29). On August 30, 2010, the Court issued a Memorandum and Order (Doc. No. 43) granting Plaintiffs' Motion to Compel Depositions on the grounds that the depositions would be relevant to Plaintiffs' claims against Stafford under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), and that any applicable legislative privilege could only be invoked by the individual city council members. In that order, the Court indicated that the council members could invoke any applicable privileges if and when their depositions were noticed, and extended Plaintiffs' deadline to respond to the Motion for Summary Judgment until ten days after resolution of the disputes relating to those depositions. Various city council members, along with the Stafford mayor and the Council itself, filed Motions to Quash their deposition notices. (Doc. Nos. 46-51, 53.)

On September 29, 2010, the Court issued a Memorandum and Order (Doc. No. 45) granting in part and denying in part the Motion to Dismiss, and granting Plaintiffs leave to file an amended complaint to cure the deficiencies identified in that order.[6] On

---

[6] Specifically, the Court found Plaintiffs' allegations insufficient with respect to the claims against Chief Krahn and Stafford, along with the state-law claims against all Defendants.

October 19, 2010, Plaintiffs filed an Amended Complaint. (Doc. No. 54.) On November 2, 2010, Defendants Stafford and Chief Krahn filed a Motion to Dismiss Plaintiffs' Claims, and Defendant Estrada moved to dismiss the state-law claims. (Doc. No. 61.) The Court subsequently ordered Plaintiffs to respond to the Motion for Summary Judgment, but delayed their response deadline with respect to the *Monell* claims against Stafford. Plaintiffs filed their response on February 23, 2011, Defendants filed a reply on March 23, 2011, and Plaintiffs filed a sur-reply on April 7, 2011.

### III.   LEGAL STANDARDS

#### A.  MOTION TO DISMISS

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. ---, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 129 S. Ct. at 1950 (citation omitted). The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004)). Importantly, the court should not evaluate the merits of the allegation, but must satisfy itself only that plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). "Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 231 (5th Cir. 2009) (internal citation omitted).

### B.  MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. Fed. R. Civ. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a

reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.*; *see also Harvill v. Westward Communications*, L.L.C., 433 F.3d 428, 436 (5th Cir. 2005) (court may not make credibility determinations or weigh the evidence at the summary judgment stage). Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. Fed. R. Civ. P. 56(e)(1); *see, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Defendants move to dismiss and for summary judgment on several grounds; the Court will address each in turn. In the interest of efficiency, for those claims for which Defendants move both to dismiss and for summary judgment, the Court will address all of Defendants' arguments as part of the summary judgment motion. With respect to the *Monell* claims against Stafford, however, Plaintiffs' have not yet been required to respond to the Motion for Summary Judgment, so the Court will address only the Motion to Dismiss.

## IV.    STANDING

Defendants first argue that the Hobarts lack standing to bring claims in their individual capacities. In support of this contention they point to cases holding that "all persons who claim a deprivation of constitutional rights" are "required to prove some

violation of their personal rights." *Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) (citing *Dohaish v. Tooley*, 670 F.2d 934 (10th Cir.)). However, Plaintiffs do claim deprivation of their individual constitutional rights, for injuries suffered as a result of the wrongful death of their son. The Fifth Circuit has clearly held that those "within the class of people entitled to recover under Texas law for the wrongful death of a child" are eligible "to recover under § 1983 for her own injuries resulting from the deprivation of her son's constitutional rights." *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir. 1992). Texas law makes clear that the parents of the deceased are eligible beneficiaries in a wrongful death action. Tex. Civ. Prac. & Rem. Code § 71.004(a) (Vernon 2008); *see Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010). Accordingly, the Court finds that the Hobart have standing to bring a wrongful death claim on behalf of themselves under Section 1983.[7]

## V. CONSTITUTIONAL CLAIMS

### A. OFFICER ESTRADA

Defendants argue that Plaintiffs have not proven a violation of the Fourth Amendment by Officer Estrada, and even if they have, Officer Estrada is entitled to qualified immunity. The Court disagrees, and finds that Officer Estrada is not entitled to summary judgment on this claim.

#### 1. Constitutional Violation

"To prevail on a Fourth Amendment excessive-force claim, a plaintiff must establish: (1) an injury; (2) that the injury resulted directly from the use of excessive force; and (3) that the excessiveness of the force was unreasonable." *Carnaby v. City of*

---

[7] Defendants do not challenge Plaintiffs' standing to bring claims as representatives of their son. (*See* Doc. No. 76, at 16.)

*Houston*, --- F.3d ---, 2011 WL 988865, at *3 (5th Cir. March 22, 2011) (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir.2007)). "It is objectively unreasonable to use deadly force 'unless it is necessary to prevent a suspect's escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). Conversely, "[a]n officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (citing *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003)). Further, "'[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1979) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). "To determine whether a seizure was objectively reasonable, and thus whether an injury is cognizable, we ask whether the totality of the circumstances justified [that] particular sort of search or seizure" balancing "the amount of force used against the need for force." *Flores*, 381 F.3d at 398-99 (citations omitted). "This balancing test requires careful attention to the facts and circumstances of each particular case." *Id.* at 399 (citation omitted).

First, there is no dispute that there has been an injury—the death of Aaron Hobart. Second, whether Officer Estrada's conduct was clearly excessive and unreasonable turns on whether Officer Estrada had probable cause to believe that Hobart posed a significant threat of death or serious physical injury to Officer Estrada or to others. *Id.* There is conflicting evidence on this question, and a reasonable jury could find that Officer

Estrada lacked such probable cause. When she called 911, Mrs. Hobart specifically requested that a CIT officer be dispatched. (Doc. No. 72, Ex. 9, at 1.) She told the dispatcher that Aaron was becoming delusional and very violent, but that he was not hurting anyone and needs medication and to be in a hospital. (Doc. No. 72, Ex. 9, at 1.) Therefore, based on the 911 call, there was reason for Officer Estrada or other police officials to believe that Hobart could potentially be violent, but not that he had committed any crime or hurt anyone. After he entered the house, Officer Estrada claims he heard a "roar" from Aaron, but the Hobarts deny that Aaron made such a noise, and it is (at the very least) not readily apparent from the audio recording of the incident that such a noise occurred.[8] Officer Estrada testified that Aaron punched him in the head, but he did not actually see the punching, and did not know if it was from fists or from something else. (Estrada Dep., at 292-95.) Mrs. Hobart, the only other eyewitness to the events directly prior to the shooting, testified that she did not see Aaron hit Officer Estrada in the head. Rather, she testified that when Aaron came into the room "he was flailing with his arms," that "Officer Estrada had his arms up," and that Aaron's arms hit Officer Estrada's arms. (Pam Hobart Dep., at 33-35.) Although Mrs. Hobart acknowledged that she did not "see every single strike that Aaron made on Officer Estrada, sufficient to tell us where each one landed," she did testify that she "watched them the entire time," and only closed her eyes after Officer Estrada pulled out his gun but before he fired it. (Pam Hobart Dep., at 37-40.) There was no indication afterwards that Officer Estrada had suffered any

---

[8] Defendants urge the Court to listen to the audio recording of the moments leading up to the shooting, arguing that it proves conclusively that a reasonable officer could have believed his life was in imminent jeopardy. (*See* Doc. No. 33, at 19 n. 6 & 7.) The Court has carefully viewed and listened to the recording, and disagrees with Defendants' conclusion. The recording indicates that the events leading up to the shooting spanned only a matter of seconds, and indicates that Officer Estrada yelled "Stop!" and "Get Back!" several times before the shooting. However, it does not reveal precisely what occurred in the Hobarts' home, which witness's account is more accurate, or whether the objective circumstances at the time of the shooting were such that a reasonable officer would have thought he was in danger.

significant injuries—only minor-looking redness on his cheek. Furthermore, Officer Estrada had become "disoriented" and was "seeing stars" and "darkness" coming into his vision during those moments, to the point where he did not even know that it was him shooting the gun. (Estrada Dep., at 257-64.)

Mrs. Hobart testified that the flailing stopped and "2 or 3 seconds passed" before Officer Estrada began shooting. (*Id.* at 40.) She also testified that in the few seconds prior to the shooting there was "a separation of 2 or 3 feet" between Aaron and Officer Estrada, and that she had shifted her weight to go between the two, at which point Officer Estrada pulled out his gun. (*Id.*) Accordingly, if a jury were to credit Mrs. Hobart's testimony, it could reasonably conclude that Officer Estrada faced only minor physical contact from Aaron, and that such contact ended and the two men were separated for multiple seconds prior to Officer Estrada pulling out his gun and shooting Aaron approximately six times. Under that factual scenario, Officer Estrada would lack probable cause to believe that Aaron posed a significant threat of death or serious physical injury to Officer Estrada or to others, and shooting Aaron in the manner that he did would be clearly excessive and unreasonable.

Summary judgment is particularly inappropriate on the question of whether the use of force was excessive, as the "balancing test requires careful attention to the facts and circumstances of each particular case." *Flores*, 381 F.3d at 399 (citation omitted). The facts and circumstances are difficult to discern conclusively in this case, as the only available accounts of the critical events an audio recording and two witnesses, both of whom appear to have been experiencing strong emotional reactions that may have impaired their consciousness and recollection. Viewing the summary judgment facts in

the light most favorable to the non-movants, there remain genuine issues of material fact on this question.

## 2. Qualified Immunity

Defendants contend that, even if Officer Estrada's conduct violated the Fourth Amendment, he is protected by the doctrine of qualified immunity. Officials sued in their individual capacities are protected by qualified immunity unless the act violates a constitutional right clearly established at the time. *Sanchez v. Swyden*, 139 F.3d 464, 466-467 (5th Cir. 1998). "The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions." *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 284 (5th Cir. 2002). To avoid summary judgment, a plaintiff also must present evidence to raise a fact issue "material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them." *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993).

To determine whether the plaintiff has overcome the presumption of qualified immunity, the Court first considers whether the plaintiff has proven a violation of a clearly established constitutional right. *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004). A right is "clearly established" if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). If that prong is met, the court must consider whether the defendant's "actions were objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins*, 382 F.3d at 537. "The touchstone of this inquiry is whether a reasonable person would have believed that his

16

conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Glenn v. City of Tyler*, 242 F.3d 307, 317 (5th Cir. 2001). "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated" the plaintiff's asserted constitutional or federal statutory right. *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001).

In February 2009, when Aaron Hobart's shooting death occurred, it was clearly established that "'deadly force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Bazan v. Hidalgo County*, 246 F.3d 481, 488 (5th Cir. 2001) (quoting *Garner*, 471 U.S. at 11); *see Meadours v. Ermel*, 2005 WL 1923596, at *9 (S.D. Tex. Aug. 10, 2005) ("the law is clearly established that an officer can use deadly force only when he has probable cause to believe that a suspect poses a threat of death or serious harm to the officer or others"). The threat of physical harm must be immediate. *Garner*, 471 U.S. at 11. As discussed above, Mrs. Hobart's testimony and other evidence (such as the lack of injuries to Officer Estrada) support Plaintiffs' claim that Officer Estrada did not have probable cause to believe Aaron posed a threat of death of serious physical harm, let alone an immediate threat. Shooting Aaron under that circumstance would violate clearly established law at the time. "[I]n the light of pre-existing law the unlawfulness [would] be apparent." *Anderson*, 483 U.S. at 640. Thus, genuine issues of material fact remain on this question, and Plaintiffs have presented evidence of a violation of a clearly established constitutional right sufficient to defeat summary judgment.

Next, viewing the evidence in the light most favorable to Plaintiffs, the Court finds that Officer Estrada's conduct was not objectively reasonable. That is to say, if the jury credits Plaintiffs' version of the facts, no reasonable officer in Officer Estrada's circumstances would have believed his conduct to be lawful. *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001). Given the clearly established law at the time, no reasonable officer would have believed that it was legal to shoot repeatedly at a young man whom the officer had no reason to believe had a weapon and who merely hit the officer's arms with his flailing arms before multiple seconds passed with a two- or three-foot gap between the two men.

Officer Estrada testified that he was blacking out at the time of the shooting, to the point that he did not even know who was shooting the gun. However, those subjective circumstances are not relevant to this objective prong. *See Cozzo v. Tangipahoa Parish Council—President Government*, 279 F.3d 273, 284 (5th Cir. 2002) ("an individual defendant's subjective state of mind is irrelevant to the qualified immunity inquiry"). Even if a police officer who uses deadly force believed he is at risk of death or serious injury, he is not entitled to qualified immunity if that belief was objectively unreasonable. For example, if an officer were under the influence of alcohol, or if his mental state caused him to panic such that he unreasonably determine that a threat was present, that would not render his determination reasonable.

Plaintiffs provide evidence of a factual scenario under which Officer Estrada's use of force would constitute a violation of clearly established Fourth Amendment law, and which no reasonable officer could interpret to be otherwise. That is not to say that the

jury will credit the competing evidence in that manner, but simply to say that Officer Estrada is not entitled to qualified immunity as a matter of law.

### B.  CITY OF STAFFORD

Municipalities are considered "persons" who may be sued directly under Section 1983. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978)). However, "a municipality cannot be held vicariously liable for the constitutional torts of its employees or agents." *Gros v. City of Grand Prairie, Tex.*, 181 F.3d 613, 615 (5th Cir. 1999) (citing *Monell*, 436 U.S. at 694). A local government may be sued under Section 1983 "'if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulations, or decision officially adopted and promulgated by that body's officers.'" *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (plurality opinion)). To establish municipal liability under Section 1983, a plaintiff must prove three elements: 1) a policymaker; 2) an official policy; and 3) a violation of constitutional rights whose moving force is the policy or custom."  *Id.* (quotations omitted).

In the September 29 Order, the Court found that Plaintiffs had not stated a claim against Stafford. The Court found that Plaintiffs met the first element by adequately pleading that Chief Krahn is an official policymaker for the City of Stafford. However, the Court found, Plaintiffs failed to meet the second element of proving the existence of an official custom or policy. In their Amended Complaint, Plaintiffs provide additional allegations regarding the claim against Stafford. Stafford again moves to dismiss for

failure to state a claim upon which relief may be granted.[9] The Court will address each element of municipal liability in turn.

### 1. Policymaker

With regard to the first prong, "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *Praprotnik*, 485 U.S. at 123 (plurality opinion) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion)).[10] "[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989) (emphasis in original). The trial judge is to determine the identity of a municipality's final policymaker by "[r]eviewing the relevant legal materials, including state and local positive law, as well as 'custom or usage' having the force of law." *Id.* at 737 (quoting *Praprotnik*, 485 U.S. at 124 n.1 (plurality opinion)). "A city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role." *Zarnow*, 614 F.3d at 167.

In this case, Plaintiffs allege that Chief Krahn "is an official policymaker." (Doc. No. 54, ¶ 63.) They also allege:

> Chief Krahn had policymaking authority both explicitly through the City's written ordinances and implicitly as a result of the delegation of authority and the customs and practices of the City of Stafford City Council. Chief

---

[9] As noted above, the Court has given Plaintiffs additional time to respond to this aspect of Defendants' Motion for Summary Judgment, so the Court will only address the Motion to Dismiss at this time.

[10] *See also id.* at 139 (Brennan, J., concurring) ("the official in question must possess 'final authority to establish municipal policy with respect to the [challenged] action.'") (quoting *Pembaur*, 475 U.S. at 481) (plurality opinion).

> Krahn had authority to establish binding city policy respecting matters
> relating to the police department and to adjust that policy for changing
> circumstances. Such authority is reflected in the City's ordinances
> delegating all policymaking authority for the police department to Chief
> Krahn. Furthermore, it is reflected in the custom and practice of Chief
> Krahn establishing all practices of the police department, including all
> relevant General Orders relating to police operations, which are not even
> reviewed by the Stafford City Council.

(*Id.* at ¶ 64.) These allegations, if proven true, would support a finding that Chief Krahn

is a final policymaker for the City of Stafford. Even if Chief Krahn has not been

*explicitly* delegated final policymaking authority, "absent a contrary regulation or

ordinance, a city council's . . . continuous refusal to exercise some theoretical authority to

review a municipal official's policy decisions will, at some point, establish the municipal

official as the final policymaking authority by custom or usage having the force of state

law." *Gros*, 181 F.3d at 616 n.2; *see also Worsham v. City of Pasadena*, 881 F.2d 1336,

1341 (5th Cir. 1989) ("Rule 12(b)(6) dismissal could be improper . . . where it is based

solely on a theoretical right of review because a plaintiff may be able to demonstrate that

such review is ineffective and meaningless."); *Crowder v. Sinyard*, 884 F.2d 804, 829

(5th Cir. 1989) (notwithstanding "formal subservice of the Chief of Police to city

officials," chief could be considered final policymaker where his uncontradicted

testimony "indicate[d] that the city manager delegated all power regarding the city's law

enforcement activities to [him]" and, "except as to the department's budget, city officials

exercise no control over the department's activities, policies, or procedures"), *overruled

in part on other grounds by Horton v. California*, 496 U.S. 128 (1990); *Bishop v.

McCollum*, 1994 WL 1890218, at *2 (N.D. Miss. Sept. 27, 1994) (holding that chief of

police was policymaker based on, among other things, chief of police's deposition

testimony). Accordingly, Plaintiffs have alleged that Chief Krahn was a "final policymaker" sufficiently to meet the first prong.

### 2.   Policy or Custom

With regard to the second prong, a plaintiff may prove the existence of an "official policy" in one of two ways: 1) by pointing "to a policy statement formally announced by an official policymaker"; or 2) by demonstrating "a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168-69 (citation omitted). The latter type of policy may itself come in one of two forms: 1) "a pattern of unconstitutional conduct may be shown on the part of municipal actors or employees" who "are *not* policymakers"; or 2) "a *final policymaker* took a single unconstitutional action." *Id.* at 169 (emphases in original).

The failure to train municipal employees may also constitute a "policy," but only when it "reflects a 'deliberate' or 'conscious' choice by a municipality." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Thus, although municipalities are not normally liable for inadequate training of employees, failure to properly train constitutes an actionable "policy" if, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. "'Deliberate indifference' is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown v. Bryan County* 219 F.3d 450, 457 (5th Cir.

2000) (citing *Bryan County v. Brown*, 520 U.S. 397, 410 (1997)). "[A] showing of deliberate indifference is difficult, although not impossible, to base on a single incident." *Sanders-Burns v. City Of Plano*, 594 F.3d 366, 382 (5th Cir. 2010). "Claims of inadequate training generally require that the plaintiff demonstrate a pattern of conduct." *Id.* "The plaintiff must demonstrate 'at least a pattern of similar incidents in which the citizens were injured . . . to establish the official policy requisite to municipal liability under section 1983.'" *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (quoting *Rodriguez v. Avita*, 871 F.2d 552, 554-55 (5th Cir.1989)); *see also Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (same); *Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir. 2010) ("Usually a plaintiff must show a pattern of similar violations, and in the case of an excessive force claim, as here, the prior act must have involved injury to a third party."). It is possible, although narrowly so, for a plaintiff to prove municipal liability for failure to train fits under the narrow scope of the "single incident" exception. *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) (citing *Brown*, 520 U.S. 397). In order to prevail under that exception, "a plaintiff must prove that the 'highly predictable' consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the 'moving force' behind the constitutional violation." *Id.* (citing *Brown*, 219 F.3d at 461).

In their Amended Complaint, Plaintiffs allege the existence of a policy in several ways. First, they allege customs in Stafford police practices that were "so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168-69. The alleged customs primarily concern the *lack* of policies regarding

how emergency dispatchers and police officers should handle calls and encounters involving mentally ill people. For example, Plaintiffs allege:

> The police department's response to the call for help from the Hobarts followed the City's established policies and practices in terms of failing to obtain appropriate information relating to the circumstances surrounding the need for services, failing to provide thorough information to the officers dispatched, failing to require Officer Estrada to wait for additional officers before entering the residence, failing to require Officer Estrada to implement CIT procedures on this call.

(Doc. No. 54, ¶ 66.) However, Plaintiffs also allege a custom, practice, or policy that includes "[a]llowing, encouraging, requiring, and training officers to use deadly weapons in lieu of less harmful techniques, including non-lethal physical restraints or proper detention techniques," "to use deadly force as a first resort, rather than training them to assess the situation and use only necessary force," and "to confront mental health detainees in such a way as to lead to the officer's use of excessive force." (*Id.* at ¶ 71(a)-(c).) Specifically, Plaintiffs allege, "the City trains officers to assess situations according to an 'action/reaction' motive. The City trains officers and expects them to use excessive or deadly force before a person has a chance to act." (*Id.* at ¶ 72.)

With regard to their allegations based on the *lack of policies*, Plaintiffs point to no authority that the failure to create policies in a certain area can constitute an unconstitutional custom or practice. With regard to the other allegations, however, Plaintiffs point to a specific type of training they allege that Stafford applies—the "action/reaction motive"—and allege specifically that officers are trained to use deadly force "as a first resort" and "before a person has a chance to act." If proven true, such a custom or practice would violate the Constitution by instructing officers to use more force than the Fourth Amendment permits. The Court finds that Plaintiffs' allegations are

sufficiently particular and not conclusory.[11] Even if such a custom was not explicit, Plaintiffs could prove that it is "a persistent widespread practice" that "is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168-69. The Court finds that these allegations are sufficient to raise a plausible claim of the existence of unconstitutional customs or practices that rose to the level of a city policy.[12]

Plaintiffs also allege the existence of a policy on the basis that Stafford was deliberately indifferent in failing to train and/or supervise its police officers and emergency dispatchers regarding how to handle calls and encounters involving mental ill people. Specifically, they argue that Stafford failed to provide training for:

- Proper communication of crisis intervention requests for mentally-ill persons;
- Proper responses to requests for an unavailable police service, such as requests for a crisis intervention team officer;
- Dispatching appropriate personnel to respond to mental health calls;
- Appropriate and adequate information for first response officers;
- Proper use of non-lethal weapons, such as batons and chemical spray;

---

[11] Defendants cite *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992), in which the Fifth Circuit found the allegations insufficiently particular to state a claim. In that case, the plaintiffs alleged:

1) [T]he rules, regulations and policies of Defendant City of Arlington, as well as the training program in existence prior to and at the time of the shooting of Javier Fraire did not emphasize that the use of lethal force against a person or citizen should be exercised only as a last resort when all other methods of apprehension have failed . . .; and

2) [I]t was the custom and practice both before and after [the date of the shooting] for employees and officers of the City of Arlington to utilize deadly force in contravention of the standards and guidelines which comport with the Fourth and Fourteenth Amendments to the United States Constitution . . . .

*Id.* at 1277. The first allegation complains of the *failure to enact a policy* of the sort that the Court today does not consider to support Plaintiffs' claim. The second allegation is entirely conclusory, essentially stating that it was the policy of the city to violate constitutional standards governing use of force. In the instant case, by contrast, Plaintiffs allege specific ways in which the alleged customs instructed officers to act, rather than merely concluding that they were instructed to violate the law.

[12] "To render a city liable actual or constructive knowledge of a "custom" must be attributable to the governing body or officials to whom that body has delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). As discussed above, Plaintiffs have properly alleged that Chief Krahn was a final policymaker for Stafford. They allege actual and/or constructive knowledge by Chief Krahn, as chief of police, of the alleged unconstitutional customs. Accordingly, they have properly alleged knowledge on the part of Stafford.

- Proper use of a firearm;
- Proper use of non-lethal, self-defense measures;
- Appropriate management and detention of persons with mental impairments;
- Limiting excessive use of force and use of deadly force;
- Proper use of crisis intervention techniques; and
- Appropriate use of supplemental restraints.

(*Id.* at ¶ 53.) Plaintiffs also now allege that the city "knew and acknowledged that there would be recurring situations involving emergency calls relating to encounters with mentally ill citizens" and "knew and acknowledged the potential for constitutional violations with respect to lack of training in firearms and appropriate use of force," yet failed to train its officers in those areas. (*Id.* at ¶ 56, 58.) Plaintiffs allege that the city and Chief Krahn were aware of a "Community Plan" that "was developed that acknowledged the ongoing pattern of conduct that constituted constitutional violations of the mentally ill citizens of Fort Bend County," yet provided no additional training and supervision in the deficient areas. (*Id.* at ¶ 57.) They also allege that Stafford "was aware specifically of a pattern of conduct on the part of Officer Estrada of constitutional violations from conduct evidencing lack of judgment, lack of common sense, lack of safe practices," yet failed to properly train or supervise him. (*Id.* at ¶ 59.)

Plaintiffs acknowledge that they "do not have information reflecting a pattern of *injuries* from constitutional violations," but instead contend that the relevant inquiry is "whether there has been a pattern of unconstitutional *conduct*." (Doc. No. 62, at 11 (emphases in original).) The Court acknowledges the logic behind a rule allowing failure to train liability based on showing a pattern of actions that *greatly risked* injury to third parties but did not actually injure anyone until the instant plaintiff. However, such an approach has been foreclosed by binding precedent, which requires a showing that the

prior act "involved injury to a third party" to establish a pattern of misconduct for failure to train liability. *Valle*, 613 F.3d at 547; *see also Estate of Davis*, 406 F.3d at 383; *Snyder*, 142 F.3d at 798 (5th Cir. 1998); *Rodriguez*, 871 F.2d at 554-55 (5th Cir.1989).

The Court does find, however, that Plaintiffs have stated a claim under the narrow "single incident exception." In other words, Plaintiffs have alleged facts that, if proven true, would support a finding that Aaron's death was the "highly predictable consequence" of Stafford's fail to train its employees. Plaintiffs allege that Chief Krahn and others were aware of the inadequacies in training with regard to mental health issues and use of force in Stafford as a whole, and with regard to Officer Estrada in particular. Moreover, Plaintiffs allege that the inadequacies were so severe that it was known or obvious to Officer Krahn and others that a death such as Aaron's—from excessive force used against a mentally ill person—was the inevitable consequence of those inadequacies.

This holding finds support in the Fifth Circuit's decision in *Brown*. 219 F.3d 450. After the Supreme Court held that the county in that case was not liable under the single incident exception for *hiring* a police officer who used excessive force, 520 U.S. 397, the Fifth Circuit held that the county *was* liable under that exception for failure to train the officer. The court reasoned that the sheriff "knew that all law enforcement officers, unless expressly restricted, will face situations calling for the application of force," and that "there was an even greater magnitude of obviousness of the need for training and predictability of the consequences without training" with the officer in particular due to behavior and tendencies he had previously exhibited. 219 F.3d at 463. The court also noted the Supreme Court's observation that the consequences of "the failure to train a

single law enforcement officer as to a specific skill necessary to the discharge of his duties," are much easier to predict than, for example, "the consequence of a single hiring decision." *Id.* at 461 (quoting *Brown*, 520 U.S. at 410). *Brown* involved the *complete* failure to train an officer, while the Plaintiffs in the instant case acknowledge that Officer Estrada and other Stafford officers received some training. However, Plaintiffs point to specific areas of inadequate training—regarding mentally ill people and use of force— that themselves made the injurious consequences of the failure to train obvious. Indeed, in *Brown* the problem with the lack of training centered on the lack of training *regarding proper use of force*. Accordingly, the Court finds that Plaintiffs have adequately alleged a failure to train to state a claim under the single incident exception.

Defendants argue that, as a matter of law, they cannot be liable for a failure to train claim because SPD officers were certified under the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE") training standards. The Court disagrees with that argument for two reasons. First, Plaintiffs allege in a non-conclusory manner that Officer Estrada received inadequate training, and at the motion to dismiss stage all well-pleaded facts must be taken as true. Indeed, the summary judgment briefing with regard to Chief Krahn makes clear that the parties vigorously dispute whether Officer Estrada indeed received the training mandated by TCLEOSE. Second, the Court disagrees that compliance with state-mandated training requirements *automatically* precludes liability for failure to train. The Court does not read any of the Fifth Circuit cases cited by Defendants (all of which concerned summary judgment, not motions to dismiss) to hold that state requirements provide such *per se* immunity. *See Zarnow*, 614 F.3d at 170-71; *Roberts*, 397 F.3d at 293-95; *Baker v. Putnal*, 75 F.3d 190,

200 (5th Cir. 1996); *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992). Those cases treat compliance with state training requirements as a relevant but not dispositive factor. *See Zarnow*, 614 F.3d at 171 ("We consider compliance with state requirements as *a factor counseling against* a 'failure to train' finding.") (emphasis added). So, for example, the court in *Benavides* approached the issue as follows:

> Benavides has produced no evidence suggesting that the deputies received less than the basic medical training required by Texas law. Benavides must show, therefore, that this legal minimum of training was inadequate to enable the deputies to deal with "usual and recurring situations" faced by jailers and peace officers.

955 F.2d at 973.[13] Thus, even where officers have met state training requirements, the Fifth Circuit permits plaintiffs to prove deliberate indifference from failure to train.[14] Here, Plaintiffs have sufficiently alleged a failure to train.

At the summary judgment stage (which will be quite soon, due to the unusual procedural posture of this case), Plaintiffs will face a high burden to prove the existence of a policy, either as a custom or practice or under the single incident exception. However, in considering a motion to dismiss under Rule 12(b)(6), the Court must only determine whether Plaintiffs have plausibly alleged facts that, if proven true, would provide a basis for recovery. Plaintiffs have done so here with respect to the second prong of municipal liability, alleging the existence of a "policy."[15]

---

[13] *Benavides* considered and rejected the *converse* of Defendants' argument, "a per se rule that a county is deliberately indifferent to its jailers' and peace officers' training whenever it relies exclusively on state certification requirements to ensure that its deputies are adequately trained." *Id.* at 974.

[14] To the extent that district courts outside of this district have interpreted Fifth Circuit precedent to provide the blanket immunity Defendants seek, the Court respectfully disagrees with those courts' interpretations. *See Gonzales v. Westbrook*, 118 F. Supp. 2d 728, 737 (W.D. Tex. 2000); *Huong v. City of Port Arthur*, 961 F. Supp. 1003, 1007 (E.D. Tex. 1997). This is particularly so in light of the Fifth Circuit recent clear statement that compliance with state training requirements is only "a factor" in the inquiry. *Zarnow*, 614 F.3d at 171.

[15] Plaintiffs also allege that Stafford is liable because it ratified Officer Estrada's and Chief Krahn's unconstitutional conduct after the fact. "If the authorized policymakers approve a subordinate's decision

### 3.  Causation

With regard to the third prong, a plaintiff must prove that the municipal policy was the "'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404. That is, the plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* In this case, Plaintiffs allege that Stafford's customs and practices, along with its failure to train its employees, were the cause of Aaron's death. (Doc. No. 54, ¶¶ 52, 56, 60, 66, 67, 69.) The Court finds that, if Plaintiffs' allegations are proven true, it is plausible that the unconstitutional policies were the "moving force" behind Aaron's death. *See, e.g.*, *Brown*, 219 F.3d at 463-65 (finding sufficient evidence that failure to train officer was moving force behind plaintiff's injury). Accordingly, Plaintiffs have made sufficient allegations to meet the third prong of municipal liability.

### C.  CHIEF KRAHN

Both the Motion to Dismiss and Motion for Summary Judgment on the claims against Chief Krahn are now fully briefed. However, there is significant factual and legal overlap between these claims and those against Stafford. Accordingly, the Court will defer ruling on these claims until the Motion for Summary Judgment on the claims against Stafford is fully briefed.

### VI.    AMERICANS WITH DISABILITIES ACT / REHABILITATION ACT

Defendants also move to dismiss and for summary judgment on Plaintiffs' claims against Stafford under Title II of the Americans with Disabilities Act ("ADA") and

---

and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Praprotnik*, 485 U.S. at 127 (plurality opinion). However, Plaintiffs fail to allege any ratification by a policymaker of the city beyond the conclusory statement, "The City ratified Krahn's and Estrada's conduct by approving their decisions and actions." (Doc. No. 54.) The remainder of their allegations in the "Ratification" section of the Amended Complaint, and their arguments in response to the motion to dismiss, simply refer to the allegations that there were unconstitutional city policies or failure to train their employees. Accordingly, Plaintiffs have not alleged sufficient facts to state a claim against Stafford based on ratification of unconstitutional conduct.

Section 504 of the Rehabilitation Act. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. According to the statute, "disability" means, "with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.* at § 12102. "[Q]ualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* at § 12131(2). "A 'public entity' includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2010) (quoting 42 U.S.C. § 12131(1)(B)). The language of Title II tracks the language of Section 504 of the Rehabilitation Act of 1973, *id.* (citations omitted), and "specifically provides that '[t]he remedies, procedures and rights' available under Section 504 shall be the same as those available under Title II." *Id.* (quoting 42 U.S.C. § 12133). Accordingly, "Jurisprudence interpreting either section is applicable to both." *Id.* "To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which

the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004). In addition, "[a] plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination." *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002).

Plaintiffs allege that Stafford, a public entity, violated the ADA and the Rehabilitation Act in numerous ways, including: failing and refusing to accommodate police department operations for mental health service calls, failing and refusing to adopt a policy to protect persons with mental illnesses, discriminating in the provision of police services and emergency responses, and failing to conduct a self-evaluation plan for programs and services affecting persons with mental illnesses. In the September 29 Order, the Court recognized that Title II of the ADA can apply to arrests. (Doc. No. 45, at 19 (citing *Morais v. City of Philadelphia*, 2007 WL 853811, at *11 (E.D.Pa. Mar. 19, 2007).) The Court further held that Plaintiffs had stated a claim under the "reasonable accommodation" theory, "under which the police properly investigate and arrest a person with a disability for a crime unrelated to that disability, but fail to reasonably accommodate the disabled person's disability in the course of investigation or arrest, 'causing the person to suffer greater injury or indignity in that process than other arrestees.'" (*Id.* at 19 (citing *Morais*, 2007 WL 853811, at *11).) The Court found it plausible that Aaron had been denied the accommodation "for the police 'to refrain from taking aggressive action against [him] until he presented an immediate threat to human life." (*Id.* at 19-20 (citing *Morais*, 2007 WL 853811, at *11); *see also Morais*, 2007 WL

853811, at *12 ("the lawful exercise of police power is a benefit of the services, programs, or activities of a public entity"); *Schorr v. Borough of Lemoyne*, 243 F. Supp. 2d 232, 235 (M.D.Pa. 2003) (same).)

Defendants argue that there is no evidence that 1) Aaron is an "individual with a disability"; 2) Defendants knew that Aaron was an individual with a disability; or 3) Aaron was subjected to intentional discrimination due to a disability. They also argue that this case falls within the exception to ADA coverage for "an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze*, 207 F.3d at 801.

As a preliminary matter, Plaintiffs have not alleged *intentional* discrimination anywhere in their complaint. Therefore, under Fifth Circuit precedent, they may not recover compensatory damages under the ADA or the Rehabilitation Act. *See Delano-Pyle*, 302 F.3d at 574. They may, however, still be entitled to declaratory or injunctive relief. *See Carter v. Orleans Parish Public Schools*, 725 F.2d 261, 263-64 & n.7 (1984).

With regard to the first prong for liability, the Court finds that Plaintiffs have presented evidence that Aaron was "a person with a disability" within the meaning of the ADA. In addition to Aaron's medical records, Plaintiffs present an affidavit from Dr. Moreland stating, based on his experience treating Aaron:

> Aaron Hobart was diagnosed with a schizoaffective disorder which resulted in delusions and which substantially limited one or more major life activities for him, including concentrating, thinking, communicating and working. Due to his disability he met the essential eligibility requirements for the receipt of services of the participation in programs or activities provided by public entities such as the Texas Department of State Health Services, Health and Human Services Commission (HHSC)

33

and the Texana Center, which is designated as the Local Mental Healthcare authority.

(Pls.' Ex. 24.) Dr. Moreland concludes:

> Based upon my education, experience, training and treatment of Aaron Hobart, it is my opinion, within a reasonable degree of medical certainty, that Aaron Hobart had a condition which met the definition of disability or 'qualified individual with a disability' contained in [42 U.S.C. § 12101, 12131].

*Id.* Accordingly, the Court finds that Plaintiffs have, at a minimum, raised a genuine issue of material fact as to whether Aaron was a "qualified individual with a disability."

With regard to the second prong for liability, as discussed above, Plaintiffs have now presented evidence raising a material issue of fact as to whether Officer Estrada could reasonably have believed that Aaron posed an immediate threat of death or serious injury. Therefore, there remains a factual issue as to whether Aaron was "excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible." *Melton*, 391 F.3d at 671.

With regard to the third prong, the Court finds that factual issues remain as to whether Aaron was denied benefits or discriminated against *because of* his disability. In *Hainze*, the Fifth Circuit held that the plaintiff "was not denied the benefits and protections of Williamson County's mental health training by the County, Sheriff Richards, or the officers," but rather by his own assault of an officer with a deadly weapon. 207 F.3d at 801. In the instant case, by contrast, Plaintiffs have presented sufficient evidence to raise factual issues as to whether Aaron's actions could reasonably have been interpreted to present any serious threat, let alone "threat of human life," and whether there was any need for the officer to "secur[e] the scene." *See id.* at 801. Because those factual issues remain, the Court cannot state as a matter of law that this case falls

under the *Hainze* exception precluding ADA and Rehabilitation Act liability in certain police encounter situations; nor can the Court state that Defendants are entitled to judgment as a matter of law that Aaron was not denied benefits or discriminated against *because of* his disability.

This is in line with cases in other courts that have factually distinguished *Hainze*. In *Morais*, a factual issue remained as to whether the decedent "pose[d] a threat to innocent parties," so the court found that the police "were not facing the type of pressurized situation that the Fifth Circuit seemed to be contemplating in *Hainze*," and denied summary judgment. 2007 WL 853811, at *12. In *Spencer v. Dawson*, 2006 WL 3253574 (N.D. Ill. Nov. 7, 2006), the court denied summary judgment because, although it was uncontested that the plaintiff was physically manifesting his anger when he was pepper-sprayed, there was a factual issue as to whether he was threatening anyone's safety. *Id*. at *7. And in *Salinas v. City of New Braunfels*, 557 F. Supp. 2d 771 (W.D. Tex. 2006), the court denied the city's motion to dismiss because the deaf plaintiff alleged that the scene had been secure, that she had not posed a threat to the safety of the officers, and that she had requested and been denied an interpreter. *Id*. at 776; *see also Hogan v. City of Easton*, 2004 WL 1836992, at *7 n.3 (E.D.Pa. Aug. 17, 2004); *but see DeLeon v. City of Alvin Police Dep't*, 2010 WL 4942648, at *3-4 (S.D. Tex. Nov. 30, 2010) (finding that reasonable accommodation theory did not apply because exigent circumstances existed).

Finally, Defendants contend that the ADA and Rehabilitation Act claims fail because Stafford did not know that Aaron had a disability. "[T]he accommodation provisions of the ADA and RA do not require public entities to 'guess' an individual's

need for an accommodation." *McCoy v. Texas Dep't of Criminal Justice*, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006). Instead, a plaintiff must show either that he requested an accommodation or that "defendant otherwise had knowledge of an individual's disability and needs, but took no action." *Id.* In this case, it is undisputed that Mrs. Hobart requested a CIT officer and told the emergency dispatcher that Aaron was "becoming delusional," "needs to be in a hospital," and "needs medication." (Pls.' Ex. 9, Dispatch Transcript, at 1-3.) An SPD employee then called Mrs. Hobart two more times with follow-up questions, including those that the officers on their way to the Hobarts' house "wanted to know." (*Id.* at 2-3.) The Court finds that, at a minimum, a factual issue remains as to whether Stafford knew that Aaron was disabled.

Accordingly, Plaintiffs have presented sufficient evidence that Stafford violated Aaron's rights under the ADA and the Rehabilitation Act to raise factual issues that preclude summary judgment.

## VII.   TEXAS TORT CLAIMS ACT

Defendants also move to dismiss and for summary judgment on Plaintiffs' claims under Texas common law. "Under the common-law doctrine of sovereign immunity, a municipality is immune from tort liability for its own acts or the acts of its agents unless the Texas Tort Claims Act ['TTCA'] waives immunity." *City of Amarillo v. Martin*, 971 S.W.2d 426, 427 (Tex. 1998). "For a governmental entity to be held liable for the acts of its employee under the TTCA: (1) the claim must arise under one of three specific areas of liability; and (2) the claim must not fall within an exception to the waiver of sovereign immunity." *Holland v. City of Houston*, 41 F. Supp. 2d 678, 710 (S.D. Tex. 1999). Defendants argue that Plaintiffs' claims against Stafford are barred by four distinct

statutory provisions. First, they argue that the claims are barred by because they were not brought in state court in the county in which the cause of action arose. *See* Tex. Civ. Prac. & Rem. Code § 101.102(a) (Vernon 2005).  Second, they argue that the claims are barred because there has been no waiver of the city's governmental immunity. *See id.* at § 101.021. Third, they argue that the claims are barred by the exception to the waiver of governmental immunity for claims arising "from the failure to provide or the method of providing police . . . protection." *Id.* at § 101.055. Finally, they argue that the claims are barred by the exception to the waiver of governmental immunity for intentional torts. *See id.* at § 101.057.[16]  In the September 29 Order, the Court held that Plaintiffs had failed to indicate in their complaint how the city had waived its immunity, and granted Plaintiffs leave to amend the complaint to remedy that defect.

Section 101.102(a) provides, "A suit under this chapter shall be brought in state court in the county in which the cause of action or a part of the cause of action arises." Contrary to Defendants' argument, "the federal district courts in this circuit have consistently held that 'this "venue" statute does not defeat federal jurisdiction over lawsuits brought under the Act.'" *Jackson v. Sheriff of Ellis County, Texas*, 154 F. Supp. 2d 917, 920 (N.D. Tex. 2001) (quoting *Mifsud v. Palisades Geophysical Institute, Inc.*, 484 F. Supp. 159, 161 (S.D. Tex. 1980)). This court has original jurisdiction over Plaintiff's federal claims, and thus has supplemental jurisdiction over their related state law claims under 28 U.S.C. § 1367. *See id.*; *see also Lester v. Terry County, Texas*, 353 F. Supp. 170 (N.D. Tex. 1973) ("it is doubtful under the supremacy clause of the United

---

[16] Defendants also moved to dismiss the claims against the individual defendants under the Texas "election of remedies" provision because Plaintiffs have elected to sue the City of Stafford, *see id.* at § 101.106(a). However, Plaintiffs have clarified that they allege only state law violations by the city, so that portion of Defendants' motion is moot.

States Constitution, Art. 6, cl. 2, whether a state could constitutionally deprive a federal court of jurisdiction which the Congress of the United States had otherwise given it").[17]

Section 101.021 provides a waiver of sovereign immunity for certain types of torts. Plaintiffs contend that their claims against Stafford fall within the waiver because they claim "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code § 101.021(2) (Vernon 2005). Specifically, Plaintiffs contend that Officer Estrada's gun qualifies as tangible personal property. To state a claim based on that waiver provision:

> [A] plaintiff must allege (1) that the property was used or misused by a governmental employee acting within the scope of his or her employment and (2) that the use or misuse of the property was a contributing factor to the injury. The negligence of the government employee must be the proximate cause of the injury and must involve a condition or use of tangible personal property under circumstances where there would be private liability. The property itself need not be the instrumentality of the alleged harm, but it must have been a contributing factor to the harm.

*Gonzales v. City of El Paso*, 978 S.W.2d 619 (Tex. App.—El Paso 1998, no pet.). The Texas Supreme Court has held that the waiver in Section 101.021(2) provides for governmental liability both on the basis of *respondeat superior* and for premises defects. *DeWitt v. Harris County*, 904 S.W.2d 650, 653 (Tex. 1995). When the basis for liability is *respondeat superior* and the employee is entitled to official immunity, so too is the government entity. *Id.* at 654.

---

[17] The federal cases cited by Defendants all concern whether the State of Texas, through the TTCA, has waived its sovereign immunity in federal court as well as state court. *Sherwinski v. Peterson*, 98 F.3d 849, 851-52 (5th Cir. 1996) (state agency); *United Carolina Bank v. Board of Regents of Stephen F. Austin State University*, 665 F.2d 553, 559 (5th Cir. 1982) (state university); *O'Rourke v. United States*, 298 F.Supp.2d 531, 536 (E.D. Tex. 2004) (state university). It is black-letter law that, "municipalities, unlike States, do not enjoy a constitutionally protected immunity from suit." *Jinks v. Richland County*, 538 U.S. 456, 466 (2003).

Defendants do not seem to contest that Plaintiffs have met the requirements set forth in *Gonzales*. Instead, Defendants argue that "there can be no waiver of the City's governmental immunity for Officer Estrada's use of his handgun because he cannot be held liable to the Plaintiffs under Texas law in light of his individual immunity." (Doc. No. 61, at 21.) "Texas law of official immunity is substantially the same as federal qualified immunity law." *Wren v. Towe*, 130 F.3d 1154, 1160 (5th Cir. 1997). Defendants do not suggest any difference between state and federal immunity law that would be relevant here. Accordingly, because the Court has held that Officer Estrada is not entitled to qualified immunity at the summary judgment stage, it follows that he is not entitled to immunity under Texas law. Therefore, Plaintiffs' claims are not barred by Section 101.021.

Section 101.055 carves out exceptions to the waiver of sovereign immunity found in Section 101.021. Plaintiffs contend that their claims do not fall within the exception to the waiver of sovereign immunity for "Emergency Responses" or "Failure to Provide or Method of Providing Police Protection." Section 101.055(2) excludes from the waiver of immunity claims arising "from the action of an employee while responding to an emergency call or reacting to an emergency situation . . . if the action is not taken with conscious indifference or reckless disregard for the safety of others." To avoid dismissal under that subsection, Plaintiffs must show that Officer Estrada's action was "taken with conscious indifference or reckless disregard for the safety of others." Under Texas law, an act is "reckless" if the actor "knew or should have known" that it "posed a high degree of risk of serious injury." *Martin*, 971 S.W.2d at 430. The Court holds today that a reasonable jury could find that Officer Estrada acted even though no reasonable officer in

his circumstances would have believed his conduct to be lawful. If Officer Estrada shot Aaron numerous times even though Aaron posed no threat of death or serious injury, that would constitute a "reckless" action. Accordingly, Stafford is not entitled to summary judgment based on Section 101.055(2).

Section 101.055(3) excludes from the waiver of immunity claims arising "from the failure to provide or the method of providing police or fire protection." Defendants argue on this basis that Stafford is immune from a claim of negligent formulation of policy, notwithstanding artful pleading seeking to avoid that limitation. However, "[w]hile a governmental unit is immune from liability for the negligent *formulation* of policy, the negligent *implementation* of policy will subject a governmental entity to liability." *City of San Augustine v. Parrish*, 10 S.W.3d 734, 740 (Tex. App.—Tyler 1999, pet. dism'd w.o.j.) (emphasis added); *see also State v. Terrell*, 588 S.W.2d 784, 787-88 (Tex. 1979) ("If . . . an officer or employee acts negligently in carrying out that policy, government liability may exist under the Act."); *Holland*, 41 F. Supp. 2d at 714. Thus, as Plaintiffs acknowledge, Stafford has sovereign immunity to the extent that Plaintiffs' claims deal with policy *formation*. Plaintiffs have already stated that their claims are limited to "wrongful death caused by . . . the misuse of" Officer Estrada's gun.[18] That claim challenges the *implementation* rather than *formulation* of police policy, and Defendants provide no argument or authority suggesting otherwise. Accordingly, Section 101.055(3) does not bar Plaintiffs' claim.

Finally, Section 101.057(2) excludes from the waiver of sovereign immunity claims "arising out of assault, battery, false imprisonment, or any other intentional tort."

---

[18] By contrast, for example, the Texas Supreme Court has held that "written information in the form of instructions and manuals is not tangible personal property" and cannot give rise to a TTCA claim. *Texas Dep't of Public Safety v. Petta*, 44 S.W.3d 575, 581 (Tex. 2001).

Plaintiffs state that they only bring state law claims "for the wrongful death caused by the carelessness, recklessness, negligence, and grossly negligent misuse of tangible personal property." (Doc. No. 73, at 25.) Defendants argue that Section 101.057 bars the claims because "Officer Estrada intentionally shot Hobart." (Doc. No. 33, at 42.) The Court agrees that Plaintiffs' claims are barred by this provision.

"Where the essence of a claim under the TTCA arises from an intentional tort, allegations of negligence are insufficient to avoid the § 101.057 exception to liability." *Holland*, 41 F. Supp. 2d at 713. Thus, in *Petta*, the Texas Supreme Court held that the plaintiff's claim for negligence was barred because the conduct she complained of was "the same conduct that forms the basis of her assault and battery claim against" the officer, and the "specific conduct" was "clearly intentional." 44 S.W.3d at 580.[19] Following *Petta*, courts in Texas have followed two separate lines of reasoning in determining whether a claim under the TTCA arises out of an intentional tort. *See City of Waco v. Williams*, 209 S.W.3d 216, 221-25 (Tex. App.—Waco 2006, pet. denied) (discussing cases). The first approach applies "the proposition that a negligence claim under the TTCA cannot arise out of the intentional *acts*, including excessive force, of a law enforcement officer against a person." *Id.* at 221 (emphasis added). For example, the court in *City of Laredo v. Nuno*, 94 S.W.3d 786 (Tex. App.—San Antonio 2002, no pet.), held that the plaintiff's claims that the officer injured her by improperly applying handcuffs and improperly placing her in the police car arose from the "intentional tortious act of using excessive force to arrest." *Id.* at 789; *see also Escobar v. City of Houston*, 2007 WL 2900581, at *43 (S.D. Tex. Sept. 29, 2007) (citing cases for

---

[19] The conduct at issue in *Petta* occurred during a traffic stop, in which the officer allegedly beat on Petta's window with his nightstick, aimed his handgun at her and threatened to kill her, moving his police car to block her car, and shooting at her tires during the pursuit. *Id.* at 577-78, 580.

proposition that police shootings are not intentional torts where there are allegations that the gun was discharged unintentionally). The second approach inquires not whether the act itself was intentional, but whether the actor "*intended to cause injury*." *Williams*, 209 S.W.3d at 223 (emphasis in original). For example, the court in *Durbin v. City of Winnsboro*, 135 S.W.3d 317 (Tex. App.—Texarkana 2004, pet. denied), held that the plaintiff was not barred by the intentional torts exception because, although the officer intentionally committed the act of bumping the plaintiff's car, "[t]here were no allegations that [he] intended to cause any injury by his actions, only that he intended to end the pursuit." *Id.* at 325.

In the police shooting context, the court in *Harris County v. Cabazos*, 177 S.W.3d 105 (Tex. App.—Houston [1 Dist.] 2005, no pet.), seemed to consider both factors—whether the act was intentional and whether the actor intended to cause the injury—and concluded that the officer's shooting of the plaintiff was an "intentional tort[] intended to cause injury to appellee," rather than an "act[] of negligence." *Id.* at 111-13. Likewise, the federal district court in *Huong* held that TTCA claims based on an a fatal shooting by an officer were barred because the plaintiffs "described their claims arising from the shooting as the intentional tort of excessive force," and, "regardless of the language used, it is clear that Plaintiffs' claims consist of intentional torts." 961 F. Supp. at 1008-09. And in *Holland*, a court in this district applied the "intentional act" inquiry to conclude that a police shooting was an intentional tort because there was "no allegation and no evidence in the record that [the officer] did not intend to shoot [the plaintiff]," and "no indication . . . that the gun misfired or discharged inadvertently." 41 F. Supp. 2d at 713.[20]

---

[20] The *Holland* court rejected the plaintiff's argument that it was disputed whether the officer "fully appreciated the circumstances that night and whether he negligently acted under those circumstances by

In this case, whether the Court considers the intent to act or the intent to injure, summary judgment is appropriate on this claim. Plaintiffs have not alleged, or presented evidence, that Officer Estrada's gun discharged inadvertently. Nor have they alleged, or presented evidence, that Officer Estrada did not intend to injury Aaron when he shot him. Indeed, in seeking punitive damages, Plaintiffs also allege in their Amended Complaint that Estrada acted "willfully" and "intentionally." (Doc. No. 54, ¶ 40.) "[T]he fact that an action for an intentional tort is barred does not prevent an injured party from pursuing a claim for simple negligence arising out of the same facts." *Hucker v. City of Beaumont*, 144 F. Supp. 2d 696, 708 (E.D. Tex. 2001) (citing cases). However, unlike in *Durbin*, for example, Plaintiffs have presented no evidence supporting a finding of negligence rather than intent to shoot and to injure.

Plaintiffs argue that their claims do not arise from an intentional tort because they allege only the tort of wrongful death. Texas law provides, "A person is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's or his agent's or servant's wrongful act, neglect, carelessness, unskillfulness, or default." Tex. Civ. Prac. & Rem. Code § 71.002(b) (Vernon 2008). The Court agrees that a claim based on negligence that caused death would not be barred by the intentional tort exception of the TTCA. However, as the cases discussed above illustrate, courts in Texas have squarely rejected reliance solely on the name used by a plaintiff to describe the tort, in favor of a functional inquiry that considers whether the alleged misconduct constitutes an intentional tort. *See Holland*, 41 F. Supp. 2d at 714 ("Plaintiffs cannot circumvent the intentional tort exception to waiver of municipal

---

firing and shooting an unarmed person" on the basis that "[t]hese are allegations of misinterpretation or misperception of information, which do not involve tangible personal property and, thus, are not actionable under the TTCA." *Id.* at 713-14.

liability by simply pleading negligence when the shooting event upon which they base their claims is actually an intentional tort.") (quoting *Huong*, 961 F. Supp. at 1009). Because Plaintiffs have not presented sufficient evidence to support a claim of negligent conduct by Officer Estrada, summary judgment is appropriate on their state-law claims.[21]

## VIII.   MOTION TO QUASH DEPOSITIONS OF CITY COUNCIL

Also pending are Motions to Quash Deposition Notices and for Protection from Improper Discovery filed by the Stafford City Council, council members, and the Mayor of Stafford. (Doc. Nos. 46-51, 53.) Plaintiffs seek to depose council members on the subject of whether Chief Krahn was the relevant final policymaker for purposes of Stafford's municipal liability. Movants ask the Court to bar any such depositions on the grounds that they are irrelevant and that they are barred by absolute legislative privilege.

Federal Rule of Civil Procedure 26(b)(1) provides:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

"A party asserting a privilege exemption from discovery bears the burden of demonstrating its applicability." *In re Santa Fe Int'l Co.*, 272 F.3d 705, 710 (5th Cir. 2001).

The U.S. Constitution provides that, "for any speech or debate in either House, [Senators and Representatives] shall not be questioned in any other place." U.S. Const.

---

[21] Defendants also move for summary judgment on Plaintiffs' claim for excessive force under the Fourteenth Amendment. However, the Court already dismissed this claim in the September 29 Order, so that aspect of Defendants' motion is moot.

art. I, § 6. The Speech or Debate Clause affords members of the U.S. Congress absolute immunity from liability for activities taken within the sphere of legitimate legislative activity. *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501 (1975). It also provides an evidentiary privilege "against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *United States v. Gillock*, 445 U.S. 360, 366-67 (1980) (quoting *United States v. Helstoski*, 442 U.S. 477, 489 (1979)).

However, "the Supreme Court has unequivocally ruled that the embrace of the clause does not extend to a state legislator." *Cole v. Gray*, 638 F.2d 804, 810 (5th Cir. 1981) (citing *Gillock*, 445 U.S. 360); *see also Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 404 (1979). Under federal common law, state and local legislators *are* absolutely immune from civil liability for their legislative activities. *See Bogan v. Scott-Harris*, 523 U.S. 44 (1998). But the Supreme Court in *Gillock* ruled that, in contrast to the privilege enjoyed by federal legislators, there is no absolute "evidentiary privilege for state legislators for their legislative acts." 445 U.S. at 373. Instead, the Court held that, where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields." *Id. Gillock* left open the question of when, if ever, state legislators could invoke an evidentiary legislative privilege in civil cases in federal court. *See* 26A Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5675 (2010) ("It is not clear whether there is a privilege for state legislators in federal civil litigation, except in diversity cases where Rule 501 requires the application of state privilege law.").[22]

---

[22] Movants point to a legislative privilege under Texas law and contend that it should apply in this case. *See, e.g.*, *In re Perry*, 60 S.W.3d 857, 862 (Tex. 2001). Federal Rule of Evidence 501 provides that federal common law of privilege applies in general in federal cases. However, "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the

Following *Gillock*, some courts have applied an absolute evidentiary privilege in civil cases for state and local legislators within the realm of legitimate legislative activity. *See, e.g.*, *Miles-Un-Ltd., Inc. v. Town of New Shoreham*, 917 F. Supp. 91, 98 (D.N.H. 1996); *see Kay v. City of Rancho Palos Verdes*, 2003 WL 25294710, at *12-13 (C.D. Cal. Oct. 10, 2003) (citing cases). Other courts have held that, in civil cases, "any such privilege must be qualified, not absolute, and must therefore depend on a balancing of the legitimate interests on both sides." *See, e.g.*, *In re Granite Purchases for State Capital*, 821 F.2d 946, 957 (3d Cir. 1987); *Kay*, 2003 WL 25294710, at *13-14 (citing cases). For example, the court in *Manzi v. DiCarlo*, 982 F. Supp. 125 (E.D.N.Y. 1997), found that the evidentiary privilege did not apply because "the discovery and trial needs of plaintiff in enforcing her rights under federal law clearly outweigh the State Defendants' need for confidentiality." *Id.* at 129. The court in *Kay* analyzed both approaches and concluded that a qualified, rather than absolute, privilege based on balancing the competing interests was "the better, and controlling, legal rule." 2003 WL 25294710, at *14.[23] The Court finds it appropriate, to determine whether any evidentiary privilege applies in a particular

---

privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law." *Id.* Where "the only claims and defenses" at issue "relate to federal § 1983 claims," federal law of privilege applies. *American Civil Liberties Union of Mississippi v. Finch*, 638 F.2d 1336, 1342 (5th Cir. 1981). That is no different in the context of identifying the "final policymaker" for municipal liability, even through that has been described as a "question[] of state law relevant to the application of federal law," *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989). It is certainly true that courts must consider state positive law in determining the identity of the final policymaker. *Id.*; *see Black's Law Dictionary* (9th ed. 2009) ("Positive law typically consists of enacted law—the codes, statutes, and regulations that are applied and enforced in the courts."). However, whether "custom or usage having the force of law" demonstrates that the identity of the final policymaker is different from that identified by the state positive law, and whether the refusal of a city council to exercise authority is sufficient to constitute a delegation of final policymaking power, are clearly questions of federal law. *See Gros v. City of Grand Prairie*, 181 F.3d 613, 616 & n.2 (1999). The Court has found no case suggesting that it would make any sense to look to the common law of the forum state, rather than to federal law, in deciding whether those conditions been met sufficiently to prove delegation of policymaking authority within the meaning of Section 1983, a federal civil rights statute. Accordingly, under Rule 501, federal privilege law applies in this context.

[23] The court in *Kay* noted that almost none of the cases finding an absolute evidentiary privilege in civil cases even mentioned *Gillock*. *Id.* at *13.

civil context, to apply the balance of interests articulated in *Gillock*. Accordingly, the Court will weigh the federal interests at stake against the potential harm to the state legislative process. *Gillock*, 445 U.S. at 373.[24]

With regard to the first factor, the federal interests are strong in this case. First, there is a very strong federal interest in the enforcement of civil rights statutes that provide remedies for violations of the U.S. Constitution. *See, e.g.*, *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) ("The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, whether that action be executive, legislative, or judicial."); *Burnett v. Grattan*, 468 U.S. 42, 55 (1984) (rejecting application of state statute of limitations because its "policy is manifestly inconsistent with the central objective of the Reconstruction-Era civil rights statutes, which is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief"). Second, the information sought by Plaintiffs through deposing council members is relevant to their claims against the city. Although Defendants contend that the Council was the only final policymaker for purposes of municipal liability, Plaintiffs argue that Chief Krahn was actually the final policymaker. In order to determine the identity of the final policymaker, the district court must review "the relevant legal materials, including state and local positive law, as well as 'custom or usage' having the force of law." *Jett*, 491 U.S. at 737 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 n.1 (1988) (plurality opinion)). "[A] city council's . . . continuous refusal to exercise some theoretical authority to review a municipal

---

[24] *Kay* applied an eight-factor balancing test that essentially considered these two competing interests. 2003 WL 25294710, at *18-21. The Court does not find that such detail is necessary in this case.

official's policy decisions will, at some point, establish the municipal official as the final policymaking authority by custom or usage having the force of state law." *Gros*, 181 F.3d at 616 n.2; *see also Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010) ("A city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role."); *Worsham v. City of Pasadena*, 881 F.2d 1336, 1341 (5th Cir. 1989) ("a plaintiff may be able to demonstrate that [a theoretical right of] review is ineffective and meaningless"). Thus, testimony regarding whether the Council delegated policymaking authority to Chief Krahn, and whether the Council actually exercised meaningful review of Chief Krahn's decisions, is relevant because it tends to prove whether Chief Krahn was the policymaker. *See, e.g.*, *Gros*, 181 F.3d at 616 (remanding so district court could consider depositions as "evidence of the City's customs and usages in determining which City officials or bodies had final policymaking authority"); *Paz v. Weir*, 137 F. Supp. 2d 782, 813-14 (S.D. Tex. 2001) (finding based on deposition testimony that sheriff had delegated authority to jail employee, making that employee relevant policymaker); *Hardy v. Town of Greenwich*, 2009 WL 2176117, at *4-5 (D. Conn. July 22, 2009) (considering testimony of First Selectman in determining that he did not delegate final policymaking authority).[25] Third, there is no clear alternative method for Plaintiffs to prove that Chief Krahn was the final policymaker. Plaintiffs have already deposed Chief Krahn, and argue based on his testimony that he had final policymaking authority for the city, but Defendants continue to contest that. The other logical place to look for the relevant information—such as whether the Council ever

---

[25] The *Hardy* court found relevant not only that the First Selectman possessed the *authority* to overrule the chief of police on a personnel matter, but also his testimony that he "*did* overrule Chief Walters on a personnel matter on at least one occasion." *Id.* at *4.

reviewed or overruled Chief Krahn's policies—is to members of the Council, who would have personal knowledge about actions taken or not taken by the Council. Without these additional depositions, Plaintiffs would be forced to try to prove a heavily-contested element of their civil rights claim without the benefit of all sources of potentially relevant information. Even if Defendants and Movants do not believe the Council members will not provide any testimony to support Plaintiffs' argument, Plaintiffs are entitled to discover any information that "appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

With regard to the second factor, the Court does not see any significant hindrance to or inhibition of the legislative process that could result from the requested depositions. The council members are not themselves parties to this case, and there is no suggestion that they could be subjected to any civil or criminal liability based on their legislative actions. Plaintiffs do not seek to inquire as to their *motives* or *thought processes* in the legislative process, but only "the methods and processes by which the council delegated, reviewed, enforced, and/or ratified the policies and practices of the Stafford police." Furthermore, the Court does not expect that such depositions would take a significant amount of the council members' time. Neither Defendants nor the third-party movants explain, and the Court cannot see, how this type of deposition could have a negative impact on the legislative process.

Accordingly, the balance of the competing interests in this case decidedly shows that the state legislators' interests must yield to important federal interests, and the

depositions may go forward.[26] Plaintiffs are, of course, still bound by the limitations of the Federal Rules of Civil Procedure, including the prohibition of discovery that is "unreasonably cumulative or duplicative," Fed. R. Civ. P. 26(b)(2)(C)(ii), and the prohibition on depositions "conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party," Fed. R. Civ. P. 30(d)(3)(A). The Court does not presume that deposing only one council member will necessarily be sufficient to discovery all potentially relevant information; on the other hand, the Court presumes that deposing *all* council members would likely be unreasonably cumulative.[27] It would be premature for the Court to set the precise scope of this discovery at this time, and the Court hopes that the parties can settle that issue among themselves. If necessary, the parties may request a hearing with the Court to resolve disputes. Finally, the Court expects the parties to conduct such discovery expeditiously so that the summary judgment motion can be fully briefed as soon as possible.

## IX.    CONCLUSION

For the reasons discussed in this order, Defendants' Motion for Summary Judgment is **GRANTED** with respect to Plaintiffs' claims under state law, and **DENIED** with respect to Plaintiffs' claims against Officer Estrada and Plaintiffs' claims under the ADA and the Rehabilitation Act; Defendants' Motion to Dismiss is **DENIED** with respect to Plaintiffs' claims against the City of Stafford; and the Motions to Quash Deposition Notices and For Protection from Improper Discovery are **DENIED**.

---

[26] The Court expresses no opinion as to whether the type of information sought by Plaintiffs from the council members would fall within the sphere of protected "legislative activity" if an absolute privilege *did* apply.

[27] It also seems clear that there is no needed to depose current council members who were not on the City Council at the time of the events relevant to this case.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 29th day of April, 2011.

_____

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE