# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **STEVE HOBART, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:09-cv-3332** |
| | § | |
| **CITY OF STAFFORD, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

---

## MEMORANDUM AND ORDER

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. No. 32). In its April 29, 2011 Memorandum and Order (the "April 2011 Order"), the Court ruled on the majority of this motion. *Hobart v. City of Stafford*, 784 F. Supp. 2d 732 (S.D. Tex. 2011). The portions of the motion addressing the liability of Defendants Krahn and the City of Stafford were not resolved, however, and are now ripe for resolution. After considering the remaining portions of the motion, all responses thereto, and the applicable law, the Court finds that the motion must be GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

This lawsuit arises from the death of Aaron Hobart ("Aaron"), son of Plaintiffs Steve and Pam Hobart (collectively, "the Hobarts" or "Plaintiffs"). The facts of this case were laid out nearly a year ago in the Court's April 2011 Order, and are recounted in relevant part here.

### A. Aaron Hobart's Death

1

Aaron Hobart suffered from a schizoaffective disorder, which resulted in delusions. (Moreland Decl., Doc. No. 72-24.) Aaron's mental health was deteriorating in the days, weeks, and months leading up to his death on February 18, 2009. In 2008, Aaron was examined by three doctors, and had two visits with the third, Dr. C. Scott Moreland, a psychiatrist. (Aaron Hobart's Medical Records, Doc. Nos. 32-9, 32-10, 32-11.) Dr. Moreland's orders indicate that Aaron had stopped taking his medication in November 2008. (Doc. No. 32-9 at 178-79.) On February 16, 2009, Mrs. Hobart called Dr. Moreland's office to request an immediate appointment. (*Id.*) The office scheduled an appointment for Aaron on February 18, the next available slot. (*Id.*) Mrs. Hobart said that, at that time, Aaron was not posing a danger to himself or to others. (*Id.*) Mrs. Hobart was instructed to call Dr. Moreland's office if there was any change in Aaron's mental status, and was told that, if Aaron became a danger to himself or others, she should call 911 or take Aaron to the emergency room. (*Id.*)

On February 18, 2009, Aaron refused to leave his room to go to his appointment with Dr. Moreland. When Mr. Hobart came home from work, he found Aaron in his room, speaking "belligerently and abusively" in a raspy alternate voice. (Steve Hobart Dep. at 20:8-24:23, Doc. No. 72-5.) Mrs. Hobart called Dr. Moreland, who told her not to press Aaron to attend the appointment that day, so that Aaron could calm down. (Doc. No. 32-9 at 183.) Dr. Moreland also sent a follow-up email to Mrs. Hobart giving her instructions on how to administer Aaron's medication, and providing information from the Houston Crisis Intervention Team ("CIT") website regarding how to request emergency help. (*Id.* at 184-85.) The information stated that the CIT program "educates patrol officers about mental illness and tactics and techniques to help verbally de-escalate

2

situations involving individuals in serious mental health crises," that one should call for a CIT officer "[w]hen the situation involves a person in a serious mental health crisis," and that, if the situation is an emergency, one should call 911 and request a CIT officer. (*Id.*) It also noted that "[i]f the person is mentally ill and poses a substantial risk of imminent harm to self or others, Texas Peace officers have the authority to take the individual to a facility for an emergency mental health evaluation, even if the person is involuntary. The officer may use whatever force he needs to get the individual to the facility for evaluation." (*Id.*)

Based on the instructions in Dr. Moreland's email, Mrs. Hobart called 911 and requested a "CIT officer." (Dispatch Transcript at 1, Doc. No. 72-9.) She told the 911 operator, "I have a son that needs to be taken," that Aaron was "becoming . . . very violent," that he was "deteriorate" [sic] and "becoming delusional," but that "he's not hurting anyone," "needs to be in a hospital," and "needs medication." (*Id.*) The operator informed Mrs. Hobart that an officer would come to the Hobarts' home. (*Id.*) A few minutes later, a man from the Stafford Police Department ("SPD") called Mrs. Hobart twice with further questions, and Mrs. Hobart informed him that Aaron was "becoming more and more belligerent," but that he did not have any weapons in his room and that he was not "under the influence." (*Id.* at 2-3.) Officers Garcia and Claunch from the SPD were the primary officers dispatched on the call, but Officer Estrada was the first to arrive at the Hobarts' home. (Jesus Estrada Dep. at 176:23-177:13, Doc. No. 72-3.)

Officer Estrada testified that, prior to arriving at the home, he was aware that Aaron was hallucinating, but did not know if Aaron was mentally ill or was simply under the influence of drugs. (*Id.* at 138:6-139:24.) Officer Estrada also testified that he

believed dispatch had informed him that Aaron did not have a weapon. (*Id.* at 179:21-180:11.) SPD Sergeant Dustin Claborn ("Sgt. Claborn") testified that Officer Estrada asked dispatch to ask Mrs. Hobart to step outside to talk to him when he arrived. (Sgt. Claborn Dep. at 126:16-20, Doc. No. 72-2.) However, it is undisputed that when Officer Estrada arrived, Mrs. Hobart let him into the house. (*Id.* at 128:12-17.) Sgt. Claborn also testified that Officer Estrada did not attempt to learn where Aaron was located or whether he was trying to hurt himself or others. (*Id.* at 127:19-130:4.)

The video camera in Officer Estrada's car was running during the events at issue in this case, and both sides have provided that footage as an exhibit. The video shows Officer Estrada entering the Hobarts' home by himself at approximately 15:07:59 on the video's clock. For a period of time, only the front yard is visible, with audio from inside the home captured on Officer Estrada's microphone. Immediately after he enters the home, one can hear Officer Estrada conversing with Mrs. Hobart. At approximately 15:08:15, one can hear noises, and Officer Estrada shouts, "Stop!" and "Get back!" several times. At approximately 15:08:20, one can hear gunshots. Officer Estrada then begins shouting, "Goddamnit!" "Shots fired!" and "Oh my god!" and Mrs. Hobart begins screaming loudly. The video then shows two other SPD officers arriving in the house at approximately 15:08:43. They accompany Officer Estrada onto the lawn, where Estrada kneels down with his head on the ground sobbing, and remains panicked during the next seven minutes of video and audio, repeatedly saying, "Oh my god," crying, and stating that he cannot catch his breath.

Officer Estrada and Mrs. Hobart offer different versions of what happened during the approximately 54 seconds that Estrada was in the house. According to Officer

4

Estrada, the following occurred: When he first entered, he thought that everything seemed quiet and normal, and "perceived . . . that either the disturbance was over or there was no disturbance." (Estrada Dep. at 208:4-211:11.) Mrs. Hobart let him in, and the two spoke inside the house. (*Id.*) Officer Estrada then began walking down the hall, at which point Mrs. Hobart pointed down the hall, and Officer Estrada saw Aaron, approximately thirty feet away. (*Id.* at 224:17-230:24.) Aaron was in a bedroom, and at first he was facing away from Officer Estrada, not yelling, screaming, or causing a disturbance. (*Id.* at 228:3-14.) Aaron then turned and saw Officer Estrada for the first time, at which point he loudly "roared," brought his arms up "from down low to—up to his waist," and began to charge at Officer Estrada. (*Id.* at 228:15-233:24.)

At that point, Officer Estrada, who was approximately five feet away from the front door of the house, "attempted to step back away from [Aaron] to give him room" because he believed Aaron was "going to come at" him. (*Id.* at 233:23-234:2.) However, Officer Estrada was unable to get out of Aaron's way or to back out of the house because Aaron traveled the entire length of the hallway and began "attacking" Officer Estrada. (*Id.*) Officer Estrada remembers in those moments "hearing and feeling [] thumps on [his] head" that he attributes to "being punched" on the left side of his face and head. (*Id.* at 251:23-260:24.) Officer Estrada states that attempted to pull out his baton, but was unable to do so because it got stuck in its holster. (*Id.*) He was also unable to use his spray or operate his police radio. (*Id.* at 237:16-241:13.) Officer Estrada testified that Aaron hit him to the point where Officer Estrada became "disoriented," began "seeing stars," and experienced "darkness" coming into his vision. (*Id.* at 252:4-5; 263:15-19.) He thought he was "fixing to be knocked out." (*Id.* at 264:9-24.) He then heard the sound of

gunshots, but did not know that he was the one shooting, let alone who he was shooting at. (*Id.* at 262:21-263:5.) He did not know where Aaron was in relation to him when the shooting occurred, and is not sure where Mrs. Hobart was at the time (though he thinks she was to his left). (*Id.* at 265:3-268:13.) A few seconds later, Officer Estrada believed that Aaron was getting back up, and he felt someone who he believed to be Aaron grabbing his vest. (*Id.* at 275:22-277:15.) Officer Estrada attempted to shoot his gun again, but could not get his fingers to squeeze the trigger. (*Id.*) The person grabbing his vest turned out to be one of his fellow SPD officers who had just entered the house. (*Id.* at 277:12-18.)

According to Mrs. Hobart's testimony, the following occurred in the house: When Officer Estrada arrived she "was under the impression that . . . [she] was getting a CIT person that was going to explain that and was going to go through a certain procedure, so [she] was trusting that they knew what was going to happen next." (Pam Hobart Dep. at 168:12-19, Doc. No. 72-6.) Aaron ran from out of his bedroom and toward Officer Estrada while "flailing with his arms." (*Id.* at 33:15-35:20, Doc. No. 32-19.) When he reached Officer Estrada, "Officer Estrada had his arms up," and Aaron's arms hit Officer Estrada's arms. (*Id.*) Mrs. Hobart did not see Aaron's arms hit Officer Estrada's head. (*Id.* at 35:18-20.) Although she acknowledged that she did not "see every single strike that Aaron made on Officer Estrada," Mrs. Hobart "watched them the entire time," and only closed her eyes after Officer Estrada pulled his gun from its holster. (*Id.* at 37:20-40:25.) The flailing stopped and "2 or 3 seconds" passed before Officer Estrada began shooting. (*Id.* at 40:1-7.) In the few seconds prior to the shooting there was "a separation of 2 or 3 feet" between Aaron and Officer Estrada, and Mrs. Hobart had shifted her

weight to go between the two, at which point Officer Estrada pulled out his gun. (*Id.* at 40:10-20.)

Officer Estrada fired six or seven bullets in the Hobarts' home, four of which struck Aaron: one in the back of the right upper neck, one in the right lower back, one in the back of the right hip, and one in the right middle back. (Autopsy Report at 4-6, Doc. No. 72-22.) Officer Estrada did not have any bruises on his face from the incident, although he did have some redness on his face that he contends was a result of the punches. (Estrada Dep. at 254:1-255:2; Photos of Estrada's Injuries, Doc. No. 72-14.) At the time of his death on February 18, 2009, Aaron was nineteen years old, stood five-foot-nine-inches tall, and weighed 166 pounds. (Autopsy Report at 3.) He was barefoot and dressed in shorts and a t-shirt. (*Id.*) There is no suggestion that he had any type of weapon at the time. Officer Estrada stands six-foot-one-inch tall and weighs 190 pounds. (Estrada Dep. at 53:23-54:1.)

### B.  Policies and Training

Plaintiffs present evidence of SPD policies and training issues that Plaintiffs contend led to Aaron's death. Stafford's Chief of Police, Chief Krahn, testified that, for more than ten years, the Stafford City Council gave him the authority "to adopt departmental policies or procedures." (Krahn Dep. at 30:12-15, Doc. No. 72-1.) The "polic[ies] for the operation of the department" are contained in the "General Orders" (*id.* at 31:14-17), which define themselves as "standing written guidelines that provide purpose, policy, and procedures for carrying out Stafford Police Department operations and activities." (SPD General Orders at 359, Doc. No. 72-8.) Chief Krahn implemented the SPD's first set of General Orders, and has testified that he does not need City Council

approval to amend or adopt General Orders. (Krahn Dep. at 27:20-29:23.) Defendants contend that there exists a General Order related to mentally ill persons, "General Order 025," but it is not clear that Defendants produced a final version of that order, as it does not appear to be contained in the current version General Orders that Defendants did produce. (*See* SPD General Orders.)[1]

The parties vigorously dispute whether Officer Estrada completed CIT training mandated by the Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE"). Albert Rodriguez, an expert for Defendants, testifies that Officer Estrada did complete the TCLEOSE training. (Report of Albert Rodriguez at 24-25, Doc. No. 32-2.) However, Chief Krahn testified that TCLEOSE began mandating CIT training for police officers in approximately 2005 or 2006, and that all officers were required to have completed their mandated training by August 2008. (Krahn Dep. at 67:2-9.) In December 2008, SPD began a process of ensuring that it was in compliance with the CIT training mandated by TCLEOSE. (Claborn Dep. at 28:13-29:21.) Chief Krahn was responsible for that CIT training process. (*Id.*) Officers who did not receive CIT training in their original training program were required to complete sixteen hours of special CIT training. (*Id.* at 31:16-32:1.) Officer Estrada did not receive special CIT training, but Sgt. Claborn testified that Officer Estrada nonetheless complied with the TCLEOSE requirement because he received sixteen hours of instruction through the basic police officer's academy that, according to Sgt. Claborn, was "the same 16 hours of

---

[1] The version of General Order 025 produced by Defendants states, among other things, "If an officer must control and restrain a mentally ill person, he shall use the least amount of force necessary." (Doc. No. 72-17.) It also states that, "If the caller requests a 'Crisis Intervention Team,' the [dispatcher] is to inform the caller that the [SPD]'s procedure is to send police officers to evaluate the situation and determine the need for warrantless intervention," that, "[i]n all cases involving a report of a mentally ill person the [dispatcher] is to instruct the caller to have someone meet the officers outside the location," and that dispatchers "are to dispatch two officers to all calls involving mentally ill persons." (*Id.*)

instruction" as the TCLEOSE CIT training. (*Id.* at 168:14-17.) However, Officer Estrada's training record indicates that he completed zero hours of the "CIT(16hr)-BPOC" course. (Doc. No. 72-19.) Further, as Plaintiffs point out, the materials used in the special sixteen-hour CIT training that Officer Estrada did not receive are substantially more thorough than the section of materials from the academy addressing CIT. (*See* Doc. Nos. 72-10, 72-11.) Defendants vigorously dispute Plaintiffs' contention that Officer Estrada did not receive the required state training.

Also at issue is the general training given to SPD officers. One aspect of the basic training for the SPD is "control of conflict," which teaches officers not to "react out of panic" in the field. (Claborn Dep. at 209:10-25.) Sgt. Claborn testified that, although officers are trained on combat breathing, retaining peripheral vision, and auditory skills, they are not put into any situations during training in which their ability to control themselves and avoid panicking during stressful situations may be evaluated. (*Id.* at 56:19-58:17.) He likewise testified that Officer Estrada's conduct on February 18, 2009 was in line with SPD policies, and that officers are trained to shoot "until the threat is ended." (*Id.* at 214:12-215:14; 222:5-223:14, 242:21-245:2.) Claborn specified that Estrada's behavior of firing "until the threat was over," even while losing consciousness, was within the guidelines of the SPD's General Orders. (*Id.* at 214:17-215:4.)

Plaintiffs also point to the City's failure to address Officer Estrada's poor performance as a contributing cause of Aaron's death. During field training, officers in the SPD are evaluated on a scale of "one" to "five", with "one" being the lowest score and "three" being the minimum acceptable level. (*Id.* at 60:15-23.) Sgt. Claborn testified that, if an officer receives a rating below a "three," it indicates that there is "some sort of

either issue or problem or lack in that area." (*Id.* at 61:4-7.) Depending on the situation, the department would then take action, which could be "as simple as reviewing it with [the officer]," or as involved as providing "specific and focused training." (*Id.* at 61:8-13.) During his field training, Officer Estrada received a series of "1" and "2" ratings in categories such as "Common Sense and Judgment," "Control of Conflict," "Officer Safety," and "Communications." (Doc. No. 72-20.) Officer Estrada testified that he and his trainers spoke about his deficiencies after the evaluations, but he does not specifically remember receiving any additional training to correct those deficiencies. (Estrada Dep. at 82:10-83:6.)

## II.    LEGAL STANDARD

Summary judgment is appropriate where the pleadings and evidence show that no genuine issue of material fact exists, and that the movant therefore is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1997). If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to identify specific facts showing there is a genuine issue for trial. *Id.* "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (citation omitted).

Factual controversies should be resolved in favor of the nonmoving party. *Liquid Air Corp.*, 37 F.3d at 1075. However, "summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support

a judgment in favor of the nonmovant." *Id.* at 1076 (internal quotations omitted). Importantly, "[t]he nonmovant cannot satisfy his summary judgment burden with conclusional allegations, unsubstantiated assertions, or only a scintilla of evidence." *Diaz v. Superior Energy Servs., LLC*, 341 F. App'x 26, 28 (5th Cir. 2009) (citation omitted). A court should not, in the absence of proof, assume that the nonmoving party could or would provide the necessary facts. *Liquid Air Corp.*, 37 F.3d at 1075.

## III.    ANALYSIS

The portions of Defendants' Motion for Summary Judgment that remain to be resolved relate to Plaintiffs' claims against the City of Stafford and Chief Krahn brought under 42 U.S.C. § 1983 ("Section 1983"). These claims are the subject of supplemental briefing by both parties, including Plaintiffs' Supplemental Response (Doc. Nos. 83-85), and Defendants' Supplemental Reply (Doc. No. 86).

### A.  Section 1983 Claim against the City of Stafford

Municipalities are considered "persons" subject to suit under Section 1983 for civil rights violations. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, "a municipality cannot be held vicariously liable for the constitutional torts of its employees or agents." *Gros v. City of Grand Prairie*, 181 F.3d 613, 615 (5th Cir. 1999) (citing *Monell*, 436 U.S. at 694). A municipality may be sued under Section 1983 "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (quoting *Monell*, 436 U.S. at 690). Alternatively, a Section 1983 claim may be brought against a municipality when the constitutional violation occurs pursuant to a governmental custom, even if that

11

custom has not received official approval or adoption.  *Zarnow*, 614 F.3d at 166 (citing *Monell*, 436 U.S. at 690).  To establish municipal liability, a plaintiff must establish the existence of three elements: (1) a policymaker; (2) an official policy or custom; and (3) a constitutional violation whose moving force is that policy or custom. *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

### 1.  Policymaker

To satisfy the first element, a plaintiff must prove that "an official policymaker with actual or constructive knowledge of the constitutional violation acted on behalf of the municipality." *Id.* at 167 (citing *Cox v. City of Dallas*, 430 F.3d 734, 748-49 (5th Cir. 2005)). In order to be a policymaker, one must "decide the goals for a particular city function and devise the means of achieving those goals." *Id.* (internal quotation marks omitted) (citations omitted). Ultimately, "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *Praprotnik*, 485 U.S. at 123 (plurality opinion) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion)). Plaintiffs argue that Chief Krahn acted as a policymaker for the City of Stafford.

"A city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role." *Zarnow*, 614 F.3d at 167. Courts in the Fifth Circuit regularly have found that chiefs of police are official law enforcement policymakers for the purposes of municipal liability under Section 1983. *See Fraire v. City of Arlington*, 957 F.2d 1268, 1279 n. 45 (5th Cir. 1992); *Oporto v. City of El Paso*,

2010 WL 3503457, at *4 (W.D. Tex. Sept. 2, 2010) (citing *Kincheloe v. Caudle*, 2009 WL 3381047, at *18 (W.D. Tex. Oct. 16, 2009)); *Lopez v. City of Houston*, 2008 WL 437056, at *10 (S.D. Tex. Feb. 14, 2008). Plaintiffs contend that the City of Stafford's governing body, its City Council, delegated policymaking authority to Chief Krahn both through formal action and by its conduct and practice.

First, Plaintiffs argue that the City delegated policymaking authority for the police department to the Chief of Police via city ordinance. Section 228 of the Code of Ordinances provides that "[t]he chief shall have immediate direction and control of the police department . . . and shall promulgate all orders, rules, and regulations for the government of the police division." (Krahn Decl. ¶ 13, Doc. No. 32-1.) In addition to this express designation of control over the police department, Plaintiffs point to the fact that Chief Krahn's General Orders are not reviewed by the City Council. Chief Krahn has testified that, when he amends his General Orders, he does not need to obtain approval from the City Council. (*Id.* at 29:3-23.) In fact, Chief Krahn is not aware of the City Council ever reviewing his General Orders. (*Id.* at 31:8-25.) Such review would be difficult to accomplish, as Chief Krahn does not send a copy of his General Orders to the City Council or City Attorney for review prior to adopting them. (*Id.* at 32:1-13.) Chief Krahn's arguably unreviewed General Orders contain all SPD policies with respect to the conduct of police officers, including but not limited to dispatch operations, use of force, levels of force, performance evaluations, performance ratings, scope of responsibilities, and investigation of police incidents. (Doc. No. 72-8.)

While the City Council has a theoretical right to review these policies, the evidence indicates that it never has exercised that right. "[A] city council's . . .

13

continuous refusal to exercise some theoretical authority to review a municipal official's policy decisions will, at some point, establish the municipal official as the final policymaking authority by custom or usage having the force of state law." *Gros*, 181 F.3d at 616 n.2; *see also Crowder v. Sinyard*, 884 F.2d 804, 829 (5th Cir. 1989) (notwithstanding "formal subservice of the Chief of Police to city officials," chief could be considered final policymaker where his uncontradicted testimony "indicate[d] that the city manager delegated all power regarding the city's law enforcement activities to [him]" and, "except as to the department's budget, city officials exercise no control over the department's activities, policies, or procedures"), *overruled in part on other grounds by Horton v. California*, 496 U.S. 128 (1990). In *Zarnow*, the Fifth Circuit found that "the General Orders promulgated by the police chief sufficed . . . to prove policymaking authority." 614 F.3d at 168. Likewise here, because Chief Krahn implements policies governing police practices without review, he has been delegated final policymaking authority over the SPD.

### 2. Official Custom or Policy

Next, the Court must consider whether the arguably unconstitutional action taken against Aaron Hobart was the result of an official custom or policy, such that not only Officer Estrada, but the City itself, may be held liable for it. The Fifth Circuit has explained that a plaintiff may prove the existence of an official policy in one of two ways: (1) by pointing "to a policy statement formally announced by an official policymaker;" or (2) by demonstrating "a persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents

14

municipal policy." *Zarnow*, 614 F.3d at 168-69 (citation omitted). The latter form of policy, which is the sort alleged by Plaintiffs, may be demonstrated by showing either "a pattern of unconstitutional conduct . . . on the part of municipal actors or employees" who are not policymakers, or by showing that a final policymaker took a single unconstitutional action. *Id.* at 169. In this case, Plaintiffs seek to establish an official custom or policy of encouraging or condoning the excessive use of force.

The failure to train municipal employees also may constitute a policy when it "reflects a 'deliberate' or 'conscious' choice by a municipality." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Thus, although municipalities are not normally liable for inadequate training of employees, failure to properly train is an actionable policy under Section 1983 if, "in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. In addition to claiming that the City had an official custom or policy of encouraging the excessive use of force, Plaintiffs also seek to establish the existence of an official custom or policy of failure to train.[2]

---

[2] Plaintiffs have also sought to allege municipal liability based on the City's alleged lack of policies, and based on the City's alleged ratification of Officer Estrada's and Chief Krahn's unconstitutional conduct. The Court dismissed both of these claims in its April 2011 Order on Defendants' Motion to Dismiss. *Hobart*, 784 F. Supp. 2d at 752, 752 n.11, 755 n.15. Plaintiffs ask the Court to reconsider the portion of that Order dismissing their ratification claim. Plaintiffs base this request on the existence of new evidence. However, new evidence would not support reconsideration of the Court's dismissal, which addressed the adequacy of Plaintiffs' pleadings, not the persuasiveness of their evidence. Nonetheless, after considering the evidence submitted by Plaintiffs in support of their ratification argument, the Court concludes that Plaintiffs do appear to have a claim—and possibly a very strong one—that the City is liable based on its ratification of Officer Estrada's conduct. In light of this evidence, and because Defendants were, for a time, litigating the issue of ratification and therefore would not be prejudiced by its inclusion in this case, the Court finds that Plaintiffs should be given leave to amend their Complaint to add a claim based on ratification. Although in one sense this amendment comes late in the case, the procedural irregularities in

15

### a. Policy of encouraging or condoning the excessive use of force

First, Plaintiffs challenge the City's policy of encouraging or condoning the excessive use of force. In the April 2011 Order, the Court noted that "Plaintiffs point to a specific type of training they allege that Stafford applies—the 'action/reaction motive'— and allege specifically that officers are trained to use deadly force 'as a first resort' and 'before a person has a chance to act.'" *Hobart*, 784 F. Supp. 2d at 752. The Court concluded that, "[i]f proven true, such a custom or practice would violate the Constitution by instructing officers to use more force than the Fourth Amendment permits." *Id.* The Court now must consider whether the evidence gives rise to a genuine issue of material fact as to whether the City had such a custom or practice.

Plaintiffs urge that the City had a practice of instructing officers to use whatever force subjectively deemed necessary in a given situation, instead of an objectively reasonable amount of force, or the least amount of force necessary. These allegedly unconstitutional policies are not embodied in any writing; rather, Plaintiffs support their claims with testimony from Sgt. Claborn regarding officer training, as well as testimony from Officer Estrada about the training he received. Sgt. Claborn has testified that the SPD has a practice of "firing until the threat has ended," and that this has been the SPD's practice for years. (Claborn Dep. at 214:12-215:14.) According to Sgt. Claborn, Officer Estrada's shooting of Aaron was in compliance with this aspect of SPD training. Sgt.

---

this case make this the first time that the Court has considered Plaintiffs' evidence—developed through discovery—of the City's ratification of Officer Estrada's behavior. Plaintiffs need not conduct further discovery on this issue, and may, if they wish, amend their Complaint to include this claim as against the City. Defendants will have the opportunity to move for summary judgment on that claim alone, should they wish to do so. The Court does not believe that amendment to add this claim will substantially delay the proceedings in this case.

Claborn has stated that, even if Mrs. Hobart's version of the events is correct—that is, even if Officer Estrada and Aaron had separated by two or three feet prior to the shooting, and even if Mrs. Hobart was about to step between the two—Officer Estrada's actions were consistent with the training provided by the City. (*Id.* at 145:1-23.) When asked what training Officer Estrada had received to prepare him for his encounter with Aaron, Sgt. Claborn responded that it was the "overall firearms training," which consists of "firing until the threat is ended." (*Id.* at 214:12-16.) When asked a clarifying question—whether the City actually trains its officers that, if they are going unconscious, they should continue to fire until the threat is over—Sgt. Claborn affirmed that the City does so train its officers. (*Id.* at 214:17-215:4.) Sgt. Claborn further responded that, if you are *not* going unconscious, you can only fire until the threat is over "[i]f you reasonably believe your life is in danger." (*Id.* at 215:15-18.) This distinction suggests that, as long as an officer is losing consciousness, the policy of firing until the threat is over—that is to say, the policy of using deadly force—does not depend upon an officer reasonably believing his or her life is in danger.

Officer Estrada confirmed that he was trained that, if he began seeing "stars and black," he should shoot his gun. (Estrada Dep. at 263:15-23.) Later in his deposition, Officer Estrada added that this was part of training related to "protect[ing] your life as well as others." (*Id.* at 264:16-265:2.) In the context of the deposition, it is unclear whether the two elements—shooting any time you begin to see stars and the concern for protecting human life—were necessarily tied together in the officer training. Estrada also explains that the training to shoot once he began seeing black applied even if he did not

17

know what he was shooting at, how many bullets he was shooting, or who else was around him. (*Id.* at 264:16-265:17.)

The testimony of Officer Estrada and Sgt. Claborn, when read together, raises a factual question about the training SPD officers received with respect to the use of deadly force. If, as the testimony suggests, SPD officers were trained to use deadly force anytime they began to lose consciousness, regardless of the surrounding circumstances, such training would be inconsistent with constitutional mandates regarding excessive use of force. The Fifth Circuit has explained that "[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer *reasonably believes* that the suspect poses a *threat of serious harm* to the officer or others." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (emphasis added). Here, the testimony suggests that SPD training encouraged officers to use deadly force in situations in which a reasonable officer would *not* believe he or she was at any risk of harm, much less serious harm. As an extreme example, the encouragement to shoot as you begin to lose consciousness would allow an officer having a seizure while interacting with a member of the public to begin discharging his or her weapon, even if there existed no reasonable belief that anyone posed a threat of serious harm.

Though the encouragement to use force in such a situation may not have been written, the testimony of Sgt. Claborn indicates that it was a part of the SPD's training. This evidence gives rise to a genuine issue of material fact as to whether the encouragement of the excessive use of force was "a persistent widespread practice" that was "so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168-69.

18

### b.  Failure to train

As a separate theory of municipal liability, Plaintiffs also urge that the City had a policy of inadequately training its officers. To prevail on a "failure to train" theory under Section 1983, a plaintiff must demonstrate: (1) that the municipality's training procedures were inadequate; (2) that the municipality was deliberately indifferent in adopting its inadequate training policy; and (3) that the inadequate training policy directly caused the violations in question. *Zarnow*, 614 F.3d at 170. The Supreme Court has clarified that the fact "that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city." *City of Canton*, 489 U.S. at 390.

In Plaintiffs' Supplemental Response (Doc. No. 83), they emphasize three ways in which the SPD training was deficient: Plaintiffs claim that the SPD provided inadequate training on the appropriate use of force, that it failed to provide CIT training to Officer Estrada, and that it failed to provide adequate training regarding the proper method of dispatching mental health calls.

### i.   Failure to train on appropriate use of force

#### (a) Adequacy of training

While this claim is similar to Plaintiffs' claim that the SPD affirmatively condoned and even encouraged the use of excessive force, it relies instead upon the allegation that the SPD failed to provide training on the appropriate use of force. While the two claims are different, much of the strongest evidence supporting each claim is the same. To prove inadequate training, Plaintiffs rely on the suggestion by Sgt. Claborn that officers in the SPD explicitly are trained to continue shooting, even after the immediate threat has ended. Although Sgt. Claborn's testimony is that SPD has a practice of "firing

19

*until* the threat has ended," not *after* the threat has ended, he also testified that the shooting of Aaron—even if Aaron and Officer Estrada had separated prior to the shooting, meaning that the two were no longer in physical contact—was in compliance with SPD training. (Claborn Dep. at 145:1-23.) This suggests that the SPD failed to train officers regarding when the use of force, and especially the use of deadly force, is appropriate.

Further, as discussed above, Sgt. Claborn testified that the training Officer Estrada received to prepare him for this incident was the "overall firearms training," which consists of "firing until the threat is ended." (*Id.* at 214:12-16.) Sgt. Claborn did not suggest that officers were trained to adjust their use of force based on the severity of the situation, or to use the least amount of force necessary. Moreover, as noted above, Sgt. Claborn's testimony raises a factual issue as to whether officers were trained that firing while going unconscious was only appropriate if the officer reasonably believed his life to be in danger; the testimony suggests that they were not so trained. (*Id.* at 214:17-215:4; 215:15-18.)

Finally, the Court has already held that factual questions exist as to the constitutionality of Officer Estrada's use of deadly force. *Hobart*, 784 F. Supp. 2d at 748-49. Chief Krahn and Sgt. Claborn have affirmed that Officer Estrada's arguably unconstitutional actions were consistent with his training. When asked whether he had any criticisms as to how Officer Estrada conducted himself at the Hobarts' residence on February 18, 2009, Chief Krahn responded that he did not. (Krahn Depo. at 7:25-8:3.) He further testified that he is not aware of any information suggesting that Officer Estrada was not in compliance with the SPD's operating procedures. (*Id.* at 8:4-21.) Sgt. Claborn

20

has stated that he believes Officer Estrada's handling of the situation was "objectively reasonable" (Claborn Dep. at 34:18-20), and that there was nothing about Officer Estrada's handling of the incident that was inconsistent with his SPD training (Claborn Dep. at 94:18-22). The approval of Officer Estrada's arguably unconstitutional conduct by both Chief Krahn and Sgt. Claborn indicates that his conduct was consistent with the SPD's training on the appropriate use of force. The Court therefore finds that a genuine issue of material fact remains as to whether the SPD failed to provide adequate training on the use of force.

### (b) Deliberate indifference

Plaintiffs also must prove that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymaker[] of the city can be reasonably said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. "'Deliberate indifference' is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000) (citing *Bryan County v. Brown*, 520 U.S. 397, 410 (1997)).

There are essentially two types of situations that can implicate deliberate indifference in the failure to train police officers. One is a general failure to provide adequate training in light of foreseeable serious consequences that could result from the lack of instruction. *City of Canton*, 489 U.S. at 389. For example, the Supreme Court has explained that lack of training "in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to [provide such training] could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* at 390 n.10. The

second situation is where a municipality fails to act in response to the specific need to train a particular officer. *See, e.g.*, *Brown*, 219 F.3d at 458. On their claim of inadequate training on the use of force, Plaintiffs allege the first scenario; that is, they assert that Aaron's death was a foreseeable consequence of the lack of training on appropriate use of force.

Because Plaintiffs do not contend that the unconstitutional training policy caused any prior injuries, they must establish deliberate indifference based entirely on one incident—the shooting of Aaron Hobart. Usually, a plaintiff "must demonstrate 'at least a pattern of similar incidents in which the citizens were injured to establish the official policy requisite to municipal liability under Section 1983.'" *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (quoting *Rodriguez v. Avita*, 871 F.2d 552, 554–55 (5th Cir. 1989)); *see also Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (same); *Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir. 2010) ("Usually a plaintiff must show a pattern of similar violations, and in the case of an excessive force claim, as here, the prior act must have involved injury to a third party.") It is possible, although narrowly so, for a plaintiff to prove municipal liability for failure to train based on a single incident. Under this "single incident" exception, Plaintiffs' evidence must show that Chief Krahn had sufficient notice that the failure to train officers on the proper use of force was likely to lead to a violation of the Fourth Amendment rights of those they would encounter. *See Brown*, 219 F.3d at 460.

Unlike in *Brown*, which was based on the alleged inadequate training of a single deputy, Plaintiffs do not base this claim on the charge that only Officer Estrada received deficient training in the proper use of force. Rather, the evidence—in particular, the

22

testimony of Sgt. Claborn—indicates that the use of force training provided to all officers in the SPD may have been constitutionally deficient. In sum, it is indisputable that Chief Krahn knew that SPD officers would find themselves in situations where they were required to determine what level of force to use. The City equipped its officers with firearms, allowing them to use deadly force.  And, a fact question remains as to whether the City trained its officers when to use different levels of force, and under what circumstances the use of deadly force would be appropriate. In light of these facts, a jury could find that the need to train SPD officers in the constitutional limitations on the use of force, and the use of deadly force in particular, was  "'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *See City of Canton*, 489 U.S. at 390 n.10.

### (c) Causation

Plaintiffs "must meet a heightened standard of causation in order to hold a municipality liable under § 1983." *Valle*, 613 F.3d at 546 (citing *City of Canton*, 489 U.S. at 391). The municipality's failure to train must be the "moving force" that caused the constitutional violation. *Brown*, 219 F.3d at 461. This requires Plaintiffs to establish a "direct causal link" between the municipality's policy and the constitutional injury. *Brown*, 520 U.S. at 404. Here, the link is plainly established. If Plaintiffs' evidence is believed, then Aaron Hobart was killed as the result of an unconstitutional use of force by Officer Estrada. Chief Krahn and Sgt. Claborn have testified to the fact that—in shooting as he was going unconscious, and notwithstanding the fact that Aaron Hobart may have been moving away from Officer Estrada at the time he was shot—Officer Estrada acted consistently with his training at the SPD. Had Officer Estrada been properly trained on

when to use deadly force as opposed to other, lesser forms of force, it is highly likely that Aaron's death could have been avoided. Thus, the evidence submitted by Plaintiffs indicates that Aaron's death was, at least in part, the direct result of improper training on the use of force. The facts in evidence make this question appropriate for a jury.

### ii. Failure to train Officer Estrada on CIT procedures

Plaintiffs also claim that the SPD failed to provide sufficient training to Officer Estrada on CIT procedures. Again, Plaintiffs do not present evidence of prior injuries to third parties, and therefore seek to establish a policy of inadequate training under the single incident exception, discussed above.

### (a) Adequacy of training

There is conflicting summary judgment evidence regarding whether or not Officer Estrada received adequate training on CIT procedures. Two of Defendants' witnesses, Sgt. Claborn and Defendants' expert, Albert Rodriguez, testified that Officer Estrada completed CIT training in compliance with the TCLEOSE requirement. However, Officer Estrada's training record indicates that he completed zero hours of the "CIT(16hr)-BPOC" course (Doc. No. 72-19), and, as discussed above, Plaintiffs point out that the materials used in the special sixteen-hour CIT training are substantially more thorough than the section of materials from the academy addressing CIT. (*See* Doc. Nos. 72-10, 72-11.)

In order to show that this less-thorough training was actually inadequate, and that the City knew it was inadequate, Plaintiffs point to Chief Krahn's knowledge of the importance of CIT training, and the fact that he knew or should have known of the

dangers of failing to provide such training. Chief Krahn knew, at least as of 2007 or 2008, that there was a "lack of an effective means for Fort Bend County Law Enforcement agencies to deal with mental health calls for service and mental health commitments." (Doc. No. 72-13 at 34.) Chief Krahn was part of a team that found it necessary to train and equip police officers to follow a "mental health protocol as set by statute or policy expediting the process to ensure the person get the help he or she needs." (*Id.* at 6.)

Moreover, Chief Krahn and Sgt. Claborn were both aware, before December 2008, that there were a growing number of interactions with mentally ill individuals and that CIT training was mandated by TCLEOSE. (Claborn Dep. at 183:15-20; 264:10-265:4.) For this reason, officers in the SPD were supposed to have sixteen hours of CIT training by August 2008. (Krahn Dep. at 67:5-9.) Before Aaron's death, no one at the SPD was qualified to provide CIT training, and it was not until four months after the training was supposed to have been completed that the City began efforts to ensure its compliance with the TCLEOSE standards. (Claborn Dep. at 28:20-29:1.) Thus, though TCLEOSE mandated that the city have a trained CIT officer to train other officers in the SPD, the City did not send any officer to receive such training until six months after Aaron was killed. (*Id.* at 28:20-31:15.) There was no field training in CIT at all before February 2009. (*Id.* at 205:20-23.) Finally, Sgt. Claborn testified that, as of December 2008, the SPD had a "handful" of employees who had not yet completed their CIT training. (*Id.* at 31:8-13.)

The Fifth Circuit has considered whether the failure to implement mandatory CIT training can constitute an actionable municipal policy under Section 1983. In *Valle*, the

25

plaintiffs presented evidence that the City of Houston chose not to implement a 2004 proposal for mandatory CIT training, prepared at the direction of the Executive Assistant Chief of Police. 613 F.3d at 545. The court considered the two recommendations made in the 2004 proposal: "(1) that *all* patrol officers be required to complete twenty-four hours of CIT training, and (2) that all patrol *sergeants* be required to complete CIT training." *Id.* The court reasoned that "[t]he 2004 proposal suggests that the City recognized that mental health situations were not being adequately dealt with by CIT-trained officers and that there was a need for additional CIT training." *Id.* The court held that the City's failure to implement those recommendations raised a genuine issue of material fact as to whether "the department's decision not to implement the CIT training recommendations in the 2004 proposal constituted an official policy of failing to adequately train." *Id.* at 545.

The facts of this case are somewhat different from *Valle*, as Defendants present conflicting evidence as to whether the City was implementing the mandated CIT training before Aaron's death, and as to whether Officer Estrada himself received the required CIT training. However, that factual dispute does not disrupt the parallel between this case and *Valle*: here, as there, the policymaker knew of the importance of CIT training, and, at least arguably failed to implement such training adequately prior to the death of Aaron Hobart. Though it is a close question, the Court finds that a genuine issue of material fact remains as to whether the SPD's decision not to implement the state-mandated CIT training recommendations in a timely manner, combined with its approval of arguably insufficient sixteen-hour supplemental training for some officers, including Officer Estrada, constitutes an official policy of failing to adequately train.

26

**(b) Deliberate indifference**

An even closer question in this case is whether the City's failure to train Officer Estrada was undertaken with deliberate indifference. As discussed above, there are two situations in which deliberate indifference might be found. On this claim, Plaintiffs allege both that the City failed to provide adequate training in light of foreseeable serious consequences that could result from such failure, and that the City failed to act after it should have been on notice that Officer Estrada, in particular, needed further CIT training.

With regard to the first contention, Plaintiffs point again to Chief Krahn's knowledge of the importance of CIT training, and his failure to ensure that all SPD officers received proper training. Even in *Valle*, though, such evidence established the existence of a policy of inadequate training, but on its own was insufficient to prove deliberate indifference. 613 F.3d at 547-50. The plaintiffs in *Valle* still needed to show that the unconstitutional use of excessive force was the "highly predictable" consequence of sending non-CIT officers to a situation involving an individual with mental health issues. *Id.* at 549. The plaintiffs could not make such a showing, and the court concluded that they failed to satisfy the deliberate indifference prong. *Id.* Similarly here, Plaintiffs must show that Chief Krahn was on notice that the unconstitutional use of force against a person with mental health issues was likely to result from his failure to provide sufficient CIT training. *Id*; *see also Brown*, 219 F.3d at 460. On this point, Plaintiffs contend that the City failed to act in response to a clear need to train Officer Estrada.

In *Brown*, the Fifth Circuit found the City of Bryan County liable for the acts of a deputy who, after a car chase, arrested and injured the plaintiff in violation of the

plaintiff's constitutional rights. 219 F.3d at 468. The court found that Bryan County could be held liable for the single decision of a policymaker—in that case, the sheriff—not to train the deputy. *Id.* at 461-64. "[W]ith respect to specific officers," the court held, "a need for more or different training can be so obvious and the inadequacy of training so likely to result in a violation of constitutional rights that the city can reasonably be said to have been deliberately indifferent to the need for training." *Id.* (citing *City of Canton*, 489 U.S. at 390). The court based its finding of liability on the existence of facts on which a reasonable jury could have concluded that the sheriff was on notice that that particular deputy would likely use excessive force. *Id.* at 454-55. The deputy at issue was twenty-one years old, and inexperienced in law enforcement. *Id.* at 454. Prior to joining the department, he had been arrested for "assault and battery, resisting arrest, public drunkenness, driving while intoxicated, possession of false identification, driving with a suspended license, and nine moving traffic violations." *Id.* at 454-55. At the time he was hired, the deputy had an outstanding warrant for his arrest for violation of his probation. *Id.* While at the department, the deputy was involved in a number of "takedown" arrests, similar to the arrest that led to the lawsuit in that case. *Id.* at 455. Beyond on the job training and access to training videos, the department provided no training at all to the deputy, *id.*, and did not provide guidelines as to how officers were to supervise such untrained reserve deputies. *Id.* at 456. Considering all of these facts, the Fifth Circuit upheld the jury's conclusion that the county was liable under Section 1983 for failure to train.

Five years later, in *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 385 (5th Cir. 2005), the Fifth Circuit again considered whether,

under different facts, the failure to train a single officer gave rise to municipal liability when it resulted in only a single incident. In *Davis*, the officer had a record of improper behavior that the plaintiffs alleged should have put his supervisors on notice of the officer's need for training. *Id.* at 382. The Fifth Circuit acknowledged that the officer in *Davis* had engaged in activities exhibiting "lack of judgment, crudity, and perhaps illegalities," but emphasized that his prior bad acts did not involve excessive use of force and injury to a third party, and therefore could not have put the policymakers on notice of his need for training on that particular issue. *Id.* at 383. On that basis, the court concluded that the municipality could not be held liable for the officer's conduct. Aside from *Brown* itself, the Fifth Circuit has never held that the failure to train a single officer can give rise to municipal liability, and has characterized the single incident exception as inherently "a narrow one, and one that we have been reluctant to expand." *Burge*, 336 F.3d at 373 (citing *Pineda v. City of Houston*, 291 F.3d 325, 334-35 (5th Cir. 2002)).

The Court must determine whether the facts of this case are more closely analogized to *Brown* or to the other Fifth Circuit cases, including *Davis*, finding that the failure to train a single officer is insufficient to establish municipal liability. The facts in this case demonstrate that Officer Estrada had a pattern of failing to perform satisfactorily in the areas of control of conflict, use of judgment, officer safety, and communications. (Doc. No. 72-20.) There were several training exercises where other officers figuratively "died" as a result of Officer Estrada's conduct. *Id*. On three occasions, Officer Estrada received the lowest rating possible on "common sense and judgment." (*Id.*) On another occasion, he received the second lowest rating in that category. (*Id.*) Officer Estrada never received above the minimum rating in that category. (*Id.*) He received the lowest

possible rating on "control of conflict" on one field training. (*Id.*) Officer Estrada also received the lowest or second lowest rating for "officer safety" on four separate occasions, and received unacceptable ratings on "communications" on four separate occasions. (*Id.*) Notwithstanding these issues, and perhaps in response to them, one officer instructed Officer Estrada not to hesitate to use deadly force when protecting the lives of others, especially other officers. (Doc. No. 72-2 at 227:7-21.). Plaintiffs urge that "telling an officer who has repeatedly failed to use control, common sense, judgment or appropriate communications not to hesitate to use deadly force is deliberately indifferent to the constitutional rights of those that they are encountering." (Doc. No. 84 at 22.) However, even if this officer's recommendation were erroneous, it would be at most an error on the part of the particular officer who made the comment, not deliberate indifference attributable to the policymaker.

Officer Estrada's prior acts do not rise to the level of the prior bad acts in *Brown.* First, unlike in *Brown*, the connection between Officer Estrada's prior conduct and the shooting of Aaron Hobart is tenuous. In *Brown*, the deputy had had prior incidents of "takedown" arrests of the sort that led to the *Brown* case. Here, it is not clear that Officer Estrada's issues with control, common sense, judgment, and communication should have alerted Chief Krahn, or even Officer Estrada's direct supervisors, to the fact that Officer Estrada would use excessive force in dealing with a mentally ill individual. Moreover, unlike in *Brown*, where the sheriff had direct knowledge of the deputy's prior incidents, there is no evidence that Chief Krahn actually knew about Officer Estrada's shortcomings until after Aaron's death. In *Brown*, the Fifth Circuit explained that the fact that the "sheriff's department had relatively few officers[] makes it highly unlikely that Burns

was 'lost in the crowd,' and his training simply neglected." 219 F.3d at 459. No such evidence exists in this case. Finally, and perhaps most importantly, the Fifth Circuit noted in *Roberts v. City of Shreveport* that there is a difference between a complete failure to train—as in *Brown*—and a failure to train in one limited area. 397 F.3d 287, 295-96 (5th Cir. 2005); *see also Valle*, 613 F.3d at 548 ("We further note that it is difficult to show deliberate indifference in a case such as this one where the City has implemented at least some training."). Here, as in *Roberts* and *Valle*, there was not a complete absence of training. Indeed, there was not even a complete lack of CIT training. Though disagreement remains as to how much CIT training Officer Estrada received and whether that training was sufficient, he undeniably did receive *some* CIT training, and indisputably received training in other areas, as well.

To allow Plaintiffs to proceed under the single incident exception on these facts would ignore the Fifth Circuit's admonition to construe *Brown* narrowly. *Burge*, 336 F.3d at 373. As to this claim, then, summary judgment must be granted in favor of Defendants.

### iii.  Failure to train dispatcher(s)

Plaintiffs' third failure to train argument is based on their claim that the SPD provided inadequate training to its dispatchers, or at least to James Patterson, the dispatcher who took Mrs. Hobart's call on February 18, 2009. Plaintiffs claim that Patterson was not trained on how to implement the SPD's protocol for addressing mental health calls, and that, in fact, he was unaware that such protocol even existed. (Patterson Dep. at 50:14-53:19, 55:2-57:24, Doc. No. 83-4.) As a result, Patterson did not engage in any of the procedures outlined in General Order 025, "Handling Mentally Ill Persons," such as informing Mrs. Hobart that a regular police officer was being dispatched, telling

Mrs. Hobart to have someone meet the officers outside of the location, referring to a list of questions specific to a mental health call, or ensuring that there were two responding officers. (Doc. No. 72-17 at 3568.)

The evidence in support of Plaintiffs' claim is limited to the dispatcher's own testimony that he did not receive CIT training. Thus, Plaintiffs' evidence, at best, supports a finding that the City failed to train only this one dispatcher. It is unclear whether Plaintiffs intend to establish that there was a policy of improperly training all dispatchers, or that just this one dispatcher was improperly trained. Under either theory, though, Plaintiffs' claim must fail.

There is insufficient evidence to support a claim that the City had a general policy of failing to train its dispatchers, as there is no evidence to indicate that this sole dispatcher's training was not the result of mere negligence on the part of City employees. The Supreme Court made clear in *City of Canton* that the "negligent administ[ration]" of "an otherwise sound program" does not indicate deliberate indifference. 489 U.S. at 391. Patterson testified that he did not read the entire training manual that he was given (Patterson Dep. at 51:4-14.) He stated that he was "pretty much" told to read it, but that his trainers did not go over the entire manual with him. (*Id.*) This testimony seems to imply either a failure either on Patterson's part, or perhaps negligence on the part of whoever provided his direct training. Unlike Plaintiffs' claim regarding the City's failure to train on the proper use of force, there is no testimony from Sgt. Claborn, Chief Krahn, or anyone else to suggest that Patterson's behavior on February 18, 2009 was consistent with his training.

If Plaintiffs' claim is instead that there was a particular need to provide additional training to this one dispatcher, such a claim also must fail. There is no evidence that Patterson had any deficiencies which would have given rise to the need to provide him additional training. Thus, Defendants are entitled to summary judgment on Plaintiffs' claim that the City failed to train its dispatcher(s).

### B.  Section 1983 Claim against Chief Krahn

In addition to pursuing their case against the City, Plaintiffs also bring a claim against Chief Krahn under Section 1983 for his role in the City's failure to train.

### 1.  Supervisory Liability

Supervisory officials may be held liable only if they affirmatively participate in acts that cause a constitutional deprivation, or if they implement unconstitutional policies that causally result in plaintiff's injury. *Mouille v. City of Live Oak*, 977 F.2d 924, 929 (5th Cir. 1992). Plaintiffs seek to hold Chief Krahn liable for his implementation of the unconstitutional training policies that caused Aaron Hobart's death. The standard applicable to failure to train allegations against supervisors is the same as that applied to municipal liability. *Roberts*, 397 F.3d at 293 (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 452-54 nn.7-8 (5th Cir. 1994)). Because the Court already has considered Plaintiffs' failure to train claims, and has concluded that the only failure to train claim that may proceed is the claim that the City failed to train on the appropriate use of force, that is the only claim that the Court must consider in determining Chief Krahn's liability. (Plaintiffs' two other failure to train claims fail as against Chief Krahn for the same reasons that they fail as against the City of Stafford.) Because the standard is the same, and because Chief Krahn is the policymaker whom the Court has determined was

arguably deliberately indifferent, the Court need not re-analyze the failure to train claim here. As stated above, there remain factual questions as to the existence of an official policy of failing to adequately train officers on the use of force, Officer Krahn's deliberate indifference, and whether this policy was the moving force in Aaron's death. As to Chief Krahn, though, Plaintiffs' claim must overcome one more hurdle.

### 2. Qualified Immunity

Section 1983 claims against public officials in their individual capacities are subject to the defense of qualified immunity. *Foley*, 355 F.3d at 338. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *DePree v. Saunders*, 588 F.3d 282, 287 (5th Cir. 2009) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

In examining whether an official is entitled to qualified immunity, courts "conduct the two-step analysis" outlined in *Saucier v. Katz*, 533 U.S. 194 (2001). *See Lytle v. Bexar Cnty.*, 560 F.3d 404, 409 (5th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009)). The test requires courts to look at (1) "whether, taking the facts in the light most favorable to the plaintiff, the [defendant's] alleged conduct violated a constitutional right;" and (2) "whether the right [claimed to be violated] was clearly established at the time of the conduct." *Lytle*, 560 F.3d at 410. If a court answers "both the constitutional violation and

34

qualified immunity questions affirmatively, the [defendant] is not entitled to qualified immunity." *Id.*

Though the Supreme Court has listed only the two steps described above, several Fifth Circuit panels have stated that the qualified immunity question involves not only an inquiry into whether the right was clearly established at the time of the conduct, but also whether the official's action was objectively reasonable in light of the rules clearly established at the time it was taken. *See, e.g.*, *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009); *Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) ("Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable.").

In its April 2011 Order, the Court held that Officer Estrada is not entitled to qualified immunity as a matter of law. *Hobart*, 784 F. Supp. 2d at 748-49. The Court explained that "Plaintiffs provide evidence of a factual scenario under which Officer Estrada's use of force would constitute a violation of clearly established Fourth Amendment law, and which no reasonable officer could interpret to be otherwise." *Id.* at 748. Plaintiffs now have presented evidence that Officer Estrada's actions were entirely consistent with the training he received from the SPD. Crediting Plaintiffs' version of the facts, no reasonable officer in Chief Krahn's circumstances would have believed it to be lawful to fail to train police officers on the appropriate use of force. *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001). In 2009, it was clearly established that deadly force cannot be used unless the officer has objectively reasonable cause to believe that a person poses a threat of serious physical harm. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). It would be illogical to suggest that the deliberately indifferent failure to train

police officers about appropriate levels of force was not clearly established at the same time, and the Court concludes that it was.

## IV.    CONCLUSION

For the reasons discussed above, the Court finds that Defendants' Motion for Summary Judgment must be **GRANTED IN PART** and **DENIED IN PART** as follows:

- Defendants' motion must be denied as to Plaintiffs' claims against the City based on the City's policy of encouraging or condoning the excessive use of force and of failing to train on the appropriate use of force;

- Defendants' motion must be granted as to Plaintiffs' other Section 1983 claims against the City;

- Defendants' motion must be denied as to Plaintiffs' claim against Chief Krahn for failure to train on the appropriate use of force; and

- Plaintiffs are given leave to amend their Complaint to state a claim based on ratification.

If Plaintiffs wish to amend their Complaint to add a claim based on ratification, they must do so within fifteen (15) days of this Memorandum and Order.

**IT IS SO ORDERED.**

**SIGNED** this the 17th day of April, 2012.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

36