UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEVE HOBART, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-cv-3332 |
| | § | |
| CITY OF STAFFORD, et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendants City of Stafford ("the City" or "Stafford") and Chief Bonny Krahn's ("Chief Krahn") Motion for Summary Judgment Addressing Ratification Theory of Recovery. (Doc. No. 94.) After considering the motion, all responses thereto, and the applicable law, the Court finds that the motion must be **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

This lawsuit arises from the death of Aaron Hobart ("Aaron"), son of Plaintiffs Steve and Pam Hobart (collectively, "the Hobarts" or "Plaintiffs"). Many of the facts of this case have been laid out in the Court's April 29, 2011 Memorandum and Order (the "April 2011 Order"), and the Court's April 17, 2012 Memorandum and Order (the "April 2012 Order"). (Doc. Nos. 79, 87.) The circumstances leading up to Aaron' Hobart's death are recounted below, as are the steps the City took after the incident. Additional facts, including facts about the City's policies, can be found in the Court's prior orders.

1

### A.  Aaron Hobart's Death

Nineteen-year-old Aaron Hobart suffered from a schizoaffective disorder, which resulted in delusions.  (Doc. No. 72-24, Moreland Decl.)[1]  Aaron's mental health was deteriorating in the days, weeks, and months leading up to his death on February 18, 2009.  In 2008, Aaron was examined by three doctors, and had two visits with the third, Dr. C. Scott Moreland, a psychiatrist.  (Doc. Nos. 32-9, 32-10, 32-11, Aaron Hobart's Medical Records.)  Dr. Moreland's records indicate that Aaron had stopped taking his medication in November 2008.  (Doc. No. 32-9 at 178-79.)  On February 16, 2009, Mrs. Hobart called Dr. Moreland's office to request an immediate appointment.  (*Id.*)  The office scheduled an appointment for Aaron on February 18, the next available slot.  (*Id.*)  Mrs. Hobart said that, at that time, Aaron was not posing a danger to himself or to others.  (*Id.*)  Mrs. Hobart was instructed to call Dr. Moreland's office if there was any change in Aaron's mental status, and was told that, if Aaron became a danger to himself or others, she should call 911 or take Aaron to the emergency room.  (*Id.*)

On February 18, 2009, Aaron refused to leave his room to go to his appointment with Dr. Moreland.  When Mr. Hobart came home from work, he found Aaron in his room, speaking "belligerently and abusively" in a raspy alternate voice.  (Doc. No. 72-5, Steve Hobart Dep. at 20:8–24:23.)  Mrs. Hobart called Dr. Moreland, who told her not to press Aaron to attend the appointment that day, so that Aaron could calm down.  (Doc. No. 32-9 at 183.)  Dr. Moreland also sent a follow-up email to Mrs. Hobart giving her instructions on how to administer Aaron's medication, and providing information from the Houston Crisis Intervention Team ("CIT") website regarding how to request emergency help.  (*Id.* at 184–85.)  The information stated that

---

[1] Aaron had also previously been diagnosed with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and depression.  (Doc. No. 72-38, Moreland Medical Records, Initial Evaluation at 1.)

the CIT program "educates patrol officers about mental illness and tactics and techniques to help verbally de-escalate situations involving individuals in serious mental health crises," that one should call for a CIT officer "[w]hen the situation involves a person in a serious mental health crisis," and that, if the situation is an emergency, one should call 911 and request a CIT officer. (*Id.*)  It also noted that "[i]f the person is mentally ill and poses a substantial risk of imminent harm to self or others, Texas Peace officers have the authority to take the individual to a facility for an emergency mental health evaluation, even if the person is involuntary.  The officer may use whatever force he needs to get the individual to the facility for evaluation." (*Id.*)

Based on the instructions in Dr. Moreland's email, Mrs. Hobart called 911 and requested a "CIT officer."  (Doc. No. 72-9, Dispatch Tr. at 1.)  She told the 911 operator, "I have a son that needs to be taken," that Aaron was "becoming . . . very violent," that he was "deteriorate" [sic] and "becoming delusional," but that "he's not hurting anyone," "needs to be in a hospital," and "needs medication." (*Id.*)  The operator informed Mrs. Hobart that an officer would come to the Hobarts' home.  (*Id.*)  A few minutes later, an employee from the Stafford Police Department ("SPD") called Mrs. Hobart twice with further questions, and Mrs. Hobart informed him that Aaron was "becoming more and more belligerent," but that he did not have any weapons in his room and that he was not "under the influence." (*Id.* at 2–3.)  Officers Garcia and Claunch from the SPD were the primary officers dispatched on the call, but Officer Estrada was the first to arrive at the Hobarts' home.  (Doc. No. 72-3, Jesus Estrada Dep. at 176:23–177:13.)

Officer Estrada testified that, prior to arriving at the home, he was aware that Aaron was hallucinating, but did not know if Aaron was mentally ill or was simply under the influence of drugs. (*Id.* at 138:6–139:24.)  Officer Estrada also testified that he believed dispatch had

informed him that Aaron did not have a weapon.  (*Id.* at 179:21–180:11.)  SPD Sergeant Dustin

Claborn ("Sgt. Claborn") testified that Officer Estrada asked dispatch to request Mrs. Hobart to

step outside to talk to him when he arrived.  (Doc. No. 72-2, Claborn Dep. at 126:16–20.)

However, it is undisputed that, when Officer Estrada arrived, Mrs. Hobart let him into the house.

(*Id.* at 128:12–17.)  Sgt. Claborn also testified that Officer Estrada did not attempt to learn where

Aaron was located or whether he was trying to hurt himself or others.  (*Id.* at 127:19–130:4.)

The video camera in Officer Estrada's car was running during the events at issue in this

case, and both sides have provided that footage as an exhibit.  The video shows Officer Estrada

entering the Hobarts' home by himself at approximately 15:07:59 on the video's clock.  For a

period of time, only the front yard is visible, with audio from inside the home captured on

Officer Estrada's microphone.  Immediately after he enters the home, one can hear Officer

Estrada conversing with Mrs. Hobart.  At approximately 15:08:15, one can hear noises, and

Officer Estrada shouts, "Stop!" and "Get back!" several times.  At approximately 15:08:20, one

can hear gunshots.  Officer Estrada then begins shouting, "Goddamnit!" "Shots fired!" and "Oh

my god!" and Mrs. Hobart begins screaming loudly.  The video then shows two other SPD

officers arriving in the house at approximately 15:08:43.  They accompany Officer Estrada onto

the lawn, where Estrada kneels down with his head on the ground sobbing, and remains panicked

during the next seven minutes of video and audio, repeatedly saying, "Oh my god," crying, and

stating that he cannot catch his breath.

Officer Estrada and Mrs. Hobart offer different versions of what happened during the

approximately 54 seconds that Estrada was in the house.  According to Officer Estrada, the

following occurred:  When he first entered, he thought that everything seemed quiet and normal,

and "perceived . . . that either the disturbance was over or there was no disturbance." (Estrada Dep. at 208:4–211:11.) Mrs. Hobart let him in, and the two spoke inside the house. (*Id.*) Officer Estrada then began walking down the hall, at which point Mrs. Hobart pointed down the hall, and Officer Estrada saw Aaron, approximately thirty feet away. (*Id.* at 224:17–230:24.) Aaron was in a bedroom, and at first he was facing away from Officer Estrada, not yelling, screaming, or causing a disturbance. (*Id.* at 228:3–14.) Aaron then turned and saw Officer Estrada for the first time, at which point he loudly "roared," brought his arms up "from down low to—up to his waist," and began to charge at Officer Estrada. (*Id.* at 228:15–233:24.)

At that point, Officer Estrada, who was approximately five feet away from the front door of the house, "attempted to step back away from [Aaron] to give him room" because he believed Aaron was "going to come at" him. (*Id.* at 233:23–234:2.) However, Officer Estrada was unable to get out of Aaron's way or to back out of the house because Aaron traveled the entire length of the hallway and began "attacking" Officer Estrada. (*Id.*) Officer Estrada remembers in those moments "hearing and feeling [] thumps on [his] head" that he attributes to "being punched" on the left side of his face and head. (*Id.* at 251:23–260:24.) Officer Estrada states that he attempted to pull out his baton, but was unable to do so because it got stuck in its holster. (*Id.*) He was also unable to use his spray or operate his police radio. (*Id.* at 237:16–241:13.) Officer Estrada testified that Aaron hit him to the point where Officer Estrada became "disoriented," began "seeing stars," and experienced "darkness" coming into his vision. (*Id.* at 252:4–5, 263:15–19.) He thought he was "fixing to be knocked out." (*Id.* at 264:9–24.) He then heard the sound of gunshots, but did not know that he was the one shooting, let alone who he was shooting at. (*Id.* at 262:21–263:5.) He did not know where Aaron was in relation to him when

the shooting occurred, and is not sure where Mrs. Hobart was at the time (though he thinks she was to his left).  (*Id.* at 265:3–268:13.)  A few seconds later, Officer Estrada believed that Aaron was getting back up, and he felt someone who he believed to be Aaron grabbing his vest.  (*Id.* at 275:22–277:15.)  Officer Estrada attempted to shoot his gun again, but could not get his fingers to squeeze the trigger.  (*Id.*)  The person grabbing his vest turned out to be one of his fellow SPD officers who had just entered the house.  (*Id.* at 277:12–18.)

According to Mrs. Hobart's testimony, the following occurred in the house: When Officer Estrada arrived she "was under the impression that . . . [she] was getting a CIT person that was going to explain that and was going to go through a certain procedure, so [she] was trusting that they knew what was going to happen next."  (Doc. No. 72-6, Pam Hobart Dep. at 168:12–19.)  Aaron ran from out of his bedroom and toward Officer Estrada while "flailing with his arms."  (*Id.* at 33:15–35:20.)  When he reached Officer Estrada, "Officer Estrada had his arms up," and Aaron's arms hit Officer Estrada's arms.  (*Id.*)  Mrs. Hobart did not see Aaron's arms hit Officer Estrada's head.  (*Id.* at 35:18–20.)  Although she acknowledged that she did not "see every single strike that Aaron made on Officer Estrada," Mrs. Hobart "watched them the entire time," and only closed her eyes after Officer Estrada pulled his gun from its holster.  (*Id.* at 37:20–40:25.)  The flailing stopped and "2 or 3 seconds" passed before Officer Estrada began shooting.  (*Id.* at 40:1–7.)  In the few seconds prior to the shooting there was "a separation of 2 or 3 feet" between Aaron and Officer Estrada, and Mrs. Hobart had shifted her weight to go between the two, at which point Officer Estrada pulled out his gun.  (*Id.* at 40:10–20.)

Officer Estrada fired six or seven bullets in the Hobarts' home, four of which struck Aaron:  one in the back of the right upper neck, one in the right lower back, one in the back of

6

the right hip, and one in the right middle back.  (Doc. No. 72-22, Autopsy Report at 4–6.) Officer Estrada did not have any bruises on his face from the incident, although he did have some redness on his face that he contends was a result of the punches.  (Estrada Dep. at 254:1–255:2; Doc. No. 72-14, Photos of Estrada's Injuries.)  At the time of his death on February 18, 2009, Aaron was nineteen years old, stood five-foot-nine-inches tall, and weighed 166 pounds. (Autopsy Report at 3.)  He was barefoot and dressed in shorts and a t-shirt.  (*Id.*)  There is no suggestion that he had any type of weapon at the time.  He had, at most, a high school education.[2]  Officer Estrada stood six-foot-one-inch tall and weighed 190 pounds.  (Estrada Dep. at 53:23–54:1.)

### B.  The City's Response

Stafford's Chief of Police, Chief Bonny Krahn, testified that, in response to these events, he initiated an internal investigation into the shooting to determine whether any of the City's policies had been violated.  (Doc. 95-1, Krahn Dep. at 103:5–15.)[3]  Chief Krahn placed Assistant Chief Phil Horton in charge of effectuating the investigation.  (*Id.* at 103:9–15.)  Assistant Chief Horton assigned Sgt. Claborn to conduct the internal investigation.  (*Id.* at 103:19–21.)  Chief Krahn never personally discussed the shooting with Officer Estrada, apparently on the advice of the City's attorneys.  (*Id.* at 102:20–103:4.)

---

[2] The record is does not indicate whether Aaron completed high school.  Aaron had difficulty focusing in school even before he began exhibiting signs of schizoaffective disorder.  (Moreland Medical Records, Initial Evaluation at 1.)  Before his schizoaffective disorder diagnosis, as an incentive to focus on his studies, the Hobarts allowed him to participate in a trip to Italy that he expressed interest in.  (*Id.*)  After he returned from this trip, however, he became "obsessed and delusional."  (*Id.*)  The record does not indicate whether he continued his high school education after this trip.

[3] The "polic[ies] for the operation of the department" are contained in the "General Orders" (Krahn Dep. at 31:14–17), which define themselves as "standing written guidelines that provide purpose, policy, and procedures for carrying out Stafford Police Department operations and activities."  (Doc. No. 72-8, SPD General Orders at 359.)

Sgt. Claborn testified that his investigation consisted of reviewing the audio and video available from Officer Estrada's vehicle on the day of the shooting, as well as an interview Detective Richard Ramirez conducted of Officer Estrada as part of a criminal investigation into the incident.   (Doc. No. 95-2, Claborn Dep. at 64:15–17, 66:11–24.)[4]  He stated that SPD policy "requires that the use of force review include only the information and perception of the officer [leading] up to the use of force" (*id.* at 66:13–15), and explained that reviewing these records answered all of his questions about Officer Estrada's perception leading up to the use of deadly force.  (*Id.* at 66:25–67:5.)  As a result, at no point during the investigation did Sgt. Claborn discuss the events of February 18, 2009 with Officer Estrada, with the other officers present, or with the Hobarts.  (*Id.* at 66:25–67:5; Administrative Review #I-09-02 at 1.)

After reviewing what he described as all of the relevant evidence, Sgt. Claborn concluded that Officer Estrada was "in fear for his life" and his use of deadly force was objectively reasonable in light of the "totality of this situation."   (*Id.* at 67:16–19, 72:1–74:1.)  Specifically, he indicated that it "could be a reasonably objective use of force" to begin shooting if an officer is about to lose consciousness.  (*Id.* at 72:1–17.)  At his deposition, he confirmed that he believed Officer Estrada's decision to shoot while losing consciousness was objectively reasonable, even in light of the fact that Officer Estrada did not know the location of innocent bystanders, including Pam and Steve Hobart and other officers; it was objectively reasonable even in light of the fact that Aaron Hobart was "barefoot, in shorts and a T-shirt," and weaponless; it was objectively reasonable even though Officer Estrada apparently could not specifically recall how

---

[4] Sgt. Claborn's Summary of the Incident indicates that, in addition to the aforementioned materials, he also reviewed the in-car video and audio of Officers Claunch and Garcia, the statements of Officer Estrada and Steve and Pam Hobart, and a timeline established by Ft. Bend County's District Attorney's Office.  (Doc. No. 72-7, Administrative Review #I-09-02 at 1.)

8

Aaron struck his face, or how many times Aaron struck his face; it was objectively reasonable even though Aaron Hobart's autopsy revealed that he had gunshot wounds in his side and back, suggesting that Aaron may not have been facing Officer Estrada at the time of the shooting; it was objectively reasonable even in light of the fact that Officer Estrada did not know Aaron's location in relation to himself when he first fired; and it was objectively reasonable even though Sgt. Claborn could not say whether Officer Estrada, in the time it took him to retrieve his gun, could have retrieved his pepper spray or his baton.  (*Id.* at 67:6–19, 69:4–15, 72:21–73:19, 75:8–16, 75:13–76:17, 78:11–79:6, 88:13–90:20.)

Sgt. Claborn was able to conclude that Officer Estrada's use of deadly force was appropriate because he believed he "was about to be seriously injured or killed," a belief that was reasonable because Aaron Hobart was "in proximity to [Officer Estrada]"; because Officer Estrada "remember[ed] [Aaron's] hand coming at him again" after beginning to lose consciousness; because Officer Estrada was "fairly certain of who was assaulting him"; because Officer Estrada could not be perfectly certain of what was occurring as he was "ducking down, trying to cover up"; because people turn and change positions in a fight, and Aaron did not necessarily have to be facing Officer Estrada to be striking him; and, because the circumstances were such that if Officer Estrada lost consciousness, "the suspect" could gain "access to everything on [Officer Estrada's] belt."  (*Id.* 67:6–10, 69:4–15, 70:19–71:7, 73:12–74:1, 74:20–24, 75:21–22; 92:20–93:6.)  Sgt. Claborn also testified that he would find Officer Estrada's use of force reasonable even if Aaron and Officer Estrada had "actually separated," as Ms. Hobart testified they had.  (*Id.* at 146:1–14.)

After Sgt. Claborn completed his review of the events of February 18, 2009, he concluded that Officer Estrada's actions were entirely consistent with the SPD's current training and a reasonable use of force.  (*Id.* at 65:9–13, 96:7–20.)  The purpose of Sgt. Claborn's investigation was to begin the process of determining whether Officer Estrada should be disciplined or further trained.  (*Id.* at 147:22–148:8.)[5]  As a result of Sgt. Claborn's investigation, Chief Krahn concluded that Officer Estrada's use of force was reasonable and no disciplinary action should be taken.  (*Id.* at 148:14–22.)  Chief Krahn explained that he "has not been persuaded that Officer Estrada's decision to fire when he did was unreasonable." (Doc. No. 94-3, Krahn Decl. ¶ 19.)  However, he also stated that "significant" to his conclusion was the fact that Officer Estrada "made no evaluation of whether shooting Hobart would be authorized by any city policy, police department regulation or training but, instead fired driven only by the self-preservation basic instinct to avoid dying at that instant."  (*Id.* ¶ 24.)  He further defended his assessment that Officer Estrada did not employ an excessive amount of force by explaining that he does

> not believe it appropriate for me to now sit in the comfort of my office at no personal risk to my life, and with no limitation on my time, and substitute my personal opinion in place of the conclusion of Officer Estrada about the seriousness, or imminence of the danger he perceived when he made the decision to fire.

The record contains some evidence suggesting that the investigation of Officer Estrada's conduct did not proceed in accordance with the SPD's normal investigative procedures.  For instance, an investigation of use of force is normally initiated by filing out a "response to resistance" form, which is reviewed by the chain of command.   (*Id.* at 150:15–151:2.)  Sgt.

---

[5] Sgt. Claborn himself did not make the final determination of whether Officer Estrada should be disciplined.  (*Id.* 147:22–148:22.)

10

Claborn admits that he was not in Officer Estrada's direct chain of command, and he does not know why he was asked to investigate this incident. (*Id.* at 151:12–152:7.)[6] Additionally, SPD's General Order 33.2.4 provides that the "Chief of Police will notify complainants of the findings of [an] investigation." (Doc. No. 72-8, General Order 33, at 3.) Although Sgt. Claborn did not know that the Hobarts were complainants at the outset of his investigation, he learned that they were complaining of Officer Estrada's conduct when they issued a press release. (Claborn Dep. at 149:15–150:8.) General Order 33 provides that complaints can be either formal, signed, and written complaints or informal, oral complaints. (General Order 33, at 2–3; Claborn Dep. at 152:16–155:6.)[7] Although the Hobarts' press statement constituted an oral complaint, it appears that they were not notified of the outcome of this investigation. (Claborn Dep. at 148:25 – 150:10, 152:16–155:6.)

Following the completion of the investigation, Officer Estrada was returned to his position as a patrol officer. (*Id.* at 95:15–23, 147:4–21.)[8] In fact, Chief Krahn even selected Officer Estrada to be one of the SPD police officers to attend a Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE") "train the trainer" course, the completion of which would enable Officer Estrada to provide CIT training to others. (*Id.* 30:11–17, 32:5–17.) Sgt. Claborn testified that he believed Chief Krahn made this decision based on his belief that Officer Estrada's "need to use force in a situation involving a person with mental

---

[6] Sgt. Claborn at first indicated that Officer Estrada's supervisor was not asked to investigate this incident because he was "out on the scene;" however, he subsequently acknowledged that, in the past, other response to resistance forms had been reviewed by supervisors who had been on the scene. (Claborn Dep. at 151:18–152:2.)

[7] Sgt. Claborn at first indicated that the policy requiring notification applied only to complaints that had been written down. (Claborn Dep. at 153:7–154:4.) However, when presented with the General Order, Sgt. Claborn appeared to concede that the Hobarts had an oral complaint. (*Id.* at 155:1–6.)

[8] During the investigation, Officer Estrada was on administrative leave for a period of time, and also worked in several office positions. (*Id.* at 147:4–21.)

illness . . . gives him an experience that can be relayed and hopefully be effective training for officers in the future." (*Id.* 32:18–33:7.)

## II.     PROCEDURAL HISTORY

Plaintiffs filed their original Complaint on October 15, 2009.  (Doc. No. 1.)  Shortly thereafter, the City, Chief Krahn and Officer Estrada (collectively "Defendants") filed a Motion to Dismiss.  (Doc. No. 7.)   Before the Court issued a ruling on the Motion to Dismiss, Defendants filed a Motion for Summary Judgment.  (Doc. No. 32.)  On September 29, 2010, the Court issued a Memorandum and Order (Doc. No. 45) granting in part and denying in part the Motion to Dismiss, and granting Plaintiffs leave to file an amended complaint to cure the deficiencies identified in that order.[9]   On October 19, 2010, Plaintiffs filed an Amended Complaint.  (Doc. No. 54.)   On November 2, 2010, Defendants filed a second Motion to Dismiss.  (Doc. No. 61.)   The Court subsequently delayed Plaintiffs' response deadline with respect to the portions of the Motion for Summary Judgment addressing Plaintiffs' § 1983 claims against the City.  (February 9, 2011, Minute Entry.)

On April 29, 2011, the Court ruled on the pending Motion to Dismiss and portions of the Motion for Summary Judgment.  (Doc. No. 79.)  The Court denied Defendants' Motion to Dismiss with respect to the majority of Plaintiffs' claims, but held that Plaintiffs failed to allege sufficient facts to state a claim against the City based on ratification.  (*Id.* at 29–30 n.15, 50.) The Court granted summary judgment with respect to Plaintiffs' state law claims, deferred adjudication of the § 1983 claims against the City and Chief Krahn until the claims against Stafford were fully briefed, and denied summary judgment on the remainder of the claims.  (*Id.*

---

[9] Specifically, the Court found Plaintiffs' allegations insufficient with respect to the claims against Chief Krahn and Stafford, along with the state-law claims against all Defendants.

at 50.)  The Court subsequently granted Defendants' unopposed motion to withdraw that portion of its April 2011 Order denying Officer Estrada's motion for summary judgment based on qualified immunity, with the understanding that that portion of the order would be re-entered once the Court rendered a decision on Chief Krahn's motion for summary judgment based on, *inter alia*, qualified immunity.  (Doc. No. 81.)

On April 17, 2012, the Court issued a Memorandum and Order addressing those portions of the Motion for Summary Judgment that related to Plaintiffs' claims against the City and Chief Krahn brought under § 1983.  (Doc. No. 87.)  The Court denied summary judgment as to Plaintiffs' claims against the City based on a policy of encouraging or condoning excessive use of force and of failing to train on the appropriate use of force; denied summary judgment as to Plaintiffs' claim against Chief Krahn for failure to train on the appropriate use of force; and granted summary judgment as to Plaintiffs' other § 1983 claims against the City and Chief Krahn.  (*Id.* at 36.)  In its April 2012 Order, the Court also considered Plaintiffs' request to reconsider that portion of its prior Memorandum dismissing Plaintiffs' ratification claim.  (*Id.* at 15 n.2.)  Recognizing that the evidence submitted by Plaintiffs suggested that they did, indeed, appear to have a § 1983 claim based on ratification, the Court granted Plaintiffs leave to amend their complaint to add a cause of action premised on ratification.  (*Id.*)

On May 2, 2012, Plaintiffs filed their Second Amended Complaint, which includes a § 1983 claim premised on ratification of Officer Estrada's alleged excessive use of force.  (Doc. No. 88.)  Plaintiffs pled this cause of action against both the City and Chief Krahn.  (*See id.* at 11 (indicating that the claims in Part B of the Complaint are brought against the City and Chief Krahn).)  The Court then granted Defendants' unopposed motion to withdraw that portion of its

April 2012 Order denying Chief Krahn's motion for summary judgment based on qualified immunity, with the understanding that that portion of the order would be re-entered once the Court rendered a decision on Chief Krahn's second motion for summary judgment with regards to the ratification theory of recovery, which would be based on, *inter alia*, qualified immunity. (Doc. No. 90.)  On August 15, 2012, the City and Chief Krahn moved for summary judgment on Plaintiffs' § 1983 claims premised on a ratification theory of recovery.  (Doc. No. 94.)  The Court now turns to this motion.

### III.   LEGAL STANDARD

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. Fed. R. Civ. P. 56(a).   Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted).

"Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party." *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007).  The Court may not make credibility determinations or weigh the evidence.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  "The court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that

is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151.   Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## IV.   ANALYSIS

### A.  § 1983 claim against the City of Stafford based on ratification

Municipalities are considered "persons" subject to suit under § 1983 for civil rights violations.   *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).   However, "a municipality cannot be held vicariously liable for the constitutional torts of its employees or agents."  *Gros v. City of Grand Prairie*, 181 F.3d 613, 615 (5th Cir. 1999) (citing *Monell*, 436 U.S. at 694).   This is because § 1983 requires a showing that the defendant "subject[ed] or cause[d a plaintiff] to be subjected" to a deprivation of a federal right, *see* 42 U.S.C. § 1983, a requirement that "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor."  *Monell*, 436 U.S. at 692.

A municipality may be sued under § 1983 if a constitutional violation is the result of a formal policy or governmental custom.  *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010).   A plaintiff may be able to prove the existence of an unofficial policy or custom

by pointing to "a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (citation omitted). However, "[m]unicipalities can "also be liable, in certain situations, for single episodes of conduct" that are not part of any policy or custom. *Milam v. City of San Antonio*, Nos. 03-50862, 03-50937, 113 Fed. App'x 622, 626 (5th Cir. 2004) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405–06 (1997)). For instance, a decision to adopt a particular course of conduct represents official policy even if it is not intended to govern future conduct so long as the decision was made by a final policymaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).

In *Praprotnik*, a plurality of the Supreme Court also recognized "a scenario in which a municipality can be held liable for a single episode of conduct initiated by a non-policymaker employee." *Milam*, 113 Fed. App'x at 626; *Praprotnik*, 485 U.S. at 127. In *Praprotnik*, the Court explained:

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Praprotnik*, 485 U.S. at 127 (emphasis in original). The ratification theory delineated in *Praprotnik* does not appear to be premised on an assumption that ratification of a subordinate's actions reveals a municipality's *pre-existing* policy. Rather, *Praprotnik* appears to hold that post hoc ratification by a final policymaker is sufficient to subject a city to liability because decisions by final policymakers are policy. *See id.*; *Pembaur*, 475 U.S. at 481.

16

Prior to *Praprotnik*, the Fifth Circuit had decided *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161 (1985), a case that is now frequently cited as a rare example of a successful ratification claim. *See, e.g.*, *World Wide Street Preachers Fellowship*, 591 F.3d 747,755 (5th Cir. 2009); *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir. 2009); *McIntosh v. Smith*, 690 F. Supp. 2d. 515, 533–34 (S.D. Tex. 2010). The facts of *Grandstaff* are as follows: Lonnie Cox refused to stop when officers signaled to him to pull over. *Grandstaff*, 767 F.2d at 165. In response, three police cars engaged in a high-speed chase. *Id.* At some point during the chase, "gunfire erupted" and Cox was injured. *Id.* Cox eventually turned off the freeway and drove, through a fence, onto a ranch, where he stopped. His vehicle stopped approximately 200 feet from a house on the ranch. After Cox exited the vehicle, there was more gunfire, and a bullet struck the ranch house. *Id.* The facts do not indicate whether Cox ever fired; however, no bullets ever struck any police cars or police officers. *Id.* After hearing the noise, Grandstaff left the ranch house to investigate. *Id.* After reaching the patrol cars and hearing announcements indicating police were after an individual on the property, he returned to the house to warn his family of the situation unfolding. *Id.* Thereafter, he got into his pick-up and drove toward the officers. *Id.* When he reached the patrol cars the second time, police opened fire on him from two sides. *Id.*[10] Grandstaff died before an ambulance arrived. *Id.* By the time of the firing, there were five patrol cars and six police officers present. *Id.* After what the Fifth Circuit characterized as an "incompetent and catastrophic performance, there were no reprimands, no discharges, and no admissions of error." *Id.* at 171.

---

[10] Subsequently, some of the officers claimed that they had seen Grandstaff fumbling near his waistline, and believed that he was reaching for a gun. *Grandstaff*, 767 F.2d at 166 n.1.

The Fifth Circuit held that, on this record, the City of Borger could be held liable under §
1983.  *Id.*  It explained that if an "episode of such dangerous recklessness obtained so little
attention and action by the City policymaker, the jury was entitled to conclude that it was
accepted as *the way things are done and have been done* in the City of Borger."  *Id.* (emphasis
added).  This language, along with other language in the decision, suggests that liability in
*Grandstaff* was premised on a finding of pre-existing city policy.  *See id.* ("This reaction to so
gross an abuse of the use of deadly weapons says more about the existing disposition of the
City's policymaker than would a dozen incidents where individual officers employed excessive
force. . . . [T]he subsequent acceptance of dangerous recklessness by the policymaker tends to
prove his preexisting disposition and policy.")

Following the Supreme Court's decision in *Praprotnik*, the Fifth Circuit has indicated
that it would recognize a ratification theory of recovery.  *See, e.g.*, *Peterson*, 588 F.3d at 848;
*Santibanes v. City of Tomball, Tex.*, 654 F. Supp. 2d 593, 612–613 (S.D. Tex. 2009) (collecting
cases from Fifth Circuit that recognize ratification theory of municipal liability).  However, Fifth
Circuit case law is, at times, less than clear about whether ratification is a truly independent
theory of municipal liability, as *Praprotnik* suggests, or whether ratification is simply indicative
of a pre-existing policy or custom, as *Grandstaff* suggests.  Some cases do appear to treat
ratification as an independent theory of recovery.  *See, e.g.*, *Peterson*, 588 F.3d at 848
(considering ratification theory independent of analysis of policy theories); *Milam*, 113 Fed.
App'x. at 625–26 (recognizing that a municipality may be liable under § 1983 based on formal
policy, custom, single acts of policymakers and ratification by policymakers of subordinates'
conduct); *McIntosh*, 690 F. Supp. 2d at 532–535 (discussing ratification without mention of

policy).  Other post-*Praprotnik* cases might be read to suggest that ratification is a viable theory of recovery only to the extent that it is indicative of municipal policy or custom.  *See, e.g.*, *World Wide*, 591 F.3d at 755 (describing circumstances in which policymaker's ratification of subordinate's actions were "insufficient to establish an official policy or custom"); *Santibanes*, 654 F. Supp. 2d at 612 (characterizing the ratification theory recognized in *Praprotnik* as an example of when a single incident can constitute policy).  As explained above, this Court understands *Praprotnik* to have announced an independent theory of municipal liability premised on ratification.  To the extent Fifth Circuit and district courts in this Circuit occasionally analyze ratification claims by asking whether a policymaker's approval of a subordinate's act is sufficient to establish a municipal policy, this Court understands those courts to be asking whether that act itself *constitutes* policy, as they must do under *Praprotnik*, not whether it is *indicative of pre-existing* policy.[11]

There is some difficulty in treating ratification as an independent basis for municipal liability.  In particular, subjecting a municipality to liability based on post-deprivation ratification of a subordinate's actions is in tension with the requirement that a § 1983 defendant have "subject[ed] or cause[d a plaintiff] to be subjected" to a deprivation of a federal right.  42 U.S.C. § 1983; *see Monell*, 436 U.S. at 691–94 (holding that Congress did not intend for municipalities

---

[11] This is not to say that ratification cannot be evidence of a pre-existing policy.  Although *Grandstaff* has not "enjoyed wide application in this Circuit," *Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998), it has not been overruled.  *Davis v. Montgomery Cnty.*, No. H:07–505, 2009 WL 1226904, at *7 (S.D. Tex. April 30, 2009) (noting that ratification theory recognized in *Grandstaff* is still good law).  The Court means only that, post-*Praprotnik*, a plaintiff who brings a claim premised on ratification is not obliged to argue that ratification is indicative of a pre-existing policy. If a plaintiff seeks to impose liability on a municipality for certain alleged policies, that plaintiff may, of course, rely on *Grandstaff* to argue that ratification tends to show the existence of those policies.  That, however, would be a § 1983 claim premised on the existence of a municipal policy; the Court does not understand the claim before it to be such a claim, as the Court has already ruled on which policy claims may proceed in the April 2012 Order.  (Doc. No. 87.)  Plaintiffs may of course, use any evidence, including evidence of ratification, to support those policy claims that have been allowed to proceed.

to be held liable unless the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" that is the subject of the § 1983 suit); *see also* George M. Weaver, *Ratification as an Exception to the § 1983 Causation Requirement: Plaintiff's Opportunity or Illusion?*, 89 Neb. L. Rev. 358, 387 (2010).  The *Praprotnik* Court did not explain how, or whether, municipal liability premised on a policymaker's subsequent ratification of acts taken by subordinates was reconcilable with the requirement that a § 1983 defendant be held liable for only those constitutional violations it could be said to have "caused."

This Court believes that the best way to reconcile the ratification theory announced in *Praprotnik* with the causation requirement of § 1983 would be to cabin the theory to those cases where subsequent ratification can be said to have, in some sense, caused the deprivation. *Praprotnik* itself arose in the employment context.  *See Praprotnik*, 485 U.S. 114–16.  It is easy to see how, in an employment context, where a subordinate's decision may be subjected to an internal review by a policymaker before becoming final, ratification can be understood to have caused the deprivation; by approving the subordinate's actions, the policymaker, in effect, continues the deprivation.  In contrast, it is difficult to understand how the subsequent ratification of a subordinate's excessive use of force is a *cause* of that completed violation.  Indeed, the Fifth Circuit, in an unpublished opinion, has recognized that ratification is "most readily conceptualized in contexts like employment."  *Milam*, 113 Fed. App'x at 626.

However, the Fifth Circuit has never actually limited the ratification theory to the employment context, or to any other context where liability premised on ratification can be reconciled conceptually with the causation requirement of § 1983.  In fact, the Fifth Circuit and

20

this district court have, on numerous occasions, considered whether a policymaker's subsequent approval of an allegedly excessive use of force could subject the municipality to liability based on ratification, thus suggesting that a ratification claim is at least theoretically possible in such a context.  *See, e.g.*, *Peterson*, 588 F.3d at 848; *McIntosh*, 690 F. Supp. 2d at 532–535; *Santibanes*, 654 F. Supp. 2d at 612–14; *James v. Harris Cnty.*, 508 F. Supp. 2d 535, 554–55 (S.D. Tex. 2007).  As such, although the Court doubts the propriety of holding municipalities liable on a ratification theory where the constitutional violation is excessive use of force, it concludes that this Circuit apparently tolerates such claims.

Causation, however, is only the first of many hurdles a § 1983 claim premised on ratification must overcome.  As the Supreme Court explained in *Praprotnik*, a subordinate's decision is chargeable to the municipality if "authorized policymakers approve [the] decision *and the basis for it*."  *Praprotnik*, 485 U.S. at 127 (emphasis added); *see also Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 604 (5th Cir. 2001) (refusing to impose liability based on policymaker's approval of a subordinate's decision without a showing that the policymaker had actual knowledge of the improper basis of the subordinate's decision).  "[A] municipality is not liable under the ratification theory where a Police Chief accepts his officers' version of events, so long as 'that version did not show that the deputies' actions were manifestly indefensible.'" *Allen v. City of Galveston, Tex.*, No. G-06-467, 2008 WL 905905, at *8 (S.D. Tex. March 31, 2008) (citing *Coon v. Ledbetter*, 780 F.2d 1158, 1162 (5th Cir. 1986)).  Moreover, "the theory of ratification . . . has been limited to 'extreme factual scenarios.'"  *World Wide*, 591 F.3d at 755 (citations omitted).  "[U]nless the subordinate's actions are sufficiently extreme – for instance, an obvious violation of clearly established law – a policymaker's ratification or defense of his

21

subordinate's actions is insufficient to establish an official policy or custom." *Id.* (citations omitted).

This Court does not think there is a principled basis for limiting the ratification theory to so-called "extreme factual scenarios." The restriction appears to have come from *Coon v. Ledbetter*, a pre-*Praprotnik* case which noted the "highly peculiar set of facts" in *Grandstaff* and held that *Grandstaff*'s analysis was applicable only to "equally extreme factual situations." *Coon*, 780 F.2d at 1161; *see also World Wide*, 591 F.3d at 755 (citing *Coon* for the proposition that the ratification theory is limited to "extreme factual scenarios"). Perhaps there is some logic to limiting *Grandstaff* to "extreme factual scenarios;" it may be reasonable to allow the inference of a pre-existing policy from ratification only when the actions that have been ratified are particularly outrageous. *Grandstaff*, 767 F.2d at 171. As explained *supra* Part III.A, the theory of ratification recognized in *Praprotnik* does not depend on an inference of pre-existing policy, and this Court sees no reason to limit municipal *Praprotnik* liability to ratification of only the most extreme constitutional violations. Furthermore, determining whether the underlying violation is an extreme constitutional violation or only a garden-variety constitutional violation is an ill-defined task. Nonetheless, this Court is bound by the Fifth Circuit, which has consistently held that the ratification theory applies only to "extreme factual scenarios." *World Wide*, 591 F.3d at 755 (citations omitted); *Peterson*, 588 F.3d at 848 (citations omitted).

Limited guidance exists as to the definition of a sufficiently extreme factual scenario. Fifth Circuit cases consistently compare the facts before them to the facts of *Grandstaff*. *World Wide*, 591 F.3d at 755 (citations omitted); *Peterson*, 588 F.3d at 848 (citations omitted); *Coon*, 780 F.2d at 1161. Although this Court has discussed at length its conclusion that *Grandstaff* is

not a ratification case in the *Praprotnik* sense, it follows suit and compares the facts of the case before it to *Grandstaff*.  It does so because of the lack of any other successful ratification claims premised on excessive use of force.  On that standard, this Court believes the case before it may present a sufficiently extreme factual scenario.  Aaron was not a criminal suspect, but a civilian, who died after an extraordinary number of gunshots were fired.  In fact, the Court is aware of no prior criminal history indicating that Aaron had violent tendencies.[12]   Aaron was of smaller stature than Officer Estrada.  (*Compare* Autopsy Report at 3 *with* Estrada Dep. at 53:23–54:1.) Aaron was known to be unarmed, a fact that makes this case perhaps even more egregious than *Grandstaff*.  (Estrada Dep. at 179:21–180:11.)   One of the four bullets that struck Aaron was in the back of his neck, suggesting that Aaron may well have been retreating at the time that shot was fired.  (Autopsy Report at 4–6.)  Officer Estrada admits, and Sgt. Claborn is aware, that Officer Estrada did not know the location of Pam Hobart, Steve Hobart, or his fellow officers, when he fired.  (Claborn Dep. at 72:21–73:19.)  Following Aaron's death, the SPD initiated an investigation that did not comport with ordinary procedures for reviewing use of deadly force. (Claborn Dep. at 148:25–155:6; General Order 33, at 2–3.)  Furthermore, Sgt. Claborn never even spoke with Officer Estrada about the events of February 18, 2009.  (Claborn Dep. at 66:25– 67:5.)   The Court concedes that this case, unlike *Grandstaff*, did not involve numerous officers of the police department.  However, beyond that, it cannot say that the facts are otherwise less egregious, or that the municipality's actions are any less indicative of a "concern[] . . . only with unworthy, if not despicable, means to avoid legal liability."  *Grandstaff*, 767 F.2d at 166.

---

[12] The record does reveal that in August of 2007, Aaron was arrested for reckless driving when an officer saw him driving a vehicle at over 100 miles per hour and changing lanes without signaling.  (Moreland Medical Records, Initial Evaluation at 1; Doc. No. 32, Mot. for Summ. J. at 7.)  This arrest led ultimately to a seventeen day hospitalization and a diagnosis of schizoaffective disorder.  (Moreland Medical Records, Initial Evaluation at 1.)

Furthermore, a factfinder could conclude that, even on Officer Estrada's version of events, firing a weapon, while apparently losing consciousness, in response to being struck by a mentally ill individual who was known to be unarmed, without any awareness of where innocent bystanders were positioned, was "manifestly indefensible."  *James*, 508 F. Supp. at 554; *Allen*, 2008 WL 905905, at *8.  This is especially so because the facts reveal that Officer Estrada had no bruising on his face, only some redness he contends was a result of the punches.  (Estrada Dep. at 254:1–255:2; Doc. No. 72-14, Photos of Estrada's Injuries.)  Additionally, as mentioned, the location of the gunshot wounds suggests that Aaron may have been retreating at the time that Officer Estrada employed deadly force.  (Autopsy Report at 4–6.)  Furthermore, evidence exists that, during and shortly after the incident, Officer Estrada appeared to be having difficulty assessing the situation around him.  (*See, e.g.*, Claborn Dep. at 67:6–19, 69:4–15 (discussing how Officer Estrada did not know Aaron's location in relation to himself when he first fired beyond believing that Aaaron was close enough to be striking him); Estrada Dep. at 275:22–277:18 (describing how after the shooting, Officer Estrada believed Aaron was grabbing him and attempted to shoot his gun again, but it turned out that it was his fellow officer who had just entered the house).)  While the Court is keenly aware of its obligation to review the reasonableness of the use of deadly force from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham v. Connor*, 490 U.S. 386, 396 (1979), these facts, in totality, strongly suggest that Officer Estrada may not have assessed the situation and threat level the way a reasonable officer would have.

Furthermore, a factfinder could interpret Chief Krahn's and Sgt. Claborn's unusual investigation of the incident and Sgt. Claborn's decision not to even discuss the incident with

24

Officer Estrada, as indicative of ratification.  *Cf. Santibanes*, 654 F. Supp. 2d at 613–14 (noting that policymaker's decision not to view certain evidence that raises questions about plausibility of a subordinate's explanation supports a finding of ratification).  Indeed, some of the statements made in Chief Krahn's declaration would further support the conclusion that, although an investigation was held, Chief Krahn never actually assessed whether Officer Estrada acted reasonably, and instead assumed that if Officer Estrada felt endangered, then his use of force was necessarily justified.  (*See, e.g.*, Krahn Decl. ¶ 24 (noting that Chief Krahn found it "significant" that Officer Estrada "made no evaluation of whether shooting Hobart would be authorized by any city policy, police department regulation or training but, instead fired driven only by the self-preservation basic instinct to avoid dying at that instant"); *id.* ¶ 29 (explaining that Chief Krahn does "not believe it appropriate for me to now sit in the comfort of my office . . . and substitute my personal opinion in place of Officer Estrada['s] about the seriousness, or imminence of the danger he perceived when he made the decision fire").  The Court recognizes that "policymakers who simply go along with a subordinate's decision do not thereby vest final policymaking authority in the subordinate, nor does a mere failure to investigate the basis of as subordinate's discretionary decisions amount to such a delegation."  *Milam*, 113 Fed. App'x at 627 (citing *Praprotnik*, 485 U.S. at 130) (quotation marks omitted).  However, once a policymaker does initiate an investigation, surely this Court must be entitled to consider whether that investigation was merely a rubberstamping process.

The City and Chief Krahn spend a significant part of their Motion arguing, again, that Officer Estrada acted reasonably and that SPD's training policies meet constitutional standards. (Doc. No. 94, ¶¶ 10–15, 24–30.)  The Court finds these arguments unpersuasive.  First, the April

2011 Order and the April 2012 Order explain in detail that genuine issues of material fact exist as to both of these points.[13]   Second, the Court does not find existence of some evidence which supports Officer Estrada's decision to fire dispositive of the ratification claim.   (*See* Doc. No. 94, ¶ 10 (arguing that a summary judgment record that contains factual evidence supporting Officer Estrada's decision cannot support a claim of ratification).   The question before the Court is whether the Chief Krahn ratified Officer Estrada's actions and the basis for them.   *Praprotnik*, 485 U.S. at 127.   A factfinder may conclude that Chief Krahn ratified the alleged unconstitutional basis for the actions if the record supports a conclusion that, even on Officer Estrada's version of the facts, his actions were "manifestly indefensible."   *Allen*, 2008 WL 905905, at *8.   This Court finds genuine issues of material fact as to whether Chief Krahn actually assessed the reasonableness of Officer Estrada's actions, or whether he simply assumed that Officer Estrada's belief that he was facing a threat of death or serious bodily injury necessarily justified the use of deadly force.   The combination of physical evidence from the February 18, 2009 incident, and evidence of Officer Estrada's state of mind may lead a jury to conclude that, even on Officer Estrada's own facts, his actions were manifestly indefensible. Even if the record does contain some evidence supporting Officer Estrada's decision, a jury could nonetheless find that the totality of the circumstances here overwhelmingly reveal the indefensibility of his actions.   *Cf. Grandstaff*, 767 F.2d at 166 n.1 (finding ratification indicative of policy of dangerous recklessness even though some of the officers claimed that they had seen Grandstaff fumbling near his waistline, and believed that he was reaching for a gun).

---

[13] Furthermore, because the Court understands a § 1983 ratification claim to be independent of any pre-existing policies, the Court finds the arguments put forward about the SPD's policies irrelevant.

The Court admits that ratification is rarely a viable theory in this Circuit.  If only a few of the facts in this case were different, this Court would be obliged to conclude that no reasonable jury could find that the City was liable based on ratification.  However, the totality of the facts here, including the physical evidence from the February 18, 2009 incident, evidence of Officer Estrada's state of mind, and indications in the record that Chief Krahn did not consider it his role to evaluate the reasonableness of Officer Estrada's assessment of the threat level convince this Court that a reasonable jury could find the City liable on a ratification theory.  Accordingly, Defendants' Motion for Summary Judgment Addressing Ratification Theory of Recovery (Doc. No. 94) must be **DENIED** as to the City of Stafford.

### B.  § 1983 claim against Chief Krahn based on ratification

Plaintiffs also appear to bring a § 1983 claim against Chief Krahn based on ratification. (Doc. No. 88, Second Am. Compl., at 11 (indicating that the claims in Part B of the Complaint are brought against the City and Chief Krahn).)  A supervisory official may be held liable under § 1983 "only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury."  *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (citing *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008).  This Court is aware of, and Plaintiffs have cited, no cases that impose liability on a supervisor based on ratification.[14]  To the extent that ratification might, in some instances, be characterized as the implementation of an unconstitutional policy that "causally result[s] in the constitutional injury," *id.*, as explained extensively *supra* Part III.A, subsequent ratification of a subordinate's excessive use of force

---

[14] Indeed, neither party addresses the bases for supervisory liability, apparently assuming that ratification may serve as a basis for supervisory liability.  Instead, they dispute only whether Krahn is entitled to qualified immunity, an issue that is irrelevant in light of the Court's holding.

does not *cause* the constitutional injury.  Accordingly, this Court finds that, as a matter of law, no claim may be stated against Chief Krahn based on ratification of a subordinate's allegedly excessive use of force.

## IV. CONCLUSION

For the reasons discussed above, the Court finds that Defendants' Motion for Summary Judgment Addressing Ratification Theory of Recovery (Doc. No. 94) must be **GRANTED IN PART** and **DENIED IN PART**.  Specifically, Defendants' motion must be **DENIED** as to Plaintiffs' claims against the City and **GRANTED** as to the Plaintiffs' claims against Chief Krahn.

Furthermore, because qualified immunity has now been determined as to each claim against Officer Estrada and Chief Krahn, the Court reinstates those portions of its April 2011 denying Officer Estrada's motion for summary judgment based on qualified immunity and those portions of its April 2012 order denying Chief Krahn's motion for summary judgment based on qualified immunity.

**IT IS SO ORDERED.**

**SIGNED** this the 9th day of January, 2013.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE