UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEVE HOBART, et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-CV-3332 |
| | § | |
| CITY OF STAFFORD, et al., | § | |
| | § | |
| *Defendants*. | § | |

MEMORANDUM AND ORDER

Pending before the Court is Defendant City of Stafford's ("the City" or "Stafford")

Motion for Reconsideration of its Motion for Summary Judgment. (Doc. No. 109.) After

considering the motion, all responses thereto, and the applicable law, including the intervening

Fifth Circuit decision, the Court finds that the motion must be **GRANTED IN PART** and

**DENIED IN PART**.

I.     BACKGROUND

This lawsuit arises from the death of Aaron Hobart ("Aaron"), son of Plaintiffs Steve and

Pam Hobart (collectively, "the Hobarts" or "Plaintiffs"). Many of the facts of this case have been

laid out in the Court's April 29, 2011 Memorandum and Order (the "April 2011 Order"), the

Court's April 17, 2012 Memorandum and Order (the "April 2012 Order"), and the Court's

January 9, 2013 Memorandum and Order (the "January 2013 Order"). (Doc. Nos. 79, 87, 97.)

The circumstances leading up to Aaron Hobart's death are recounted below, as are the steps the

City took after the incident. Additional facts, including facts about the City's policies, can also

be found in the Court's prior orders.

### A. Aaron Hobart's Death

Nineteen-year-old Aaron Hobart suffered from a schizoaffective disorder, which resulted in delusions.[1] (Doc. No. 72-24, Moreland Decl.) Aaron's mental health was deteriorating in the days, weeks, and months leading up to his death on February 18, 2009. In 2008, Aaron was examined by three doctors, and had two visits with the third, Dr. C. Scott Moreland, a psychiatrist. (Doc. Nos. 32-9, 32-10, 32-11, Aaron Hobart's Medical Records.) Dr. Moreland's records indicate that Aaron had stopped taking his medication in November 2008. (Doc. No. 32-9 at 178-79.) On February 16, 2009, Mrs. Hobart called Dr. Moreland's office to request an immediate appointment. (*Id.*) The office scheduled an appointment for Aaron on February 18, the next available slot. (*Id.*) Mrs. Hobart said that, at that time, Aaron was not posing a danger to himself or to others. (*Id.*) Mrs. Hobart was instructed to call Dr. Moreland's office if there was any change in Aaron's mental status, and was told that, if Aaron became a danger to himself or others, she should call 911 or take Aaron to the emergency room. (*Id.*)

On February 18, 2009, Aaron refused to leave his room to go to his appointment with Dr. Moreland. When Mr. Hobart came home from work, he found Aaron in his room, speaking "belligerently and abusively" in a raspy alternate voice. (Doc. No. 72-5, Steve Hobart Dep. at 20:8–24:23.) Mrs. Hobart called Dr. Moreland, who told her not to press Aaron to attend the appointment that day, so that Aaron could calm down. (Doc. No. 32-9 at 183.) Dr. Moreland also sent a follow-up email to Mrs. Hobart giving her instructions on how to administer Aaron's medication, and providing information from the Houston Crisis Intervention Team ("CIT") website regarding how to request emergency help. (*Id.* at 184–85.) The information stated that

---

[1] Aaron had also previously been diagnosed with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and depression. (Doc. No. 72-38, Moreland Medical Records, Initial Evaluation at 1.)

the CIT program "educates patrol officers about mental illness and tactics and techniques to help verbally de-escalate situations involving individuals in serious mental health crises," that one should call for a CIT officer "[w]hen the situation involves a person in a serious mental health crisis," and that, if the situation is an emergency, one should call 911 and request a CIT officer. (*Id.*) It also noted that "[i]f the person is mentally ill and poses a substantial risk of imminent harm to self or others, Texas Peace officers have the authority to take the individual to a facility for an emergency mental health evaluation, even if the person is involuntary. The officer may use whatever force he needs to get the individual to the facility for evaluation." (*Id.*)

Based on the instructions in Dr. Moreland's email, Mrs. Hobart called 911 and requested a "CIT officer." (Doc. No. 72-9, Dispatch Tr. at 1.) She told the 911 operator, "I have a son that needs to be taken," that Aaron was "becoming . . . very violent," that he was "deteriorate" [sic] and "becoming delusional," but that "he's not hurting anyone," "needs to be in a hospital," and "needs medication." (*Id.*) The operator informed Mrs. Hobart that an officer would come to the Hobarts' home. (*Id.*) A few minutes later, an employee from the Stafford Police Department ("SPD") called Mrs. Hobart twice with further questions, and Mrs. Hobart informed him that Aaron was "becoming more and more belligerent," but that he did not have any weapons in his room and that he was not "under the influence." (*Id.* at 2–3.)

Officers Garcia and Claunch from the SPD were the primary officers dispatched on the call, but Officer Estrada was the first to arrive at the Hobarts' home. (Doc. No. 72-3, Jesus Estrada Dep. at 176:23–177:13.) Officer Estrada testified that, prior to arriving at the home, he was aware that Aaron was hallucinating, but did not know if Aaron was mentally ill or was simply under the influence of drugs. (*Id.* at 138:6–139:24.) Officer Estrada also testified that he believed dispatch had informed him that Aaron did not have a weapon. (*Id.* at 179:21–180:11.)

SPD Sergeant Dustin Claborn ("Sgt. Claborn") testified that Officer Estrada asked dispatch to request Mrs. Hobart to step outside to talk to him when he arrived. (Doc. No. 72-2, Claborn Dep. at 126:16–20.) However, it is undisputed that, when Officer Estrada arrived, Mrs. Hobart let him into the house. (*Id.* at 128:12–17.) Sgt. Claborn also testified that Officer Estrada did not attempt to learn where Aaron was located or whether he was trying to hurt himself or others. (*Id.* at 127:19–130:4.)

The video camera in Officer Estrada's car was running during the events at issue in this case, and both sides have provided that footage as an exhibit. The video shows Officer Estrada entering the Hobarts' home by himself at approximately 15:07:59 on the video's clock. For a period of time, only the front yard is visible, with audio from inside the home captured on Officer Estrada's microphone. Immediately after he enters the home, one can hear Officer Estrada conversing with Mrs. Hobart. At approximately 15:08:15, one can hear noises, and Officer Estrada shouts, "Stop!" and "Get back!" several times. At approximately 15:08:20, one can hear gunshots. Officer Estrada then begins shouting, "Goddamnit!" "Shots fired!" and "Oh my god!" and Mrs. Hobart begins screaming loudly. The video then shows two other SPD officers entering the house at approximately 15:08:43. They accompany Officer Estrada onto the lawn, where Estrada kneels down with his head on the ground sobbing, and remains panicked during the next seven minutes of video and audio, repeatedly saying, "Oh my god," crying, and stating that he cannot catch his breath.

Officer Estrada and Mrs. Hobart offer different versions of what happened during the approximately 44 seconds that Officer Estrada was in the house by himself. According to Officer Estrada, the following occurred: When he first entered, he thought that everything seemed quiet and normal, and "perceived . . . that either the disturbance was over or there was no disturbance."

4

(Estrada Dep. at 208:4–211:11.) Mrs. Hobart let him in, and the two spoke inside the house. (*Id.*) Officer Estrada then began walking down the hall, at which point Mrs. Hobart pointed down the hall, and Officer Estrada saw Aaron, approximately thirty feet away. (*Id.* at 224:17–230:24.) Aaron was in a bedroom, and at first he was facing away from Officer Estrada, not yelling, screaming, or causing a disturbance. (*Id.* at 228:3–14.) Aaron then turned and saw Officer Estrada for the first time, at which point he loudly "roared," brought his arms up "from down low to—up to his waist," and began to charge at Officer Estrada. (*Id.* at 228:15–233:24.)

At that point, Officer Estrada, who was approximately five feet away from the front door of the house, "attempted to step back away from [Aaron] to give him room" because he believed Aaron was "going to come at" him. (*Id.* at 233:23–234:2.) However, Officer Estrada was unable to get out of Aaron's way or to back out of the house because Aaron traveled the entire length of the hallway and began "attacking" Officer Estrada. (*Id.*) Officer Estrada remembers in those moments "hearing and feeling [] thumps on [his] head" that he attributes to "being punched" on the left side of his face and head. (*Id.* at 251:23–260:24.) Officer Estrada states that he attempted to pull out his baton, but was unable to do so because it got stuck in its holster. (*Id.*) He was also unable to use his pepper spray or operate his police radio. (*Id.* at 237:16–241:13.) Officer Estrada testified that Aaron hit him to the point where Officer Estrada became "disoriented," began "seeing stars," and experienced "darkness" coming into his vision. (*Id.* at 252:4–5, 263:15–19.) He thought he was "fixing to be knocked out." (*Id.* at 264:9–24.) He then heard the sound of gunshots, but did not know that he was the one shooting, let alone who he was shooting at. (*Id.* at 262:21–263:5.) He did not know where Aaron was in relation to him when the shooting occurred, and is not sure where Mrs. Hobart was at the time (though he thinks she was to his left). (*Id.* at 265:3–268:13.) A few seconds later, Officer Estrada believed that Aaron was getting

back up, and he felt someone who he believed to be Aaron grabbing his vest. (*Id.* at 275:22–277:15.) Officer Estrada attempted to shoot his gun again, but could not get his fingers to squeeze the trigger. (*Id.*) The person grabbing his vest turned out to be one of his fellow SPD officers who had just entered the house. (*Id.* at 277:12–18.)

According to Mrs. Hobart's testimony, the following occurred in the house: When Officer Estrada arrived she "was under the impression that . . . [she] was getting a CIT person that was going to explain that and was going to go through a certain procedure, so [she] was trusting that they knew what was going to happen next." (Doc. No. 72-6, Pam Hobart Dep. at 168:12–19.) Aaron ran from out of his bedroom and toward Officer Estrada while "flailing with his arms." (*Id.* at 33:15–35:20.) When he reached Officer Estrada, "Officer Estrada had his arms up," and Aaron's arms hit Officer Estrada's arms. (*Id.*) Mrs. Hobart did not see Aaron's arms hit Officer Estrada's head. (*Id.* at 35:18–20.) Although she acknowledged that she did not "see every single strike that Aaron made on Officer Estrada," Mrs. Hobart "watched them the entire time," and only closed her eyes after Officer Estrada pulled his gun from its holster. (*Id.* at 37:20–40:25.) The flailing stopped and "2 or 3 seconds" passed before Officer Estrada began shooting. (*Id.* at 40:1–7.) In the few seconds prior to the shooting there was "a separation of 2 or 3 feet" between Aaron and Officer Estrada, and Mrs. Hobart had shifted her weight to go between the two, at which point Officer Estrada pulled out his gun. (*Id.* at 40:10–20.)

Officer Estrada fired six or seven bullets in the Hobarts' home, four of which struck Aaron: one in the back of the right upper neck, one in the right lower back, one in the back of the right hip, and one in the right middle back. (Doc. No. 72-22, Autopsy Report at 4–6.) Officer Estrada did not have any bruises on his face from the incident, although he did have some redness on his face that he contends was a result of the punches. (Estrada Dep. at 254:1–255:2;

6

Doc. No. 72-14, Photos of Estrada's Injuries.) At the time of his death on February 18, 2009,

Aaron was nineteen years old, stood five-foot-nine-inches tall, and weighed 166 pounds.

(Autopsy Report at 3.) He was barefoot and dressed in shorts and a t-shirt. (*Id.*) There is no

suggestion that he had any type of weapon at the time. He had, at most, a high school education.[2]

Officer Estrada stood six-foot-one-inch tall and weighed 190 pounds. (Estrada Dep. at 53:23–

54:1.)

### B.  The City's Response

Stafford's Chief of Police, Chief Bonny Krahn, testified that, in response to these events,

he initiated an internal investigation into the shooting to determine whether any of the City's

policies had been violated.[3] (Doc. 95-1, Krahn Dep. at 103:5–15.) Chief Krahn placed Assistant

Chief Phil Horton in charge of effectuating the investigation. (*Id.* at 103:9–15.) Assistant Chief

Horton assigned Sgt. Claborn to conduct the internal investigation. (*Id.* at 103:19–21.) Chief

Krahn never personally discussed the shooting with Officer Estrada, apparently on the advice of

the City's attorneys. (*Id.* at 102:20–103:4.)

Sgt. Claborn testified that his investigation consisted of reviewing the audio and video

available from Officer Estrada's vehicle on the day of the shooting, as well as an interview

Detective Richard Ramirez conducted of Officer Estrada as part of a criminal investigation into

---

[2] The record does not indicate whether Aaron completed high school. Aaron had difficulty focusing in school even before he began exhibiting signs of schizoaffective disorder. (Moreland Medical Records, Initial Evaluation at 1.) Before his schizoaffective disorder diagnosis, as an incentive to focus on his studies, the Hobarts allowed him to participate in a trip to Italy that he expressed interest in. (*Id.*) After he returned from this trip, however, he became "obsessed and delusional." (*Id.*) The record does not indicate whether he continued his high school education after this trip.

[3] The "polic[ies] for the operation of the department" are contained in the "General Orders" (Krahn Dep. at 31:14– 17), which define themselves as "standing written guidelines that provide purpose, policy, and procedures for carrying out Stafford Police Department operations and activities." (Doc. No. 72-8, SPD General Orders at 359.)

the incident.[4] (Doc. No. 95-2, Claborn Dep. at 64:15–17, 66:11–24.) He stated that SPD policy "requires that the use of force review include only the information and perception of the officer [leading] up to the use of force" (*id.* at 66:13–15), and explained that reviewing these records answered all of his questions about Officer Estrada's perception leading up to the use of deadly force. (*Id.* at 66:25–67:5.) As a result, at no point during the investigation did Sgt. Claborn discuss the events of February 18, 2009 with Officer Estrada, with the other officers present, or with the Hobarts. (*Id.* at 66:25–67:5; Administrative Review #I-09-02 at 1.)

After reviewing what he described as all of the relevant evidence, Sgt. Claborn concluded that Officer Estrada was "in fear for his life" and his use of deadly force was objectively reasonable in light of the "totality of this situation." (*Id.* at 67:16–19, 72:1–74:1.) Specifically, he indicated that it "could be a reasonably objective use of force" to begin shooting if an officer is about to lose consciousness. (*Id.* at 72:1–17.) At his deposition, he confirmed that he believed Officer Estrada's decision to shoot while losing consciousness was objectively reasonable, even in light of the fact that Officer Estrada did not know the location of innocent bystanders, including Pam and Steve Hobart and other officers; it was objectively reasonable even in light of the fact that Aaron Hobart was "barefoot, in shorts and a T-shirt," and weaponless; it was objectively reasonable even though Officer Estrada apparently could not specifically recall how Aaron struck his face, or how many times Aaron struck his face; it was objectively reasonable even though Aaron Hobart's autopsy revealed that he had gunshot wounds in his side and back, suggesting that Aaron may not have been facing Officer Estrada at the time of the shooting; it was objectively reasonable even in light of the fact that Officer Estrada did not know Aaron's

---

[4] Sgt. Claborn's Summary of the Incident indicates that, in addition to the aforementioned materials, he also reviewed the in-car video and audio of Officers Claunch and Garcia, the statements of Officer Estrada and Steve and Pam Hobart, and a timeline established by Ft. Bend County's District Attorney's Office. (Doc. No. 72-7, Administrative Review #I-09-02 at 1.)

location in relation to himself when he first fired; and it was objectively reasonable even though Sgt. Claborn could not say whether Officer Estrada, in the time it took him to retrieve his gun, could have retrieved his pepper spray or his baton. (*Id.* at 67:6–19, 69:4–15, 72:21–73:19, 75:8–16, 75:13–76:17, 78:11–79:6, 88:13–90:20.)

Sgt. Claborn was able to conclude that Officer Estrada's use of deadly force was appropriate because he believed he "was about to be seriously injured or killed," a belief that was reasonable because Aaron Hobart was "in proximity to [Officer Estrada]"; because Officer Estrada "remember[ed] [Aaron's] hand coming at him again" after beginning to lose consciousness; because Officer Estrada was "fairly certain of who was assaulting him"; because Officer Estrada could not be perfectly certain of what was occurring as he was "ducking down, trying to cover up"; because people turn and change positions in a fight, and Aaron did not necessarily have to be facing Officer Estrada to be striking him; and, because the circumstances were such that, if Officer Estrada lost consciousness, "the suspect" could gain "access to everything on [Officer Estrada's] belt." (*Id.* at 67:6–10, 69:4–15, 70:19–71:7, 73:12–74:1, 74:20–24, 75:21–22; 92:20–93:6.) Sgt. Claborn also testified that he would find Officer Estrada's use of force reasonable even if Aaron and Officer Estrada had "actually separated," as Ms. Hobart testified they had. (*Id.* at 146:1–14.)

After Sgt. Claborn completed his review of the events of February 18, 2009, he concluded that Officer Estrada's actions were entirely consistent with the SPD's current training and a reasonable use of force. (*Id.* at 65:9–13, 96:7–20.) The purpose of Sgt. Claborn's investigation was to begin the process of determining whether Officer Estrada should be

disciplined or further trained.[5]  (*Id.* at 147:22–148:8.) As a result of Sgt. Claborn's investigation, Chief Krahn concluded that Officer Estrada's use of force was reasonable and no disciplinary action should be taken. (*Id.* at 148:14–22.) Chief Krahn explained that he "has not been persuaded that Officer Estrada's decision to fire when he did was unreasonable." (Doc. No. 94-3, Krahn Decl. ¶ 19.) However, he also stated that "significant" to his conclusion was the fact that Officer Estrada "made no evaluation of whether shooting Hobart would be authorized by any city policy, police department regulation or training but, instead fired driven only by the self-preservation basic instinct to avoid dying at that instant." (*Id.* ¶ 24.) He further defended his assessment that Officer Estrada did not employ an excessive amount of force by explaining that he does

> not believe it appropriate for me to now sit in the comfort of my office at no personal risk to my life, and with no limitation on my time, and substitute my personal opinion in place of the conclusion of Officer Estrada about the seriousness, or imminence of the danger he perceived when he made the decision to fire.

(*Id.* ¶ 29.)

The record contains some evidence suggesting that the investigation of Officer Estrada's conduct did not proceed in accordance with the SPD's normal investigative procedures. For instance, an investigation of use of force is normally initiated by filling out a "response to resistance" form, which is reviewed by the chain of command. (Claborn Dep. at 150:15–151:2.) Sgt. Claborn admits that he was not in Officer Estrada's direct chain of command, and he does not know why he was asked to investigate this incident.[6]  (*Id.* at 151:12–152:7.) Additionally,

---

[5] Sgt. Claborn himself did not make the final determination of whether Officer Estrada should be disciplined. (*Id.* at 147:22–148:22.)

[6] Sgt. Claborn at first indicated that Officer Estrada's supervisor was not asked to investigate this incident because he was "out on the scene;" however, he subsequently acknowledged that, in the

SPD's General Order 33.2.4 provides that the "Chief of Police will notify complainants of the findings of [an] investigation." (Doc. No. 72-8, General Order 33, at 3.) Although Sgt. Claborn did not know that the Hobarts were complainants at the outset of his investigation, he learned that they were complaining of Officer Estrada's conduct when they issued a press release. (Claborn Dep. at 149:15–150:8.) General Order 33 provides that complaints can be either formal, signed, and written complaints or informal, oral complaints.[7] (General Order 33 at 2–3; Claborn Dep. at 152:16–155:6.) Although the Hobarts' press statement constituted an oral complaint, it appears that they were not notified of the outcome of this investigation. (Claborn Dep. at 148:25–150:10, 152:16–155:6.)

Following the completion of the investigation, Officer Estrada was returned to his position as a patrol officer.[8] (*Id.* at 95:15–23, 147:4–21.) In fact, Chief Krahn even selected Officer Estrada to be one of the SPD police officers to attend a Texas Commission on Law Enforcement Officer Standards and Education ("TCLEOSE") "train the trainer" course, the completion of which would enable Officer Estrada to provide CIT training to others. (*Id.* at 30:11–17, 32:5–17.) Sgt. Claborn testified that he believed Chief Krahn made this decision based on his belief that Officer Estrada's "need to use force in a situation involving a person with mental illness . . . gives him an experience that can be relayed and hopefully be effective training for officers in the future." (*Id.* at 32:18–33:7.)

---

past, other response to resistance forms had been reviewed by supervisors who had been on the scene. (Claborn Dep. at 151:18–152:2.)

[7] Sgt. Claborn at first indicated that the policy requiring notification applied only to complaints that had been written down. (Claborn Dep. at 153:7–154:4.) However, when presented with the General Order, Sgt. Claborn appeared to concede that the Hobarts had made an oral complaint. (*Id.* at 155:1–6.)

[8] During the investigation, Officer Estrada was on administrative leave for a period of time, and also worked in several office positions. (*Id.* at 147:4–21.)

## II.     PROCEDURAL HISTORY

Plaintiffs filed their original Complaint on October 15, 2009. (Doc. No. 1.) Shortly thereafter, the City, Chief Krahn and Officer Estrada (collectively "Defendants") filed a Motion to Dismiss. (Doc. No. 7.) Before the Court issued a ruling on the Motion to Dismiss, Defendants filed a Motion for Summary Judgment. (Doc. No. 32.) On September 29, 2010, the Court issued a Memorandum and Order (Doc. No. 45) granting in part and denying in part the Motion to Dismiss, and granting Plaintiffs leave to file an amended complaint to cure the deficiencies identified in that order.[9] On October 19, 2010, Plaintiffs filed an Amended Complaint. (Doc. No. 54.) On November 2, 2010, Defendants filed a second Motion to Dismiss. (Doc. No. 61.) The Court subsequently delayed Plaintiffs' response deadline with respect to the portions of the Motion for Summary Judgment addressing Plaintiffs' § 1983 claims against the City. (February 9, 2011, Minute Entry.)

On April 29, 2011, the Court ruled on the pending Motion to Dismiss and portions of the Motion for Summary Judgment. (Doc. No. 79.) The Court denied Defendants' Motion to Dismiss with respect to the majority of Plaintiffs' claims, but held that Plaintiffs failed to allege sufficient facts to state a claim against the City based on ratification. (*Id.* at 29–30 n.15, 50.) The Court granted summary judgment with respect to Plaintiffs' state law claims, deferred adjudication of the § 1983 claims against the City and Chief Krahn until the claims against the City were fully briefed, and denied summary judgment on the remainder of the claims. (*Id.* at 50.) The Court subsequently granted Defendants' unopposed motion to withdraw that portion of its April 2011 Order denying Officer Estrada's motion for summary judgment based on qualified immunity, with the understanding that that portion of the order would be re-entered once the

---

[9] Specifically, the Court found Plaintiffs' allegations insufficient with respect to the claims against Chief Krahn and Stafford, along with the state law claims against all Defendants.

Court rendered a decision on Chief Krahn's motion for summary judgment based on, *inter alia*, qualified immunity. (Doc. No. 81.)

On April 17, 2012, the Court issued a Memorandum and Order addressing those portions of the Motion for Summary Judgment that related to Plaintiffs' claims against the City and Chief Krahn brought under § 1983. (Doc. No. 87.) The Court denied summary judgment as to Plaintiffs' claims against the City based on a policy of encouraging or condoning excessive use of force and of failing to train on the appropriate use of force; denied summary judgment as to Plaintiffs' claim against Chief Krahn for failure to train on the appropriate use of force; and granted summary judgment as to Plaintiffs' other § 1983 claims against the City and Chief Krahn. (*Id.* at 36.) In its April 2012 Order, the Court also considered Plaintiffs' request to reconsider that portion of its prior Memorandum dismissing Plaintiffs' ratification claim. (*Id.* at 15 n.2.) Recognizing that the evidence submitted by Plaintiffs suggested that they did, indeed, appear to have a § 1983 claim based on ratification, the Court granted Plaintiffs leave to amend their complaint to add a cause of action premised on ratification. (*Id.*)

On May 2, 2012, Plaintiffs filed their Second Amended Complaint, which includes a § 1983 claim premised on ratification of Officer Estrada's alleged excessive use of force. (Doc. No. 88.) Plaintiffs pled this cause of action against both the City and Chief Krahn. (*See id.* at 11 (indicating that the claims in Part B of the Complaint are brought against the City and Chief Krahn).) The Court then granted Defendants' unopposed motion to withdraw that portion of its April 2012 Order denying Chief Krahn's motion for summary judgment based on qualified immunity, with the understanding that that portion of the order would be re-entered once the Court rendered a decision on Chief Krahn's second motion for summary judgment with regards

to the ratification theory of recovery, which would be based on, *inter alia*, qualified immunity. (Doc. No. 90.)

On August 15, 2012, the City and Chief Krahn moved for summary judgment on Plaintiffs' § 1983 claims premised on a ratification theory of recovery. (Doc. No. 94.) On January 9, 2013, the Court ruled on Defendants' motion for summary judgment on Plaintiffs' ratification theory. (Doc. No. 97.) The Court granted the motion as to Plaintiffs' claims against Chief Krahn and denied the motion as to Plaintiffs' claims against the City. (*Id.* at 28.) The Court also reinstated those portions of its April 2011 order denying Officer Estrada's motion for summary judgment based on qualified immunity and those portions of its April 2012 order denying Chief Krahn's motion for summary judgment based on qualified immunity. (*Id.*)

On January 11, 2013, Chief Krahn and Officer Estrada filed a notice of interlocutory appeal of this Court's decision to deny summary judgment based on qualified immunity. On October 10, 2014, the Fifth Circuit issued its decision. (Doc. No. 106 or *Hobart v. Estrada*, 582 F. App'x 348 (5th Cir. 2014).) It affirmed the denial of summary judgment as to Officer Estrada and reversed the denial of summary judgment as to Chief Krahn. *Hobart*, 582 F. App'x at 349. In light of the Fifth Circuit's ruling, the City moves for reconsideration of this Court's prior denial of summary judgment on Plaintiffs' § 1983 claims premised on a failure to train its officers on the proper use of force and the City's policy on the use of deadly force. (Doc. No. 109.) The City also asks the Court to reconsider its decision on Plaintiffs' ratification theory. (*Id.* at 11 n.3.) The Court now turns to this motion.

### III.     LEGAL STANDARDS

### A.  Summary Judgment

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. Fed. R. Civ. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted).

"Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party." *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007). The Court may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "The court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151. Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to

the material facts'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986)).

## IV.   DISCUSSION

### A.  Chief Krahn's Qualified Immunity on Plaintiffs' Failure to Train Claim

In order for Plaintiffs to successfully establish § 1983 supervisory liability against Chief

Krahn for his role in the City's failure to train its officers, they were required to show: (1) that

Chief Krahn failed to supervise or train Officer Estrada; (2) a causal connection existed between

the failure to supervise or train and the violation of Aaron's constitutional rights; and (3) the

failure to supervise or train amounted to deliberate indifference to Aaron's rights. *Hobart*, 582 F.

App'x at 356 (citing *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005)). Reviewing

this Court's decision on this claim, the Fifth Circuit agreed that "a factual question exists

regarding the sufficiency of the training SPD officers received with respect to the appropriate use

of force." *Id.* at 357. Nevertheless, the Fifth Circuit noted that denying Chief Krahn qualified

immunity also requires proof that the failure to train on the appropriate use of force amounted to

deliberate indifference. *Id.* This is where Plaintiffs' case faltered.

Deliberate indifference may be found in two circumstances: (1) a general failure to

provide adequate training in light of the foreseeable serious consequences that could result or (2)

a municipality's failure to act in response to the specified need to train a particular officer. *Id.*

(citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *Brown v. Bryan Cnty.*, 219 F.3d 450,

457 (5th Cir. 2000)). To demonstrate deliberate indifference, a plaintiff must usually show a

pattern of similar violations. *Id.* (citing *Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir.

2010)). Absent this pattern, a plaintiff can still establish deliberate indifference under the single

incident exception. *Id.* This exception is "narrow," however, and requires proof that "the *highly*

16

*predictable consequence* of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Id.* (emphasis in original).

Since Plaintiffs did not introduce evidence of a pattern of prior violations, their only means of proving deliberate indifference was through the single incident exception. The Fifth Circuit noted that "typically, application of the single incident exception requires evidence of the proclivities of the particular officer involved in the excessive use of force." *Id.* at 358. Indeed, the sole case in which the Fifth Circuit has held that a single incident was the basis for municipal liability, *Brown v. Bryan County, OK*, 219 F.3d 450 (5th Cir. 2000), had "an abundance of evidence about the proclivities of the particular officer involved in the use of excessive force." *Id.*

By contrast, Plaintiffs did not offer evidence of Officer Estrada's proclivities to suggest that Chief Krahn was aware that a shooting such as the one that killed Aaron was the highly predictable consequence of the training being provided. *Id.* at 359. Nor did they identify a prior incident involving Officer Estrada which would have indicated that Chief Krahn was aware of the effects of the allegedly deficient training. *Id.*

Instead, Plaintiffs argued that, because police officers will naturally find themselves in situations requiring an assessment of the appropriate use of deadly force, Chief Krahn must have been aware of the risks of not providing better training. The Fifth Circuit rejected this argument, concluding that it was

> "far too expansive an application of what is supposed to be an extremely narrow rule. It converts general knowledge of the dangers inherent if the poor training is given on the use of force to specific deliberate indifference on the part of this police chief to the risks his office's training created."

*Id.* at 358. Although Plaintiffs may have demonstrated deficient training on the use of force, they failed to show that the training deficiencies were "so obvious that the shooting here would have appeared to Chief Krahn as a 'highly predictable consequence.'" *Id.* (citing *Valle*, 613 F.3d at 549.) Since deliberate indifference stems from a knowing disregard of the effects of a decision, Plaintiffs' evidence was insufficient to support a finding of deliberate indifference. Accordingly, the Fifth Circuit held that Chief Krahn was entitled to qualified immunity on Plaintiffs' claim that he failed to train SPD officers on the appropriate use of force. *Id.* at 359.

### B.  The City's Liability for Failure to Train its Officers

The City argues that the Fifth Circuit's decision that Chief Krahn was not deliberately indifferent also precludes its liability for any failure to train its officers. Because the Fifth Circuit held that Chief Krahn was not deliberately indifferent to the risk of constitutional violations from the failure to train SPD officers, the City believes that Plaintiffs are unable to prove a critical element of their claim against the City, as well. Therefore, the City urges the Court to reconsider its prior denial of summary judgment on this claim.

To establish municipal liability under § 1983, a plaintiff must establish the existence of three elements: (1) a policymaker; (2) an official policy or custom; and (3) a constitutional violation whose moving force is that policy or custom. *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). A plaintiff may prove the existence of an official policy in one of two ways: (1) by identifying a policy statement formally announced by an official policymaker or (2) by demonstrating a persistent, widespread practice of city officials or employees which is so common and well-settled as to constitute a custom that fairly represents municipal policy. *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003). The latter type of policy, which is the type Plaintiffs allege, can be demonstrated by showing either a pattern of unconstitutional

conduct on the part of municipal employees who are not policymakers, or by showing that a final policymaker took a single unconstitutional action. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 168-9 (5th Cir. 2010).

Notably, the failure to train municipal employees may also constitute a policy when it reflects a deliberate or conscious choice by a municipality. *City of Canton*, 489 U.S. at 389. Failure to properly train is an actionable policy if, in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. *Id.* at 390. A policymaker's knowledge that a constitutional violation will most likely result from an official policy or custom is integral to municipal liability. *Cf. Gonzalez v. Ysleta Indep. School Dist.*, 996 F.2d 745, 757 (5th Cir. 1993) (recognizing that the Supreme Court "made plain that municipal liability must be predicated upon a showing of 'fault,' not merely 'responsibility'"); *see also Burge*, 336 F.3d at 370 ("Knowledge on the part of a policymaker that a constitutional violation will most likely result from a given official custom or policy is a *sine qua non* of municipal liability under section 1983."). This rigorous fault standard is necessary to ensure that § 1983 municipal liability does not collapse into a general *respondeat superior* regime, under which a municipality is responsible for the constitutional torts of its employees or agents. *Cf. Monell v. Dept. of Soc. Servs. of City of NY*, 436 U.S. 658, 694 (1978) (rejecting the imposition of *respondeat superior* liability on municipalities under § 1983).

The City argues that it is entitled to summary judgment on Plaintiffs' failure to train claim because the Fifth Circuit's ruling forecloses Plaintiffs' sole avenue of demonstrating

deliberate indifference. Therefore, Plaintiffs are unable to establish municipal liability for this claim. This Court agrees.

As this Court recognized in its prior decision, Plaintiffs' only means of establishing deliberate indifference with respect to the City was through the single incident exception. (Doc. No. 87 at 22.) Like with Chief Krahn, Plaintiffs did not base their failure to train claim against the City on evidence of a pattern of past violations or a prior incident, or on evidence that Officer Estrada received deficient training given his proclivities. Rather, Plaintiffs argued that the use of force training provided all SPD officers may have been constitutionally deficient. This Court accepted this argument, noting,

> "it is indisputable that Chief Krahn knew that SPD officers would find themselves in situations where they were required to determine what level of force to use. The City equipped its officers with firearms, allowing them to use deadly force. And, a fact question remains as to whether the City trained its officers when to use different levels of force, and under what circumstances the use of deadly force would be appropriate."

(Doc. No. 87 at 23.) Accordingly, the Court held that "a jury could find that the need to train SPD officers in the constitutional limitations on the use of force, and the use of deadly force in particular, was 'so obvious' that the failure to do so could be properly characterized as 'deliberate indifference.'" (*Id.*)

In light of the Fifth Circuit's recent ruling on Chief Krahn's qualified immunity, however, the Court must reconsider this decision. The Court's decision was predicated on the reasoning that the knowledge that officers will need to make decisions about the use of force, including deadly force, may be sufficient to demonstrate deliberate indifference. The Fifth Circuit's decision clarifies that this is not the case. The fact that an officer may act unconstitutionally as the result of his deficient training alone does not amount to deliberate indifference. To hold otherwise would impermissibly expand the scope of the single incident

exception by conflating "general knowledge" of the hazards of poor training with specific disregard by the City to the risks its training created. *Cf. Hobart*, 582 F. App'x at 358.

Plaintiffs urge this Court to avoid granting summary judgment by taking a different tack and examining Officer Estrada's proclivities. They contend that the City failed to act even though it should have been on notice that Officer Estrada needed further training due to his prior conduct. This Court already considered Officer Estrada's proclivities, and the City's obligation to respond to them, in its prior summary judgment opinion on Plaintiffs' failure to train on CIT procedures claim. (Doc. No. 87 at 27-31.) The Court acknowledged that the facts demonstrate that "Officer Estrada had a pattern of failing to perform satisfactorily in the areas of control of conflict, use of judgment, officer safety, and communications." (*Id.* at 29, citing Doc. No. 72-20.) Nevertheless, the Court concluded that Officer Estrada's prior acts "do not rise to the level of the prior bad acts in *Brown*," the only Fifth Circuit case in which the single incident exception has resulted in § 1983 municipal liability. The Court further noted that "[t]o allow Plaintiffs to proceed under the single incident exception on [Officer Estrada's proclivities] would ignore the Fifth Circuit's admonition to construe *Brown* narrowly." (*Id.* at 31, citing *Burge*, 336 F.3d at 373.) The Court's prior conclusion on Plaintiffs' failure to train on CIT procedures claim applies with equal force to their general failure to train claim.

The Fifth Circuit has held that Plaintiffs' argument – that general knowledge of the risk of deficient training amounts to deliberate indifference – is untenable. Accordingly, Plaintiffs are unable to establish that the City was deliberately indifferent to its failure to train. Therefore, the City is entitled to summary judgment on this claim.

**C.  The City's Liability for its Use of Force Policy**

The City contends that the Fifth Circuit's ruling on Chief Krahn's qualified immunity also precludes its liability on Plaintiffs' claim challenging the constitutionality of its use of force policy. Specifically, the City believes that the Fifth Circuit's finding that Chief Krahn did not act with deliberate indifference forecloses municipal liability under § 1983.

The City's argument is unavailing, however, because Plaintiffs' claim on the City's use of force policy does not mirror their failure to train claim. The former claim deviates from the latter in one critical respect: there is a fact question as to whether the City's policy on use of deadly force is facially unconstitutional. As this Court stated in its prior summary judgment opinion,

> "[t]he testimony of Officer Estrada and Sgt. Claborn, when read together, raises a factual question about the training SPD officers received with respect to the use of deadly force. If, as the testimony suggests, SPD officers were trained to use deadly force anytime they began to lose consciousness, regardless of the surrounding circumstances, such training would be inconsistent with constitutional mandates regarding excessive use of force. . . . Here, the testimony suggests that SPD training encouraged officers to use deadly force in situations in which a reasonable officer would *not* believe he or she was at any risk of harm, much less serious harm. As an extreme example, the encouragement to shoot as you begin to lose consciousness would allow an officer having a seizure while interacting with a member of the public to begin discharging his or her weapon, even if there existed no reasonable belief that anyone posed a threat of serious harm."

(Doc. No. 87 at 18 (emphasis in original).) Officer Estrada and Sgt. Claborn's testimony demonstrates that a reasonable jury could find that the City had an unconstitutional policy with respect to the use of force, one that encouraged its officers to use deadly force in situations where a reasonable officer would not believe him or herself or the public to be at risk of harm. In light of this testimony, the Court found a "genuine issue of material fact as to whether the encouragement of the excessive use of force was 'a persistent widespread practice' that was 'so

common and well settled as to constitute a custom that fairly represents municipal policy.'" (*Id.* quoting *Zarnow*, 614 F.3d at 168-9.)

The possibility that the City's use of force policy is facially unconstitutional distinguishes Plaintiffs' claim on this policy from their failure to train claims against the City and Chief Krahn. Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation was most likely to occur. *Burge*, 336 F.3d at 370; *see also Boyd v. City of Houston, Tex.*, 548 F. App'x 100, 103 (5th Cir. 2013) ("So, for example, when considering formal decisions of municipal legislative bodies, proof that the municipality's decision was unconstitutional" suffices to establish municipal liability. Likewise, when a policymaker specifically direct[s] the action resulting in the deprivation of a plaintiff's rights, [n]o questions of fault or causation arise.") (internal quotation marks omitted) (per curiam); *Piotrowski v. City of Houston, Tex.*, 567, 579-80 (5th Cir. 2001) ("While an unconstitutional official policy renders a municipality culpable under § 1983, even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result. . . . It follows that each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff, and it must be determined whether each one is facially constitutional or unconstitutional."). Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving issues of fault and causation is straightforward. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). The conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine

that the municipal action was the moving force behind the injury of which the plaintiff complains. *Id.*

This causation standard is markedly different from the one applicable to claims against facially innocuous policies. Most importantly, a facially unconstitutional policy obviates the need to demonstrate deliberate indifference. *Cf. Burge*, 366 F.3d at 370 (noting that, by contrast, where an alleged policy is "facially innocuous," establishing a policymaker's knowledge requires showing that the policy was promulgated with deliberate indifference to the risk of constitutional violations). If a plaintiff is able to demonstrate that a municipality promulgated a policy that was unconstitutional on its face, he or she does not also need to prove that the policy was promulgated with knowing disregard for its consequences – knowledge is presumed.

Under this framework, Plaintiffs in this case may not need to prove deliberate indifference to establish municipal liability. If a jury finds that the City's use of force policy was unconstitutional because it encouraged officers to use deadly force, even if the officer did not reasonably believe that the suspect posed a threat of serious harm, then the City's knowledge "necessarily follows." In light of this possibility, the Fifth Circuit's ruling that Chief Krahn was not deliberately indifferent to the risks of deficient training is inapposite to the City's liability. Resolving the question of the constitutionality of the City's policy remains squarely within the province of the jury, but the existence of this question precludes summary judgment on this claim.

The City urges this Court to consider two decisions that were issued while this case was on interlocutory appeal, *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014) and *Thompson v. Mercer*, 762 F.3d 433 (5th Cir. 2014), arguing that both decisions reiterate the constitutionality of a policy that encourages "firing until the threat has ended." In *Plumhoff*, the Supreme Court explained

that, "if officers are justified in firing at a suspect in order to end a severe threat to public safety, they need not stop shooting until the threat has ended." *Plumhoff*, 134 S. Ct. at 2022. The Fifth Circuit applied this reasoning in *Thompson*. *Thompson*, 762 F.3d at 439-440. However, neither *Plumhoff* nor *Thompson* addresses the question at issue here. The aspect of the City's policy that the Court examined was its encouragement of the use of deadly force *anytime* an officer began to lose consciousness, irrespective of the circumstances or the presence or absence of a threat of serious harm. It is the policy's criteria for the *impetus* for deadly force, not the policy of continuing to shoot until the threat is neutralized, that is constitutionally suspect. Both *Plumhoff* and *Thompson* note that continued use of deadly force is permissible only if police officers are justified in firing at a suspect in the first instance. It is this justification, or lack thereof, that Plaintiffs challenge here. The City cites no cases that suggest that it is constitutional for a police officer to begin using deadly force whenever he or she is losing consciousness, regardless of the situation.

As the Fifth Circuit's ruling on Chief Krahn's qualified immunity does not foreclose a finding of municipal liability on the City's use of force policy, this Court's prior decision to deny summary judgment to the City remains unchanged.

### D. Ratification

Finally, the City asks this Court to reconsider its prior ruling on Plaintiffs' ratification-after-the-fact theory. It contends that this theory, "particularly under these facts, simply cannot fit with the well-settled standard of municipal liability already identified in the summary judgment record." (Doc. No. 109 at 11 n.3.)

In a detailed opinion, the Court previously denied summary judgment to the City on Plaintiffs' ratification theory of recovery. (Doc. No. 97 at 27.) This theory allows a municipality

to be held liable for post hoc ratification by a final policymaker, if the policymaker approved a subordinate's decision and the basis for it. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality op.). By contrast, a municipality is not liable under the ratification theory where a police chief accepts his officers' version of events, so long as that version did not show that that the officers' actions were manifestly indefensible. *Allen v. City of Galveston, Tex.*, No. G-06-467, 2008 WL 905905, at *8 (S.D. Tex. March 31, 2008) (citing *Coon v. Ledbetter*, 780 F.2d 1158, 1162 (5th Cir. 1986)). Recovery under a ratification theory has been limited to "extreme factual situations." *Word Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009). In its prior decision, this Court expressed reservations with this limitation – reservations it maintains. (Doc. No. 97 at 22-23.) Nevertheless, it found that the case at hand may present a sufficiently extreme factual scenario. (*Id.* at 23.) Accordingly, it held that a reasonable jury could conclude that Chief Krahn ratified the allegedly unconstitutional basis for Officer Estrada's actions if the record supports the conclusion that, even on Officer Estrada's version of the facts, his actions were manifestly indefensible. (*Id.* at 26.)

The Fifth Circuit's recent ruling on Chief Krahn's qualified immunity has no bearing on this Court's denial of summary judgment on Plaintiffs' ratification theory. As noted above, the Fifth Circuit's decision was predicated on whether Plaintiffs demonstrated that Chief Krahn was deliberately indifferent to the risks created by deficiencies in SPD officers' training. This determination is wholly separate from the question of whether Chief Krahn ratified Officer Estrada's actions, and the basis for them, after Aaron's death. The former determination focuses on Chief Krahn's knowledge, or lack thereof, prior to the shooting, whereas the latter question examines the police chief's actions after the fact. Therefore, the Court finds no reason in the Fifth Circuit's decision to amend its prior ruling on ratification.

## V.      CONCLUSION

For the reasons discussed above, the Court finds that the City's Motion for Reconsideration (Doc. No. 109) must be **GRANTED IN PART** and **DENIED IN PART**. Specifically, the City's Motion must be **GRANTED** as to Plaintiffs' claim against the City on its failure to train its officers and **DENIED** as to Plaintiffs' claims on the City's use of force policy and ratification-after-the-fact.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 13th day of April, 2015.


_____

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE